UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| JLG INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. _____ |
| vs. | ) |
| | ) |
| POWERSCREEN USC INC., | ) |
| POWERSCREEN INTERNATIONAL PLC, | ) |
| and TEREX CORPORATION, | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendants. | ) |

## COMPLAINT

The plaintiff, JLG INDUSTRIES, INC. ("JLG"), by counsel, for its Complaint against the defendants herein, states as follows:

### THE PARTIES

1.     Plaintiff JLG is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania and maintains a principal place of business in McConnellsburg, Pennsylvania.

2.     Upon information and belief, defendant POWERSCREEN USC INC. (" POWERSCREEN") was and is a domestic corporation duly organized and existing under and by virtue of the laws of the State of Delaware and maintains a principal place of business in Louisville, Kentucky.

3.     Upon     information     and     belief,     defendant     POWERSCREEN INTERNATIONAL PLC (" POWERSCREEN INTERNATIONAL") is a public limited company registered under the laws of England and Wales and maintains a principal place of business in Dungannon, Northern Ireland.

4.      Upon    information    and    belief,    defendant    TEREX    CORPORATION ("TEREX"), is a domestic corporation duly organized and existing under and by virtue of the laws of the State of Delaware and maintains a principle place of business in Westport, Connecticut.

5.      Upon    information    and    belief,    POWERSCREEN    and    POWERSCREEN INTERNATIONAL were acquired by TEREX in 1999.

JURISDICTION AND VENUE

6.      This action is brought under an Asset Purchase Agreement ("APA") between POWERSCREEN and JLG, which was joined in by POWERSCREEN INTERNATIONAL. This Court has been designated by the parties as the proper venue to resolve disputes arising under the APA as described by section 9.18 of the APA.  A true and accurate copy of the APA is attached to this Complaint as <u>Exhibit A</u>.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391.

FACTUAL BACKGROUND

9.      On May 22, 1996, JLG and POWERSCREEN entered into the APA.

10.     By virtue of the APA, POWERSCREEN purchased substantially all of JLG's assets used solely or primarily in the operation of its Material Handling Division.

11.     Section 8.05 of the APA states in pertinent part that POWERSCREEN:

shall indemnify and hold [JLG] harmless from and against, and shall pay to [JLG] the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to [JLG], either directly or

indirectly, from...(c) any Assumed Liability; and (d) any product liability claim resulting from incidents or injuries occurring following the Closing.

12.    Section 1.01(f) of the APA defines "Assumed Liabilities" as "only those liabilities expressly set forth on Schedule 1.01(f)."

13.    The sixth Assumed Liability set forth on Schedule 1.01(f) states in pertinent part:

> Liability for all claims, demands, expenses and actions in law or in equity at any time made or brought by anyone or any entity for damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution or service of i) all unloaders and boom truck cranes and parts therefore which were manufactured and/or sold by [JLG]...

14.    On or about September 8, 2006, Alejandra Pacheco, Gilberto Pacheco, Jr., a minor, Maira Pacheco, a minor, and Javier Pacheco, a minor, by and through their Guardian ad Litem, Alejandra Pacheco ("the Pachecos") commenced a civil action in the Superior Court of Fresno County, California ("Underlying Litigation") as a result of an accident which occurred on May 11, 2006 ("Accident").  A true and accurate copy of the Summons and Complaint in the Underlying Litigation is attached to this Complaint as Exhibit B.

15.    In the Underlying Litigation, the Pachecos allege that the Accident occurred when a JLG Model 800BT Crane mounted upon a 1989 Ford Truck rolled over and fell upon the Pachecos' decedent, Gilberto Modesto Pacheco.  The Pachecos claim that Gilberto Modesto Pacheco died as a result of the Accident.

16.    In the Underlying Litigation, the Pachecos claim that JLG manufactured the JLG Model 800BT Crane.  The Pachecos brought negligence and strict liability causes of action against JLG.

## COUNT I

### CONTRACTUAL INDEMNIFICATION FOR THE PACHECOS' STRICT PRODUCT LIABILITY CLAIM AGAINST JLG IN THE UNDERLYING LITIGATION

17.    JLG repeats and realleges paragraphs 1 through 16 as though fully set forth in this paragraph.

18.    Pursuant to section 8.05(d) of the APA, defendants agreed to indemnify and hold JLG harmless from and against, and to pay JLG the full amount of, any loss, claim, damage, liability or expense resulting to JLG, either directly or indirectly, from any product liability claim resulting from incidents or injuries occurring following the Closing.

19.    Pursuant to section 1.01(i) of the APA, the Closing was on May 22, 1996.

20.    The Accident in the Underlying Litigation occurred on May 11, 2006.

21.    The Pachecos' strict liability cause of action against JLG in the Underlying Litigation is a " product liability claim" covered by section 8.05(d) of the APA.

22.    On or about October 11, 2006, JLG requested that POWERSCREEN, POWERSCREEN INTERNATIONAL and/or TEREX indemnify and hold JLG harmless in the Underlying Litigation in accordance with section 8.05 of the APA.

23.    Defendants have refused to indemnify and hold JLG harmless in the Underlying Litigation.

## COUNT II

### CONTRACTUAL INDEMNIFICATION FOR THE PACHECOS' NEGLIGENCE CLAIM AGAINST JLG IN THE UNDERLYING LITIGATION

24.    JLG repeats and realleges paragraphs 1 through 23 as though fully set forth herein.

25.    Pursuant to section 8.05(c) of the APA, defendants agreed to indemnify and hold JLG harmless from and against, and to pay JLG the full amount of, any loss, claim, damage, liability or expense resulting to JLG, either directly or indirectly, from any Assumed Liability.

26.    The sixth Assumed Liability set forth on Schedule 1.01(f) of the APA is liability for all claims at any time made or brought by anyone for any damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution or service of i) all unloaders and boom truck cranes and parts therefore which were manufactured and/or sold by JLG.

27.    The boom truck crane involved in the Accident in the Underlying Litigation is a JLG Model 800BT Crane.

28.    Pursuant to section 1.01(i) of the APA, the Closing Date was May 22, 1996.

29.    The Accident in the Underlying Litigation occurred on May 11, 2006.

30.    On or about October 11, 2006, JLG requested that POWERSCREEN, POWERSCREEN INTERNATIONAL and/or TEREX indemnify and hold JLG harmless in the Underlying Litigation in accordance with section 8.05 of the APA.

31.     Defendants have refused to indemnify and hold JLG harmless in the Underlying Litigation.

## COUNT III

### ATTORNEYS' FEES

32.     JLG repeats and realleges paragraphs 1 though 31 as though fully set forth herein.

33.     Section 8.05 of the APA states that defendants shall indemnify and hold JLG harmless from and against, and shall pay to JLG reasonable attorneys' fees resulting to JLG, either directly or indirectly, from " (c) any Assumed Liability; and (d) any product liability claim resulting from incidents or injuries occurring following the Closing."

34.     In the event that contractual indemnification is ultimately found against the defendants, then JLG is also entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in defending the Underlying Litigation.

WHEREFORE, plaintiff JLG, demands judgment: (a) granting JLG contractual indemnification against defendants for the Pachecos' product liability claim in the Underlying Litigation; (b) granting JLG contractual indemnification against the defendants for the Pachecos' negligence claim in the Underlying Litigation; and (c) granting JLG attorneys' fees and other litigation expenses, together with the costs and disbursements of this action.

DATED:    November 2, 2006

R. Montgomery Donaldson (DE ID No. 4367)
Montgomery, McCracken,
    Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, Delaware 19801
(302) 504-7840

and

Anthony J. Colucci, III, Esq.
COLUCCI & GALLAHER, P.C.
2000 Liberty Building
Buffalo, New York 14202
(716) 853-4080

*Attorneys for Plaintiff*

# EXHIBIT "A"
# (Part 1)

ASSET PURCHASE AGREEMENT

dated as of May 22, 1996

between

POWERSCREEN USC INC.

and

JLG INDUSTRIES, INC.

joined in by

FULTON INTERNATIONAL, INC.

and by

POWERSCREEN INTERNATIONAL PLC

# TABLE OF CONTENTS

Page

Section 1 - Definitions . . . . . . . . . . . . . . . . . . . 2

    1.01 Definitions . . . . . . . . . . . . . . . . . . . 2
    1.02 Additional Terms . . . . . . . . . . . . . . . . . 9

Section 2 - Purchase and Sale . . . . . . . . . . . . . . . . 9

    2.01 Purchase of the Assets . . . . . . . . . . . . . 9
    2.02 Assumption of Selected Liabilities . . . . . . . 9
    2.03 Purchase Price . . . . . . . . . . . . . . . . . 10
    2.04 Escrow . . . . . . . . . . . . . . . . . . . . . 10
    2.05 Closing Financial Statements;
         Purchase Price Adjustment. . . . . . . . . . . . 10
    2.06 Purchase Price Allocation . . . . . . . . . . . . 12
    2.07 Employees . . . . . . . . . . . . . . . . . . . . 13

Section 3 - Representations and Warranties of Seller . . . . . 14

    3.01 Organization . . . . . . . . . . . . . . . . . . 14
    3.02 Business . . . . . . . . . . . . . . . . . . . . 15
    3.03 Authority . . . . . . . . . . . . . . . . . . . . 15
    3.04 Financial Statements . . . . . . . . . . . . . . 17
    3.05 Title to Assets . . . . . . . . . . . . . . . . . 17
    3.06 Condition of Assets . . . . . . . . . . . . . . . 18
    3.07 Real Property . . . . . . . . . . . . . . . . . . 18
    3.08 Inventory . . . . . . . . . . . . . . . . . . . . 18
    3.09 Contracts . . . . . . . . . . . . . . . . . . . . 19
    3.10 Accounts Receivable. . . . . . . . . . . . . . . 21
    3.11 Permits . . . . . . . . . . . . . . . . . . . . . 21
    3.12 Intellectual Property . . . . . . . . . . . . . . 22
    3.13 Litigation and Pending Proceedings;
         Compliance with Law . . . . . . . . . . . . . . . 22
    3.14 Tax Matters . . . . . . . . . . . . . . . . . . . 23
    3.15 Insurance . . . . . . . . . . . . . . . . . . . . 24
    3.16 Warranty Obligations . . . . . . . . . . . . . . 24
    3.17 Proprietary Information . . . . . . . . . . . . . 25
    3.18 Working Relationships . . . . . . . . . . . . . . 25
    3.19 Customers . . . . . . . . . . . . . . . . . . . . 25
    3.20 Employees . . . . . . . . . . . . . . . . . . . . 25
    3.21 Labor Relations . . . . . . . . . . . . . . . . . 26
    3.22 Employee Benefit Plans . . . . . . . . . . . . . 27
    3.23 Immigration Matters . . . . . . . . . . . . . . . 28
    3.24 Potential Competing Interests . . . . . . . . . . 28
    3.25 Environmental Matters . . . . . . . . . . . . . . 28
    3.26 Absence of Material Change . . . . . . . . . . . 34
    3.27 Bulk Sales . . . . . . . . . . . . . . . . . . . 36
    3.28 Completeness of Statements . . . . . . . . . . . 37
    3.29 Fulton's Organization . . . . . . . . . . . . . . 38
    3.30 Fulton's Authority . . . . . . . . . . . . . . . 38

3.31 Fulton's Litigation . . . . . . . . . . . . . . 39
3.32 Fulton's Title . . . . . . . . . . . . . . . . 39

Section 4 - Representations and Warranties of
          Purchaser and Powerscreen International . . . 40

4.01 Organization . . . . . . . . . . . . . . . . . 40
4.02 Authority . . . . . . . . . . . . . . . . . . 40
4.03 Litigation . . . . . . . . . . . . . . . . . . 41

Section 5 - Covenants of Seller and Fulton . . . . . . . . 42

5.01 Nonassignable Contracts; Consents . . . . . . 42
5.02 Publicity . . . . . . . . . . . . . . . . . . 43
5.03 Noncompetition . . . . . . . . . . . . . . . . 43
5.04 Records . . . . . . . . . . . . . . . . . . . 45
5.05 Accounts Receivable . . . . . . . . . . . . . 45
5.06 Supply of Cylinders . . . . . . . . . . . . . 45
5.07 JLG Cylinder Warranty. . . . . . . . . . . . . 47
5.08 Transition Services . . . . . . . . . . . . . 48
5.09 Conveyance by Fulton . . . . . . . . . . . . . 48
5.10 JLG Trademark License . . . . . . . . . . . . 48

Section 6 - Covenants of Purchaser and Powerscreen
          Holdings . . . . . . . . . . . . . . . . . 48

6.01 Publicity . . . . . . . . . . . . . . . . . . 48
6.02 Records . . . . . . . . . . . . . . . . . . . 49
6.03 Spare Parts . . . . . . . . . . . . . . . . . 49
6.04 Use of Patent . . . . . . . . . . . . . . . . 50
6.05 Product Identification . . . . . . . . . . . . 51
6.06 Accounts Receivable . . . . . . . . . . . . . 51
6.07 Guaranty by Powerscreen International . . . . . 51

Section 7 - The Closing . . . . . . . . . . . . . . . . . 51

7.01 Effective Time and Place. . . . . . . . . . . 51
7.02 Deliveries . . . . . . . . . . . . . . . . . . 51

Section 8 - Survival of Representations and
          Warranties--Indemnification . . . . . . . . 52

8.01 Survival . . . . . . . . . . . . . . . . . . . 52
8.02 Indemnity by Seller . . . . . . . . . . . . . 52
8.03 Seller's Indemnification Limitations . . . . . 53
8.04 Environmental Indemnity by Seller. . . . . . . 53
8.05 Indemnity by Purchaser . . . . . . . . . . . . 56
8.06 Purchaser's Indemnification Limitations . . . 56
8.07 Remedies; Right of Offset . . . . . . . . . . 57
8.08 Penalties and Interest . . . . . . . . . . . . 57

Section 9 - Miscellaneous . . . . . . . . . . . . . . . . 58

9.01 Notices . . . . . . . . . . . . . . . . . . . 58
9.02 Waivers . . . . . . . . . . . . . . . . . . . 59

9.03 Expenses . . . . . . . . . . . . . . . . . . . 59
9.04 Headings; Interpretation . . . . . . . . . . . 59
9.05 Annexes and Schedules . . . . . . . . . . . . 59
9.06 Entire Agreement . . . . . . . . . . . . . . 59
9.07 Representations and Warranties . . . . . . . . 60
9.08 Currency . . . . . . . . . . . . . . . . . . 60
9.09 Brokers . . . . . . . . . . . . . . . . . . . 60
9.10 Counterparts . . . . . . . . . . . . . . . . 61
9.11 Severability . . . . . . . . . . . . . . . . 61
9.12 Benefit and Binding Effect . . . . . . . . . . 61
9.13 Risk of Loss . . . . . . . . . . . . . . . . 61
9.14 Further Assurances . . . . . . . . . . . . . . 62
9.15 Sales and Transfer Taxes and Fees . . . . . . 62
9.16 Prorations and Adjustments . . . . . . . . . . 63
9.17 Arbitration . . . . . . . . . . . . . . . . . 63
9.18 Governing Law . . . . . . . . . . . . . . . . 64

F:\USERS\05\POWERSCR\JLG-APAE.CLN
May 22, 1996 (9:45am)

# ASSETS PURCHASE AGREEMENT

This is an Assets Purchase Agreement dated as of May 22, 1996 (the "Agreement"), between **POWERSCREEN USC INC.** ("Purchaser"), a Delaware corporation, and **JLG INDUSTRIES, INC.** ("Seller"), a Pennsylvania corporation. **FULTON INTERNATIONAL, INC.** ("Fulton"), a Delaware corporation, and **POWERSCREEN INTERNATIONAL PLC** ("Powerscreen International"), a public limited company registered under the laws of England and Wales, join in this Agreement for the limited purposes described herein.

## RECITALS

**A.** The Material Handling Division of Seller (the "Division"), designs, manufactures, distributes, sells and services (i) a broad line of hydraulic materials-handling equipment which is mounted onto commercial truck chassis or trailers; and (ii) certain other equipment, all as more particularly described on Schedule A (the "Business"). The Division conducts its Business primarily through operations in York, Pennsylvania, and its principal product lines are classified as boom truck cranes and unloaders.

**B.** Seller wishes to sell, and Purchaser wishes to purchase, upon the terms and conditions set forth in this Agreement, substantially all of Seller's assets which are used solely or primarily in the operation of the Business.

**C.** Purchaser is a wholly owned subsidiary of Powerscreen Holdings USA Inc., a Delaware corporation, which in turn is a wholly owned subsidiary of Powerscreen International.

D.    Fulton is a wholly owned subsidiary of Seller and the owner of certain patents and other intellectual property to be conveyed hereunder.

E.    This Agreement is the definitive acquisition agreement contemplated by and superseding any prior verbal or written understanding or communication of the parties relating to the subject matter hereof.

NOW, THEREFORE, in consideration of the mutual benefits and covenants contained herein, and subject to the terms and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

## Section 1

### Definitions

1.01 **Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

(a)  "Accounts Receivable" shall mean all of the Division's notes and accounts receivable as reflected on the Closing Financial Statements, excluding intercompany receivables to the extent that such intercompany receivables are not trade receivables and excluding "other prepaids" as reflected on the Closing Financial Statements.

(b)  "Assets" shall mean all of Seller's assets, other than the Excluded Assets, used solely or primarily in the operation of the Business, including, without limitation, the Accounts Receivable, Assumed Contracts, Equipment, Vehicles, Inventory, transferable Permits, Real Property, Goodwill, Conveyed Intellectual Property as defined in Section 3.12 and further described in

- 2 -

Schedule 3.12, cash of $750,000, and all of the books and records of the Division.

(c)  "Assignment of Contracts" shall mean the Assignment of Assumed Contracts, substantially in the form attached hereto as Annex 1.01(c), pursuant to which Seller shall assign the Assumed Contracts to Purchaser.

(d)  "Assignment of Lease" shall mean the Assignment of Lease, substantially in the form attached hereto as Annex 1.01(d), pursuant to which Seller shall assign to Purchaser each lease of Assets utilized in the Business but not owned by Seller or any Affiliate of Seller.

(e)  "Assumed Contracts" shall mean those Contracts being assumed by Purchaser at Closing, which Assumed Contracts are listed on Schedule 1.01(e).

(f)  "Assumed Liabilities" shall mean only those liabilities expressly set forth on Schedule 1.01(f).

(g)  "Bills of Sale" shall mean the instruments of transfer, substantially in the form attached hereto as Annex 1.01(g)(1-3), pursuant to which Seller shall transfer to Purchaser the Accounts Receivable, Equipment, Vehicles, Inventory, transferable Permits, Goodwill, Conveyed Intellectual Property and the books and records of the Division.

(h)  "Closing" shall mean the consummation of the trans-actions contemplated in this Agreement in accordance with the provisions of Section 7.

(i)  "Closing Date" shall mean May 22, 1996, or such other date mutually acceptable to the parties.

- 3 -

(j) "Closing Financial Statements" shall mean the Division's unaudited pro forma balance sheet including notes and any schedules referred to therein as of the Closing Date (the "Closing Balance Sheet") and the Division's unaudited pro forma income statement including notes and any schedules referred to therein for the period beginning August 1, 1995, and ending as of the Closing Date (the "Closing Income Statement") prepared by Seller utilizing the practices and policies described in Schedule 1.01(j), which, except as specifically set forth in said Schedule, shall be consistent with the Current Financial Statements, and which statements shall be reviewed by Purchaser and be subject to adjustment pursuant to the terms and conditions of Section 2.05. For purposes of this provision, "pro forma" shall mean the adjustments made from the books and records of the Division as reflected in the notes to the Closing Financial Statements.

(k) "Contracts" shall mean all contracts, leases and commitments, other than the Excluded Assets, related solely or primarily to the conduct of the Business, whether written or oral, to which Seller is a party or otherwise obligated, all of which (excluding any invoices for Division products and any purchase orders by the Division in the ordinary course of business) are listed on Schedule 1.01(k).

(l) "Current Financial Statements" shall mean the Division's unaudited pro forma balance sheet including notes and any schedules referred to therein as of April 30, 1996, (the "Current Balance Sheet"), and the Division's related unaudited pro forma income statement including notes and any schedules referred

to therein for the nine month period ending April 30, 1996, (the "Current Income Statement"), copies of which are attached hereto as Annex 1.01(l).  For purposes of this provision, "pro forma" shall mean the adjustments made from the books and records of the Division as reflected in the notes to the Current Financial Statements.

(m)  "Deed" shall mean the Special Warranty Deed substantially in the form attached hereto as Annex 1.01(m), pursuant to which Seller shall convey to Purchaser the Real Property.

(n)  "Entity" shall mean any person, firm, trust, partnership, corporation or other business entity.

(o)  "Equipment" shall mean all of Seller's furniture, fixtures, machinery, equipment and other tangible personal property, other than the Excluded Assets, used solely or primarily to conduct the Business, wherever situated, as described on Schedule 1.01(o), together with all manufacturers' warranties pertaining to the same, to the extent that such warranties may exist and be assignable.

(p)  "Excluded Assets" shall mean the cash in excess of $750,000, intercompany accounts and other assets of the Division and of Seller set forth on Schedule 1.01(p).

(q)  "Financial Statements" shall mean the unaudited pro forma balance sheets including notes and the unaudited pro forma income statements including notes of the Division as of and for the three most recent fiscal years ended July 31, 1995, 1994, 1993, respectively, copies of which are attached hereto as Schedule 1.01(q).  For purposes of this provision, "pro forma" shall mean

the adjustments made from the books and records of the Division as reflected in the notes to the Financial Statements.

(r) "Goodwill" shall mean the Division's goodwill and names, other than the Excluded Assets, and the going concern value of the Business.

(s) "Intellectual Property" shall mean trade names, trademarks or service marks, together with the Goodwill associated therewith; copyrights; pending or issued registrations for any of the foregoing; patents and patent applications; unpatented inventions; trade secrets and other confidential or proprietary information; packaging designs; computer programs; processes; formulas and methods; and all other intangible property rights of any kind.

(t) "Inventory" shall mean the raw materials, manufacturing supplies, packaging materials, purchased products, finished and partly finished goods and all other goods, merchandise and materials of the Division, wherever situated, as more particularly described by category on Schedule 1.01(t).

(u) "Liabilities" shall mean all of Seller's accounts payable, notes payable, commitments, indebtedness, obligations or liabilities of any kind whatsoever, whether absolute, accrued, contingent, matured or unmatured, direct or indirect, related to the Business, or to which any of the Division's properties or assets are subject, all of which, to Seller's knowledge, are listed on Schedule 1.01(u) hereto.

(v) "Net Asset Value" shall mean the difference between (i) the value of the Assets, which value shall initially be

established by the Current Balance Sheet subject to the adjustments referred to in Schedule 1.01(y) and which value shall ultimately be established by the Closing Balance Sheet in accordance with Section 2.05 hereof, together with adjustments made on the same basis as the adjustments referred to in Schedule 1.01(y) excluding the premium of $554,000 but including cash of $750,000; and (ii) the value of the Assumed Liabilities, which value shall initially be established by the Current Balance Sheet subject to the adjustments set forth on Schedule 1.01(y), and which value shall ultimately be established by the Closing Balance Sheet in accordance with Section 2.05 hereof, together with adjustments made on the same basis as the adjustments referred to in Schedule 1.01(y) excluding the premium of $554,000 but including cash of $750,000. For the avoidance of doubt, in calculating Net Asset Value, with respect to the Assets no value shall be ascribed to Assumed Contracts, transferable Permits, Conveyed Intellectual Property or Goodwill. With respect to the Assumed Liabilities, value shall be ascribed only to accounts payable and warranty expense or accrual.

(w) "Other Agreements" shall mean the Assignment of Contracts, Assignment of Lease, Bills of Sale, and Deed, and all other agreements, certificates, opinions, instruments or documents contemplated by, required by or referred to in, this Agreement for the consummation of the transactions contemplated hereby.

(x) "Permits" shall mean all permits, licenses, franchises, approvals, certificates or authorizations of any foreign, federal, state or local governmental or regulatory body required

- 7 -

(cc) "Vehicles" shall mean the automobiles, trucks and other vehicles for which registrations are required listed on Schedule 1.01(cc).

1.02 **Additional Terms**. Other capitalized terms used in this Agreement but not defined in Section 1.01 above shall have the meanings ascribed to them wherever such terms first appear in this Agreement.

## Section 2

### Purchase and Sale

2.01 **Purchase of the Assets**. Subject to the terms and conditions of this Agreement, Seller and Fulton hereby agree to sell, transfer and deliver to Purchaser, and Purchaser hereby agrees to purchase, the Assets.

2.02 **Assumption of Selected Liabilities**. Subject to the terms and conditions of this Agreement, Seller shall assign, and Purchaser shall accept, the Assumed Liabilities. Except for the Assumed Liabilities, Purchaser shall not assume, and the parties do not intend for Purchaser to assume, pursuant to this Agreement or otherwise, any of the Liabilities. The mere disclosure by Seller of Liabilities shall not in any way expand the nature or scope of the Assumed Liabilities which the Purchaser shall assume at the Closing. Seller agrees and confirms that Seller is, and shall remain, responsible for and shall pay any and all of the Liabilities which are not expressly set forth on Schedule 1.01(f), subject to Seller's right vis-a-vis third parties to contest in good faith and assert any legal or equitable defense.

- 9 -

2.03 <u>Purchase Price</u>. Subject to adjustment in accordance with <u>Section 2.05</u> hereof, the Purchase Price shall be the Net Asset Value plus $554,000, which sum, subject to the provisions of <u>Section 2.04</u> below, shall be paid by wire transfer in immediately available funds at the Closing. In no event, however, shall the Purchase Price, as adjusted pursuant to Section 2.05, exceed $13,250,000.

2.04 <u>Escrow</u>. At the Closing, Purchaser shall deposit $250,000 of the Purchase Price (the "Escrowed Funds") with PNC Bank, N.A. (the "Escrow Agent") to be held in escrow pursuant to the terms and conditions of an escrow agreement among Seller, Purchaser and the Escrow Agent (the "Escrow Agreement"), the form of which is attached hereto as <u>Annex 2.04</u>. Without limiting the foregoing, the Escrowed Funds and all accrued interest thereon shall be released from escrow following resolution of the matters set forth in Sections 2.05 and 5.05 of this Agreement and otherwise pursuant to the terms of the Escrow Agreement.

2.05 <u>Closing Financial Statements; Purchase Price Adjustment</u>.

(a) Seller shall prepare and deliver to Purchaser, within 30 days following the Closing, the Closing Financial Statements. Following such delivery, Seller shall, upon request, deliver to Purchaser copies of accounting work papers, analyses, reports and other documents reviewed or created by Seller in connection with the preparation of the Closing Financial Statements. To confirm the accuracy of the amounts reflected in such Closing Balance Sheet in accordance with the accounting practices and policies set forth in Schedule 1.01(j), including the

methods and procedures set forth in the supporting schedules thereto, Purchaser and, at Purchaser's election, Purchaser's firm of certified public accountants shall complete a review of such Closing Balance Sheet within 60 days of Seller's delivery of the Closing Balance Sheet to Purchaser. Upon completion of such review, Purchaser shall, upon request, deliver and, if applicable, cause its certified public accountants to deliver to Seller copies of accounting work papers, analyses, reports, and other documents reviewed or created by or at the request of Purchaser or its certified public accountants in connection with the review of the Closing Balance Sheet contemplated by this Section 2.05.

(b) If the Net Asset Value, as determined by reference to the Closing Balance Sheet as reviewed and adjusted due to any inaccuracy identified by Purchaser in accordance with subparagraph (a) above, is greater than or less than $11,406,443, the Purchase Price set forth in Section 2.03 shall be increased or decreased, dollar for dollar, as the case may be, by the difference between $11,406,443, and the Net Asset Value (the "Purchase Price Adjustment").

(c) Unless Seller objects to the proposed Purchase Price Adjustment in accordance with subparagraph (d) below, the parties shall instruct the Escrow Agent to disburse that portion of the Escrowed Funds equal to the Purchase Price Adjustment. Should the Escrowed Funds be insufficient, the debtor party shall within seven days remit any additional funds due the creditor party under this Section 2.05.

(d)  If, upon completion of Purchaser's review of the Closing Financial Statements, Purchaser submits a Purchase Price Adjustment, Seller shall have 30 days to object to Purchaser's proposed adjustment by delivery to Purchaser of Seller's written notice of objection.  Such objection shall explain in reasonable detail the basis of Seller's objection and shall be accompanied by supporting documentation and evidence.  If Seller does not object within such 30 day period, the Purchase Price Adjustment shall be deemed to be approved by the parties and the Closing Financial Statements accepted by the parties.  If Seller does object to the proposed Purchase Price Adjustment, the parties shall seek to resolve the dispute promptly through good faith negotiations.  If Purchaser and Seller are unable to agree upon the Purchase Price Adjustment within ten days after Purchaser's receipt of Seller's objection despite good faith negotiations, the determination of the Purchase Price Adjustment shall be submitted to arbitration with the accounting firm of Coopers & Lybrand LLP in accordance with Section 11.17 hereof, and any adjustment to the Purchase Price following arbitration shall be made from the Escrowed Funds. Should the Escrowed Funds be insufficient, the debtor party shall remit within seven days any additional funds due to the creditor party.

2.06  <u>Purchase Price Allocation</u>.  Subject to adjustment pursuant to <u>Section 2.05</u>, Schedule 2.06 sets forth the allocation of the Purchase Price among the Assets and the covenant of Seller and Fulton not to compete contained in Section 5.09.  To the extent permitted by law, Purchaser, Seller and Fulton shall report the

- 12 -

transactions contemplated herein for all tax purposes in accordance with such allocation; and, in any proceeding related to the determination of any tax, to the extent permitted by law, neither Purchaser, nor Seller nor Fulton shall contend or represent that such allocation is not a correct allocation.

2.07 Employees.

(a)  Seller has either laid off or terminated (as those terms are utilized by the Worker Adjustment and Retraining Notification Act ("WARN")) all of the employees of the Division immediately prior to the Closing.  Seller assumes all responsibility for providing advance notice of such layoff or termination to the employees, if Seller has determined any such notice is required under WARN.  If Seller incurs any WARN liability in connection herewith, Purchaser shall indemnify Seller for one-half of such WARN liability, excluding attorneys and other professional fees, provided Seller has given Purchaser reasonable opportunities to redress and limit such WARN liability.

(b)  Except as expressly provided in this Section 2.07, Purchaser shall not purchase, recognize, assume, adopt or otherwise acquire any rights, obligations, assets or liabilities under, arising from or resulting from any employment agreement or arrangement in existence between Seller and any employee, or any person employed to consult with or perform services for Seller or arising from any collective bargaining agreement or union arrangement, or otherwise.  Purchaser shall, prior to the Closing Date, offer employment to the Division's employees, other than the Division's general manager Larry Weber, at base salaries or at

- 13 -

hourly rates substantially equivalent to the then current base salaries or hourly rates for such employees, which offers of employment must be accepted on or before the Closing Date. Only the Division's employees who accept Purchaser's offer of employment on or prior to the Closing Date shall become Purchaser's employees upon and following the Closing.

(c) Purchaser shall not be responsible to Seller or to any current or former employee who is or was employed by Seller at the Division for any employee benefits (whether earned, accrued or vested) due the Division's employees with respect to their employment prior to the Closing. Seller shall timely pay and discharge all of its obligations to the Division's employees, including, without limitation, the obligations described in Schedule 3.22 and salaries and related taxes up to and including the Closing Date.

(d) Seller shall provide all necessary and appropriate notices to the Division's employees and their dependents upon the termination of employees' group health care coverage as required by the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA") due to the termination of employment. Seller specifically undertakes to provide any continuation coverage required under COBRA with respect to the Division's employees.

### Section 3

### Representations and Warranties of Seller

The Seller represents and warrants to Purchaser as follows:

3.01 <u>Organization</u>. Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of

Pennsylvania. Seller has full corporate power and authority to (i) own, lease and operate the Division's properties as such properties are now owned, leased and operated, and (ii) to conduct the Division's business as and where its business is now conducted. Schedule 3.01 lists the jurisdictions in which Seller owns or leases real property used solely or exclusively by the Division or employs personnel on behalf of the Division.

True and complete copies, with all amendments, of the Certificate of Incorporation of Seller (certified as of a recent date by Pennsylvania Secretary of State) and the Bylaws of Seller (certified as of the date hereof by Seller's Secretary) are attached hereto as Schedule 3.01. Seller is not subject to any judgment, decree, writ, injunction, order, or award, which materially adversely affects, or might reasonably be expected to materially and adversely affect, the Division's assets or the earnings, operations or condition of the Business.

3.02 **Business**. Seller is not engaged in the Business other than through the Division.

3.03 **Authority**.

(a) Seller has the requisite corporate power, authority, and capacity to execute and deliver this Agreement and the Other Agreements to which it is a party, and to perform its obligations under this Agreement and the Other Agreements. This Agreement and the Other Agreements to which Seller is a party, when executed and delivered, will constitute valid and legally binding obligations of Seller, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization,

moratorium, fraudulent conveyance and similar laws affecting creditors' rights and subject to general equitable principles (whether in a proceeding at law or in equity).

(b)  The execution and delivery of this Agreement and the Other Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the performance and fulfillment of its obligations and undertakings hereunder and thereunder by Seller, will not (i) violate any provision of, or result in the breach of or accelerate or permit the acceleration of any performance required by the terms of, the Certificate of Incorporation or Bylaws of Seller; any contract, agreement, arrangement or undertaking to which Seller is a party or by which Seller may be bound; any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority; or any applicable law, ordinance, rule or regulation of any governmental body, except where such violation, breach or acceleration would not have a material adverse effect on the Assets or the Business; (ii) result in the creation of any claim, lien, charge or encumbrance upon any of the Assets (whether real or personal, tangible or intangible; or, (iii) terminate or cancel, or result in the termination or cancellation of, any agreement or undertaking to which Seller is a party, except where such termination or cancellation would not have a material adverse effect on the Assets or the Business.

(c)  The execution and delivery of, and the performance and consummation of the transactions contemplated by, this Agree-

ment and the Other Agreements to which Seller is a party have been duly authorized by all requisite corporate action of Seller.

3.04 **Financial Statements**. Seller has delivered to Purchaser, and there are attached hereto as Schedules 1.01(1) and 1.01(q), respectively, true and complete copies of the Current Financial Statements and the Financial Statements. Each of the Current Financial Statements and the Financial Statements (a) present fairly in all material respects the results of operations of the Division for the periods covered thereby and the financial condition of the Division as at the dates thereof in accordance with the accounting practices and policies described in the notes and schedules attached thereto; (b) have been prepared in accordance with the accounting practices and policies described in the notes and schedules attached thereto; (c) except as disclosed in the notes thereto, have been prepared in a manner consistent with each other; and (d) except as described therein, accurately reflect the books and records of account of Seller and the Division.

3.05 **Title to Assets**. Except as set forth on Schedule 3.05, which encumbrances other than those related to the Ford Motor Credit Company Agreement shall be removed prior to Closing, Seller has good and marketable title to all of the Assets, free and clear of any claims, liens, charges, mortgages, security interests or encumbrances whatsoever. The execution and delivery of this Agreement by Seller, and the consummation by Seller of the transactions contemplated by this Agreement, will not result in the creation of any encumbrance on the Assets.

3.06 <u>Condition of Assets</u>.   The tangible real and personal property being conveyed to Purchaser pursuant hereto, including, without limitation, the plants, buildings, structures, equipment, machinery, and vehicles, owned or leased by Seller or used or employed by the Division in the Business, are (a) sufficient and adequate to carry on the Business as presently conducted; (b) in operating condition and repair, ordinary wear and tear excepted and with due consideration for age and prior use; and (c) except as described on Schedule 3.08, located on the Real Property.

3.07 <u>Real Property</u>.   Except for matters of record at the Recorder of Deeds for York County, Pennsylvania, there are no instruments of record, easements, licenses, grants, applicable zoning or building laws, ordinances, administrative regulations, urban redevelopment laws which prohibit, interfere with, limit or impair, or would, if not permitted by any prior nonconforming use, prohibit, interfere with, limit or impair, the use, operation, maintenance of or access to, or adversely affect the value of, the Real Property.  No notice of any violation of any applicable zoning or building law or ordinance or administrative regulation has been received by Seller; and Seller does not know of the threat of any such notice.  No condemnation proceeding has been instituted or, to Seller's knowledge, is threatened with respect to any of the Real Property.

3.08 <u>Inventory</u>.  The value of the Inventory has been and is fairly reflected in all material respects on the Financial Statements and Current Financial Statements.  Except as described

on Schedule 3.08, all of the Inventory is located at the Real
Property in York, Pennsylvania.

3.09 <u>Contracts</u>.

(a)  Except as set forth on <u>Schedule 3.09</u>, Seller on
behalf of the Division is not a party to or bound by, and neither
the Business nor the Assets are bound or affected by, any written
or oral contract, agreement or commitment of any kind whatsoever,
including, but not limited to, any (i) employment agreement; (ii)
promotion or advertising agreement; (iii) agreement with any
shareholder, director or officer of Seller; (iv) agreement
containing covenants by Seller not to compete in any lines of
business or commerce; (v) franchise or distributorship agreement or
other agreement requiring payment of a royalty or commission; (vi)
loan, credit or financing agreement, including all agreements for
any commitments for future loans, credits or financing; (vii)
guarantee; (viii) mortgage or security agreement; or (ix) agreement
to purchase raw materials, packaging, supplies or services used
regularly in the Business, or to sell the products or services
provided by the Division; (x) agreement incapable of termination
without penalty on less than six months notice; and (xi) agreement
which commits the Division to a capital expenditure in excess of
$10,000.

(b)  On behalf of the Division, Seller has exercised
reasonable commercial diligence in the performance of its currently
outstanding contractual obligations.   The Division is not in
material default under any contracts and commitments to which
Seller is a party that are related to the Division.   Seller does

not know that any other party is in material default (or would be in default on the giving of notice or the lapse of time or both) under any contract or commitment related to the Division to which Seller is a party.

(c)    True and complete copies of all Assumed Contracts or Contracts which are listed on Schedule 3.09 or which are otherwise referred to in this Agreement, including any Schedule or Annex hereto, have been delivered to Purchaser or in the case of items 2, 4, 13, 20, 21, and 22 on Schedule 1.01(k) (the "Scheduled Items") made available for Purchaser's inspection.  There are no amendments to or modifications of, or significant agreements of the parties relating to, any such contract, agreement or commitment which have not been disclosed to Purchaser or, in the case of the Scheduled Items, made available for Purchaser's inspection.  Each of the Assumed Contracts is valid and binding on the parties thereto in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws affecting creditors' rights and subject to general equitable principles.  To Seller's knowledge, Schedule 3.09 includes a true and complete description of the terms of any unwritten contract or commitment related to the Business to which Seller is a party or by which Seller is bound which Seller expects Purchaser to assume at the Closing that involves more than $10,000, other than purchase orders and sales orders.

(d)    Except as set forth on Schedule 3.09, (i) none of the purchase orders or other customer contracts to be assumed by Purchaser at the Closing provide for a purchase price to be paid to

Seller which is less than the Division's cost of materials and production expenses (excluding selling, general and administrative expenses) related to the products involved; (ii) the prices which the Division shall receive or pay under all the Assumed Contracts with its customers, suppliers and others have been determined in accordance with the Division's established pricing principles; and (iii) to Seller's knowledge, there is no probable adverse change in the availability or cost of any of the Division's supplies that would materially and adversely affect the operation and financial performance of the Business following the Closing.

3.10 <u>Accounts Receivable</u>. All Accounts Receivable shown on the Current Balance Sheet or thereafter acquired by the Division and to be shown on the Closing Balance Sheet have been collected or will be collected within 120 days of the date of invoice at the aggregate recorded amounts thereof on the Division's books, less the bad debt reserves provided therefor on the Current Balance Sheet, as such reserves have been adjusted on Seller's books in the ordinary course of business and in accordance with this Agreement.

3.11 <u>Permits</u>. Seller has all Permits which are necessary for the conduct of the Business as presently conducted, and all such Permits are listed on <u>Schedule 1.01(x)</u>. All such Permits are currently in full force and effect; and, no misrepresentations or willful or negligent omissions were made of any material fact in obtaining any such Permits. No proceedings have been instituted or, to Seller's knowledge, threatened seeking the suspension, termination, modification, revocation, alteration or amendment of

any such Permits, or to declare any of them invalid in any respect. Seller knows of no reason for any such revocation or limitation.

   **3.12 Intellectual Property.** Schedule 3.12 sets forth a true and complete identification and summary description of the trade names, trademarks, service marks, copyrights, any pending or issued registrations for any of the foregoing, patents and patent applications, other than the Excluded Assets, that are used solely or primarily by the Division in the operation of the Business, including a description of the nature of the Seller's or Fulton's interest therein (the "Conveyed Intellectual Property"). Except as set forth on Schedule 3.12, the Conveyed Intellectual Property is free and clear of all liens, security interests, charges, encumbrances, and other adverse claims; and except as set forth on Schedule 3.12, neither Seller nor Fulton is a party to any license, consent, settlement or other agreement involving the Conveyed Intellectual Property. Except as set forth on Schedule 3.12, there have been and there are no claims, actions or judicial or adver- sarial proceedings involving the Conveyed Intellectual Property. To Seller's and Fulton's knowledge, the Division's use of the Conveyed Intellectual Property has not infringed upon, constituted a misappropriation of, or otherwise violated the rights of any other person in, any Intellectual Property. Seller does not know of any past or present occurrences of any probable infringement or misappropriation of, or violation of Seller's rights in, any of the Conveyed Intellectual Property.

   **3.13 Litigation and Pending Proceedings; Compliance with Law.** Except as set forth on Schedule 3.13, there are no claims of any

kind or any actions, suits, proceedings, arbitrations or investigations pending or, to Seller's knowledge, threatened in any court or before any governmental agency or instrumentality or arbitration panel against, by or affecting the Division, the Business, or the Assets, or which would prevent the performance by Seller of this Agreement or the Other Agreements or any of the transactions contemplated hereby or thereby, or which declare the same unlawful or cause the rescission thereof. To Seller's knowledge, Seller on behalf of the Division has complied with and is not in default in any respect under (and has not been charged or, to the knowledge of Seller, has not been threatened with, and is not under an investigation with respect to, any charge concerning any violation of any provision of) any federal, state or local law, regulation, ordinance, rule or order (whether executive, judicial, legislative or administrative), or any order, writ, injunction or decree of any court, agency or instrumentality. To Seller's knowledge, the Division has not sold, supplied or provided any product or service which did not comply in all material respects with applicable laws, regulations, standards, customer specifications or contractual terms, express or implied, related to its sale.

    3.14 <u>Tax Matters</u>.

        (a)  There is no, and there shall not be at the time of the Closing any, tax lien on any of the Assets.

        (b)  Except for Taxes the payment of which the Seller is contesting in good faith through appropriate proceedings and for which there is an adequate reserve, (i) Seller has withheld and

paid all Taxes required to have been withheld and paid in connection with Seller's obligations to any of the Division's employees, creditors, independent contractors, or other third parties; and (ii) Seller has collected and paid all Taxes required to have been collected and paid in connection with any amounts received by the Division from any customer or other third party. To the extent that any of such Taxes have not been paid, Seller has properly accrued for such Taxes on the Current Financial Statements and shall continue to properly accrue for such Taxes on the Division's financial statements through the Closing.

3.15 **Insurance**.  The tangible real and personal property, whether owned or leased, which are utilized in the Business are insured against the hazards and in the amounts stated in the policies of insurance listed on Schedule 3.15.  Seller independently carries insurance against personal injury and property damage to third persons and in respect of the Division's services and operations and such other insurance as is stated in the policies of insurance listed on Schedule 3.15.  All such insurance is in full force and effect.  Schedule 3.15 sets forth a true and complete list of all product liability, workers compensation, property and casualty insurance and any other insurance claims (excluding health related claims) in excess of $5,000 made by Seller on behalf of the Division during the past three years under any such policy.

3.16 **Warranty Obligations**.  Schedule 3.16 sets forth (a) a complete list of the Division's warranty expenses incurred during its last three fiscal years; (b) the Division's pending warranty

claims; and (c) a description of the Division's current procedures for handling warranty claims. Seller has provided Purchaser a true and complete history of the Division's warranty claims since August 1, 1993.

3.17 **Proprietary Information.** Except for disclosures covered by a confidentiality agreement or in the ordinary course of the Business, within the last three years Seller has not disclosed, transferred or licensed to any other Entity any (i) customer list; (ii) trade secret; or (iii) other proprietary information used or developed by Seller in connection with the Business from which Seller derives economic value from not being generally known to, and not being readily ascertainable by proper means by, other Entities who can derive economic value from its disclosure or use.

3.18 **Working Relationships.** Schedule 3.18 lists all former sales representatives or distributors of Division products that have terminated such relationship with the Division within the past two years.

3.19 **Customers.** Listed on Schedule 3.19 are the names of the Division's ten largest customers and suppliers in the year ended July 31, 1995, together with the amount of such business in the Division's last fiscal year. Seller does not know that any such customer or supplier has terminated or expects to terminate a material portion of its normal business with the Division.

3.20 **Employees.** Schedule 3.20 sets forth by general job description the names and current base salary of all of the Division's employees, together with a summary of the basis on which each such person is compensated, if the basis is other than a fixed

salary rate, and any changes in any of the foregoing since July 31, 1995.

3.21 <u>Labor Relations</u>. Except as set forth on <u>Schedule 3.21</u>, with respect to the Division: (a) Seller is not a party to, or negotiating, and has no obligations under, any agreement, collective bargaining or otherwise, with any party relating to the compensation or working conditions of any group of Seller's employees; (b) Seller is not obligated under any agreement to recognize or bargain with any labor organization or union on behalf of its employees; (c) Seller does not know of any union organizational or representational activities underway among any of the Division's employees; and (d) Seller has not been charged or, to Seller's knowledge, threatened with a charge of any unfair labor practice; and (e) there are no, and within the past three years there have not been, existing or, to Seller's knowledge, threatened labor strikes, slowdowns, disputes, grievances or disturbances involving employees of the Division. Seller has no actual knowledge of any existing or threatened labor strike, slowdown, dispute, grievance or disturbance involving another Entity affecting operations at, or deliveries from or into, any facility operated or used by the Division. No work stoppage against the Division or the Business is pending or, to Seller's knowledge, threatened; no such work stoppage has occurred since January 31, 1990.

With respect to the Division, except for violations which singly or in the aggregate would not have a material adverse effect on the Business, Seller has not committed a material violation of

the National Labor Relations Act, as amended; Title VII of the
Civil Rights Act of 1964, as amended; the Age Discrimination and
Employment Act of 1967, as amended; WARN; the Rehabilitation Act of
1973, as amended; the Occupational Safety and Health Act, Executive
Order 11246; the Fair Labor Standards Act, as amended; the
Americans with Disabilities Act of 1990, as amended; the Family and
Medical Leave Act of 1993, as amended; and all regulations under
such Acts, and all other federal, state and local laws, regulations
and executive orders relating to the employment of labor, including
any provisions thereof relating to wages, hours, collective
bargaining; the payment of Social Security and similar taxes;
unemployment and worker's compensation laws; any labor relation
laws; or any governmental regulations promulgated thereunder, as
the same affect relationships or obligations of Seller with respect
to any of the Division employees. There are no proceedings before
any court, governmental agency, instrumentality or arbitrator
relating to such matters, including any unfair labor practice
claims, either pending or, to Seller's knowledge, threatened.

3.22 **Employee Benefit Plans.** As used in this Agreement, the
term "ERISA" shall mean the Employee Retirement Income Security Act
of 1974, as amended; and the terms "employee welfare benefit plan"
and "employee pension benefit plan" shall have the meanings
ascribed to them in Sections 3(1) and 3(2) of ERISA, respectively.

With respect to each employee welfare benefit plan and
employee benefit plan which is maintained by Seller or in which at
least one of Seller's employees participates: (a) each such plan is
listed on Schedule 3.22; and (b) a true and correct copy of each

such plan, and any trust instrument or insurance policy used in conjunction with such plan or to provide benefits thereunder, and any summary plan description, have been delivered by or on behalf of Seller to Purchaser.

3.23 <u>Immigration Matters</u>.  With respect to the Division, Seller has complied with all relevant provisions of Section 274A of the Immigration and Nationality Act, as amended (the "Act"). Without limiting the foregoing, no monetary penalties have been assessed against Seller for violation of Section 274A of the Act with respect to the Division.

3.24 <u>Potential Competing Interests</u>.  Except for interests of less than five percent in companies listed on a major U.S. or an internationally recognized securities exchanges, no officer, director or salaried employee of Seller has any direct or indirect interest in any Entity which competes with, is a supplier, customer or sales agent of, or is engaged in the Business; and except as set forth on <u>Schedule 3.24</u>, no officer, director or employee of Seller has any interest, direct or indirect, in any contract or agreement with, commitment or obligation of or to, or claim against, Seller related to the Business.  No real or personal property in which any officer, director or employee of Seller has an interest is used by the Division in the operation of the Business, or is located on or at any premises used in the Business; and no such property is significant to the operation of the Business.

3.25 <u>Environmental Matters</u>.

(a)  <u>Definitions</u>

As used in this <u>Section 3.25</u>, the term:

(1)    "Adverse Environmental Condition" shall mean any of the matters referred to in clauses (i), (ii) or (iii) of the definition of Environmental Claim, but excluding any Release of Hazardous Materials from a source other than the Real Property;

(2)    "Applicable Standards" shall mean, within the meaning of Pennsylvania Act 2 of 1995, Section 303(a), the existing numerical nonresidential health based standards adopted by the Pennsylvania Department of Environmental Protection and by the Federal Government by regulation or statute, and health advisory levels, for Hazardous Materials.

(3)    ."Environmental Claim" shall mean any notice of violation, lien, claim, demand, abatement order or direction (conditional or otherwise) of any governmental authority or any person for personal injury (including sickness, disease or death), property damage, damage to the environment or natural resources, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restrictions, resulting from or based upon any of the following conditions existing on or before the Closing Date: (i) the release, or the existence or continued presence of a release (including, without limitation, sudden or non-sudden, accidental or non-accidental leaks or spills) of any Hazardous Material in, into, or onto the environment (including, without limitation, the air, groundwater, surface water, or soil) at, in, under, or from the Real Property in violation of any Environmental Law or exceeding Applicable

Standards; (ii) the environmental aspects of the transportation, storage, or disposal of Hazardous Materials on the Real Property in violation of any Environmental Law or exceeding Applicable Standards; or (iii) or any other violation of any Environmental Law;

        (4)  "Environmental Law" shall mean any federal, state or local statute, law, ordinance, rule, regulation or order (whether voluntary or not) relating to the environment, natural resources, applicable to the Business of Seller, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C.  §§ 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), and the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), as such laws have been amended through the Closing Date, and any similar state or local laws and ordinances and the regulations implementing such statutes or ordinances, but excluding any Safety Law.

        (5)  "Hazardous Materials" shall mean those materials which are regulated by or form the basis of liability under any Environmental Law including, without limitation, asbestos, petroleum and petroleum products, polychlorinated biphenyls ("PCBs"), and radioactive substances.

        (6)  "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting,

escaping, leaching, dumping, or disposing of Hazardous Materials into the environment.

(7) "Remedial Action" shall mean all actions required by Environmental Law or to comply with Applicable Standards to remediate Adverse Environmental Conditions existing on the Real Property as of the Closing Date, and the performance of related pre-remedial studies and investigations and related post-remedial monitoring and care.

(8) "Safety Law" shall mean any federal, state or local statute, law ordinance, rule, regulation or order (whether voluntary or not) relating to health or human safety applicable to the Business as presently conducted, including, without limitation, the Hazardous Material Transportation Act (42 U.S.C. §§ 9601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.), but excluding any Environmental Law.

(b) Except as set forth on Schedule 3.25 the Division has materially complied with, and, the Business and the Assets, including, without limitation, the Real Property, are in material compliance with the provisions of all Environmental Law and Safety Law, including, without limitation, reporting releases of Hazardous Materials and the registration, testing, upgrading and maintenance of underground storage tanks.

(c) Except as set forth on Schedule 3.25 and described in "Draft Environmental Site Assessment and Remedial Activities Report" (May 14, 1996), Seller has been issued, and will maintain

- 31 -

until Closing, all required federal, state and local permits, licenses, certificates and approvals necessary or required in accordance with Environmental Law or Safety Law for the operation of the Business relating to (i) air emissions; (ii) discharges to surface water or ground water; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, treatment, storage, transportation or disposal of Hazardous Materials; and (vi) other environmental, health or safety matters other than permits, licenses, certificates or approvals, the failure of which to obtain would not have a material adverse effect on the Business or the Assets. A true, accurate and complete list of such permits, licenses, certificates or approvals held by Seller related to the Business is set forth on Schedule 3.25.

(d) Except as set forth on Schedule 3.25, Seller has not received any notice of, or does not know of, any violations of any Environmental Law or Safety Law, relating to the use, ownership or occupancy of any of the Real Property.

(e) Except in a manner not in violation of any Environmental Law nor exceeding Applicable Standards, and as set forth on Schedule 3.25, there has been no emission, spill, release, disposal, discharge or threatened release into or upon (i) the air; (ii) the soils or any improvements located thereon; (iii) the surface water or groundwater; or (iv) the sewer, septic system or waste treatment, storage or disposal system servicing the Real Property, of any Hazardous Material in, into or onto the Real

Property, including the movement of Hazardous Materials through or in the air, soil, surface water or groundwater (hereafter referred to as a "Hazardous Discharge"). Notwithstanding the foregoing, Seller makes no representation concerning any emission, spill, release, disposal, discharge or threatened release into or upon the Real Property from a source outside of the Real Property.

(f) Except as set forth on Schedule 3.25, to Seller's knowledge, there has been no complaint, order, directive, claim, citation or notice by any governmental authority or any other Entity alleging violation of any Environmental Law or Safety Law with respect to (i) air emissions; (ii) spills, releases or discharges to soils or any improvements located thereon, surface water, groundwater or the sewer, septic system or waste treatment, storage or disposal systems servicing the Real Property; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, treatment, storage, transportation or disposal of Hazardous Materials; or (vi) other environmental, health or safety matters, affecting the Division's operations, the Assets, any of the Real Property, or any improvements located thereon or the business conducted thereon (any of which is hereafter referred to as an "Environmental Complaint"), which has not been fully resolved.

(g) Except as set forth in Schedule 3.25, Hazardous Materials generated by the Division or its agents disposed of, treated or stored on or off-site of the Real Property have been

- 33 -

disposed of, treated and stored in a manner not in violation of any Environmental Law or Applicable Standards. Schedule 3.25 identifies all underground storage tanks located on the Real Property and, to Seller's knowledge, includes for each storage tank: (i) the size of the tank, (ii) the date the tank was removed, and (iii) the substance(s) stored in the tank.

(h) Except as described on Schedule 3.25, (i) Seller has not stored, treated or disposed of any Hazardous Material on, in or under the Real Property, or any part thereof in such a way that would require a Permit under any Environmental Law, and (ii) Seller has not allowed the Real Property, or any part thereof, to be used for the storage, treatment or disposal of Hazardous Materials in such a way that would require a Permit under any Environmental Law.

(i) Except in a manner not in violation of any Environmental Law or Safety Law through commercial transporters, Seller on behalf of the Division has not transported or accepted for transport any Hazardous Materials.

(j) Prior to the Closing, if Seller learns of any Hazardous Discharge or a violation of Environmental Law or Safety Law, other than those disclosed on Schedule 3.25, Seller shall promptly notify Purchaser.

(k) Seller has provided Purchaser with true, accurate and complete copies of any environmental audit or site assessment reports Seller has in its possession pertaining to the

environmental history of all of the Real Property.  Seller shall also promptly furnish to Purchaser true, accurate and complete copies of all sampling and test results obtained from all environmental and/or health samples and tests taken at and around any of the Real Property to date of the Closing.

3.26 **Absence of Material Change**. Except as set forth on Schedule 3.26:

(a)  Since July 31, 1995, the business and affairs of the Division have been conducted only in the ordinary course.

(b)  Since July 31, 1995, (i) there has been no change in the condition (financial or otherwise), assets, liabilities, or operations of the Division, other than minor changes in the ordinary course of business, none of which either singly or in the aggregate has been materially adverse; and (ii) there has been no damage, destruction, or loss or other occurrence or development (whether or not insured against), which either singly or in the aggregate materially adversely affects (and Seller does not know of any threatened occurrence or development which is reasonably expected to have a material adverse affect upon) the assets, liabilities, or operations of the Division.

(c)  Since July 31, 1995, Seller has not (i) created or incurred any liability, commitment or obligation (absolute or contingent) with respect to the Division, except in the ordinary course of business or unsecured current liabilities incurred for other than money borrowed in the ordinary course of business; (ii) mortgaged, pledged or subjected to any lien or otherwise encumbered any of the Division's assets, tangible or intangible; (iii)

discharged or satisfied any lien, security interest or encumbrance against the Division, or paid any obligation or liability (absolute or contingent) of the Division, other than in the ordinary course of business; (iv) except for netting in the ordinary course of business of warranty claims against receivables, waived any rights of substantial value to the Division or canceled any debts or claims of the Division of over $5,000; (v) except in the ordinary course of business, terminated or amended, or suffered the termination or amendment of, any contract, lease, agreement or license to which Seller on behalf of the Division is or was a party; (vi) made any capital expenditures or any capital additions or betterments on behalf of the Division in excess of $10,000; (vii) sold or otherwise disposed of any of the Division's assets, tangible or intangible, except in the ordinary course of business; (viii) paid or agreed to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance pay to any of the Division's present or former officers, agents or employees except under any existing pension or other plan, or increased the compensation (including salaries, fees, commissions, bonuses, profit sharing, incentive, pension, retirement or other similar payments) being paid as of August 1, 1995, to any of the Division's management or other employees; (ix) renewed, amended, become bound by or entered into any contract, commitment or transaction on behalf of the Division other than in the ordinary course of business; or (x) except as disclosed therein, changed any accounting practice followed or employed in preparing the Financial Statements or the Current Financial Statements.

(d)   Since July 31, 1995, Seller has not made any changes in Division personnel at the manager level or above.

3.27  **Bulk Sales**.   The purchase and sale of the Assets and the other transactions contemplated in this Agreement shall be free and clear of any and all claims by creditors of Seller under any bulk sales or similar laws or statutes.   Seller shall, in accordance with Section 10 of this Agreement, indemnify and hold Purchaser harmless from and against, and shall pay to Purchaser the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to Purchaser from or in connection with any violation of applicable bulk sales or similar laws or statutes to the extent that the same may apply to the transactions contemplated herein; provided, however, that the provisions of this  Section 3.27 shall not relieve Purchaser of its obligations with respect to any Assumed Liability.

3.28  **Completeness of Statements**.  No factual information of Seller contained in the Agreement, including any Schedule or  Annex thereto, contains or will at Closing contain any untrue statement of a material fact, or, to Seller's of Fulton's knowledge, omits or will at Closing omit to state a material fact necessary in order to make a statement contained herein or therein not misleading.  No other written information furnished by or on behalf of Seller and/or Fulton to Purchaser or Powerscreen International or any of their agents in connection with the transactions contemplated in this Agreement or the Other Agreements, including, without limitation, the Peers & Co. JLG Material Handling Division Information Memorandum and Supplemental Information Package,

contains or will at Closing contain, when taken as a whole, any untrue statement of a material fact, or, to Seller's or Fulton's knowledge, omits or will at Closing omit to state a material fact necessary in order to make a statement contained herein or therein not misleading.  All representations and warranties of Seller and Fulton contained in this Agreement and in the Other Agreements are true and complete in all material respects as of the date hereof, and such representations and warranties will be true and complete in all material respects as of the Closing Date.

3.29 __Fulton's Organization__.  Fulton is a corporation duly organized and validly existing under the laws of the State of Delaware.  Fulton has full corporate power and authority to own and lease its properties as such properties are now owned and leased and to conduct its business as and where its business is now conducted.

3.30 __Fulton's Authority__.

(a)  Fulton has the requisite corporate power, authority and capacity to execute and deliver this Agreement and the Other Agreements to which it is a party, and to perform its obligations under this Agreement and the Other Agreements.  This Agreement and the Other Agreements to which it is a party, when executed and delivered, constitute valid and legally binding obligations of Fulton enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws affecting creditors rights and subject to equitable principles (whether in a proceeding at law or in equity).

(b)  The execution and delivery of this Agreement and the Other Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the performance and fulfillment of its obligations and undertakings hereunder and thereunder by Fulton will not violate any provision of, or result in the breach of or accelerate or permit the acceleration of any performance required by the terms of, the Certificate of Incorporation or Bylaws of Fulton; any contract, agreement, arrangement or undertaking to which Fulton is a party or by which Fulton may be bound; any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority; or to Fulton's knowledge, any applicable law, ordinance, rule or regulation of any governmental body, except where such violation, breach or acceleration would not have a material adverse effect on Fulton's assets or business.

(c)  The execution and delivery of, and the performance and consummation of the transactions contemplated by, this Agreement and the Other Agreements to which it is a party have been duly authorized by all requisite corporate action of Fulton.

3.31 **Fulton's Litigation**.  There are no claims, actions, suits or proceedings pending or, to Fulton's knowledge, threatened which would prevent Fulton's performance under this Agreement.

3.32 **Fulton's Title**.  Except as set forth in Schedule 3.12, Fulton has good and marketable title to the Conveyed Intellectual Property, free and clear of all claims, liens, charges, mortgages, security interests or encumbrances whatsoever.  The execution and delivery of this Agreement by Fulton, and consummation by Fulton of

the transactions contemplated by this Agreement, will not result in the creation of any encumbrances on the Conveyed Intellectual Property.

### Section 4

### Representations and Warranties
### of Purchaser and Powerscreen International

Purchaser and Powerscreen International represent and warrant to Seller as follows:

4.01 **Organization**.  Purchaser is a corporation duly organized and validly existing under the laws of the State of Delaware and on the Closing Date will be qualified to do business in the Commonwealth of Pennsylvania.  Powerscreen International is a public limited company registered and validly existing under the laws of England and Wales.  Purchaser has full corporate power and authority to own and lease its properties as such properties are now owned and leased and to conduct its business as and where its business is now conducted.

4.02 **Authority**.

(a)  Each of Purchaser and Powerscreen International have the requisite corporate power, authority and capacity to execute and deliver this Agreement and the Other Agreements to which it is a party, and to perform its obligations under this Agreement and the Other Agreements.  This Agreement and the Other Agreements to which it is a party, when executed and delivered, constitute valid and legally binding obligations of each of Purchaser and Powerscreen International, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws

- 40 -

affecting creditors rights and subject to equitable principles (whether in a proceeding at law or in equity).

(b)  The execution and delivery of this Agreement and the Other Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the performance and fulfillment of its obligations and undertakings hereunder and thereunder by each of Purchaser and Powerscreen International will not, violate any provision of, or result in the breach of or accelerate or permit the acceleration of any performance required by the terms of, the Certificate of Incorporation or Bylaws of Purchaser or Powerscreen International; any contract, agreement, arrangement or undertaking to which Purchaser or Powerscreen International is a party or by which Purchaser or Powerscreen International may be bound; any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority; or to Purchaser or Powerscreen International's knowledge, any applicable law, ordinance, rule or regulation of any governmental body, except where such violation, breach or acceleration would not have a material adverse effect on Purchaser or Powerscreen International's assets or business.

(c)  The execution and delivery of, and the performance and consummation of the transactions contemplated by, this Agreement and the Other Agreements to which it is a party have been duly authorized by all requisite corporate action of each of Purchaser or Powerscreen International.

4.03  **Litigation**.  There are no claims, actions, suits or proceedings pending or, to Purchaser's or Powerscreen

International's knowledge, threatened which would materially impair Purchaser's or Powerscreen International's performance under this Agreement.

## Section 5

### Covenants of Seller and Fulton

**5.01 Nonassignable Contracts; Consents.**

(a)  To the extent that the assignment by Seller of any Assumed Contract at the Closing is not permitted without (i) the consent of the other party to the Assumed Contract; (ii) the approval by the other party of Purchaser as a source of the products or services called for by such Assumed Contract; or (iii) the approval by the other party of Purchaser as a lessee, then this Agreement shall not be deemed to constitute an assignment or an attempted assignment of the same, if such assignment or attempted assignment would constitute a breach thereof.  However, unless otherwise agreed as to any particular Contract, Seller shall act in good faith and use its reasonable efforts (which shall not include payment of any additional consideration or economic concessions to any party) to obtain any and all such consents, approvals and novations.

(b)  If any necessary consent, approval or novation is not obtained prior to the Closing, Seller shall cooperate with Purchaser following the Closing in any reasonable arrangement designed to provide Purchaser with all of the benefits under such Contract as if such consent, approval or novation had been obtained.  Such cooperation shall include subleases from Seller and undertakings by Purchaser of the work necessary to complete

Contracts as the agent of Seller, with the understanding that Seller shall then invoice the customer for services rendered and promptly transfer the receivable or remit the amount of the receivable to Purchaser upon payment to Seller. Nothing herein shall excuse Seller from responsibility for any of its representations and warranties or covenants hereunder.

5.02 **Publicity**. Without the prior written consent of Purchaser, except as required by applicable law or as necessary to enable Seller's legal and financial advisors to assist Seller in connection with its obligations under this Agreement, Seller shall not disclose or publish, and shall use reasonable efforts to prevent the disclosure or publication of, any information concerning the execution and delivery of this Agreement, or the transactions contemplated by this Agreement, to any third party. Formal announcement of the transactions contemplated by this Agreement shall occur at the opening of business on the first business day following the Closing.

5.03 **Noncompetition**. Without the prior written consent of Purchaser, for a period of five years following the Closing and on a worldwide basis, Seller and Fulton shall not, and shall cause their Affiliates not to, (i) directly or indirectly, as a shareholder, partner, member or principal, or as an agent or employee, engage in the Business (excluding any investment by Seller or its Affiliates of less than five percent (5%) of the equity of any Entity that is publicly traded on a major U.S. or internationally recognized securities exchange or ten percent (10%) of the equity of any Entity that is not publicly traded on a major

U.S. or internationally recognized securities exchange); (ii) solicit for employment any of the former employees of the Division or, except for the agreements with Messrs. Oakman, Keefer, Faust, Smith, and Lute referenced in Item 11 of Schedule 1.01(k), hire any of the former employees of the Division which Purchaser employs following Closing with respect to employment with any business or undertaking which is in competition with the Business; or (iii) except as required by law or by any court or governmental authority or except for any disclosures of the Division's pre-Closing financial information as a part of any financial disclosures required of Seller, disclose any confidential information of the Business. In addition, except as permitted by clause (ii) above, for two years following the Closing, Seller and Fulton shall not, and shall cause their Affiliates not to, employ any former managerial or engineering employees of the Division, unless such employees have involuntarily terminated their employment with Purchaser. Notwithstanding the foregoing, Seller may, subject to Section 6.04, design, develop, manufacture and/or market truck mounted, operator occupied elevating work platforms. Seller and Fulton acknowledge that $100,000 of the Purchase Price shall be allocated to the covenant not to compete as set forth in this Section 5.03, and Seller and Fulton further acknowledge and accept the adequacy of same. For purposes of this Section 5.03 and otherwise in this Agreement, the term "Affiliates" shall mean an Entity controlling, controlled by or under common control with such Entity. Purchaser acknowledges that, should Seller not retain the services of the Division's general manager Larry Weber following

the Closing, Mr. Weber may seek and obtain employment with a third party in competition with the Business.

5.04 **Records**. For a seven-year period following the Closing, Seller shall grant to Purchaser and its representatives, at Purchaser's request (and subject to Purchaser's reimbursement of Seller's out-of-pocket expenses), access to and right to make or obtain copies of those records and documents related to the Business not transferred by Seller to Purchaser in connection with the Closing which are related to the pre-Closing Business or the Assets as may be reasonably necessary for Purchaser's tax, employee benefit or financial reporting obligations or other investigations required by law or for Purchaser's dealings with, handling or discharging of any Assumed Liability. If Seller elects to dispose of such records, Seller shall first give Purchaser sixty (60) days' written notice, during which period Purchaser shall have the right at Purchaser's expense to obtain the records without further consideration to Seller. Seller shall make its employees available to assist Purchaser as shall be reasonably necessary hereunder.

5.05 **Accounts Receivable**. Within five business days following a written request from Purchaser which request must be made within five business days following the day 120 days after the Closing, Seller shall repurchase at the same value ascribed in the sale to Purchaser hereunder any Accounts Receivable not collected within 120 days of the Closing. Upon such repurchase, Seller shall obtain from Purchaser title to any such Account Receivable, together with any security interest therein.

- 45 -

5.06 <u>Supply of Cylinders and Parts</u>.

(a)  For  four  months  following  the  Closing,  Seller  shall produce  or  secure  for  and  sell  and  deliver  to,  and  cause  its Affiliates  to  produce  or  secure  for  and  sell  and  deliver  to, Purchaser  the  hydraulic  telescopic  cylinders  specified  on  Schedule 5.06  as  well  as  related  spare  parts.   Such  cylinders  and  spare parts  shall  be  supplied  by  Seller  at  Seller's  standard  cost  as  of the  Closing  Date;  and  the  cylinders  and  spare  parts  sold  in  excess of  such  specified  quantity  shall  be  priced  at  135%  of  Seller's standard  cost  as  of  the  Closing  Date.   Notwithstanding  the foregoing,  beyond  the  volume  referenced  on  Schedule  5.06,  Seller shall  only  be  obligated  to  sell  and  deliver  to  Purchaser  such cylinders  and  spare  parts  as  are  in  accordance  with  Purchaser's actual  production  demands  for  said  four  month  period.

(b)  For  three  months  following  the  Closing,  Seller  shall produce  or  secure  for  and  sell  and  deliver  to,  or  cause  its Affiliates  to  produce  or  secure  for  and  sell  and  deliver  to, Purchaser,  at  Seller's  standard  cost  as  of  the  Closing  Date,  the parts  and  products  Seller  has  supplied  to  the  Division  within  the past  twelve  months;  provided,  however, .that  Purchaser's  orders  for such  parts  and  products  shall  be  based  upon  the  demands  of Purchaser's  customers  for  such  parts  and  products  for  such  period. All  sales  to  Purchaser  pursuant  to  this  Section  5.06  shall  be subject  to  Seller's  standard  terms  of  sale;  Seller's  standard payment  and  credit  terms  and  policies;  and  Seller's  standard  parts warranty.   With  respect  to  the  cylinders,  Seller  must  have  at  least a  six  week  lead  time  for  all  orders.   For  parts,  Seller  must  have

- 46 -

such lead times as Seller shall reasonably specify, recognizing that time shall be of the essence in its performance. Notwithstanding the foregoing, Seller's performance hereunder shall be excused by force majeure. For purposes of this provision, the term "force majeure" shall mean natural disasters, civil disturbances or failures by suppliers of Seller which are of a magnitude that objectively prevent Seller's performance of its obligations hereunder, provided that Seller has not caused or materially contributed to the disruption in component supply or is not otherwise responsible for the event(s) triggering Seller's nonperformance.

5.07 __JLG Cylinder Warranty__. In relation to the reserve to be established in the Closing Balance Sheet for the Potential Warranty relating to the "J" Series Cranes - Telescope Cylinder Scoring for a maximum of 164 units, Seller shall repair or replace any telescope cylinder on such "J" Series Cranes which proves to be defective due to scoring of the cylinder and for which JLG receives notice of such within twelve (12) months from the date of sale of the respective "J" Series Crane. For the first twenty-five (25) cylinders so repaired or replaced by Seller, Seller shall bill Purchaser at a fixed amount of $1,500 per cylinder; and, for any cylinders repaired or replaced by Seller in excess of the first twenty-five (25), Seller shall perform such repair or replacement without charge to Purchaser. Seller's agreement as aforesaid shall be subject to the following:

1.  All repair and replacement shall be on an FOB McConnellsburg basis;

- 47 -

2.    Seller's standard payment and credit terms and policies; and

3.    Seller's standard warranty terms and procedures.

**5.08 <u>Transition Services</u>.** For four months following the Closing, Seller shall provide to Purchaser the information services and accounting support described on Schedule 5.08 to facilitate the transition of the Business from a division of Seller to a freestanding subsidiary of Purchaser. Purchaser's only costs for such services shall be to assume the specific expenses described on Schedule 5.08. Seller shall use reasonable efforts to keep confidential any financial or other nonpublic information of Purchaser shared or obtained in the performance of Seller's obligations hereunder.

**5.09 <u>Conveyance by Fulton</u>.** For the consideration referenced in Schedule 2.06, Fulton hereby agrees to transfer to Purchaser all right, title and interest in and to the Conveyed Intellectual Property of Fulton as identified in Schedule 3.12.

**5.10 <u>JLG Trademark License</u>.** Fulton hereby grants Purchaser a limited right to use the JLG® trademark in connection with the Business for six months following the Closing (the "Use Period"). Such right shall be limited to (i) affixing such trademark to any current models of equipment reflected on Schedule A shipped to customers during the Use Period; and (ii) continued use of any marketing materials included in the Assets.

## Section 6

## Covenants of Purchaser and Powerscreen Holdings

**6.01 Publicity.** Without the prior written consent of Seller, except as required by applicable law, the regulations of the International Stock Exchange of the United Kingdom and the Republic of Ireland Limited, or as necessary to enable Purchaser's legal and financial advisors to assist Purchaser in connection with its obligations under this Agreement, Purchaser shall not disclose or publish, and shall use reasonable efforts to prevent the disclosure or publication of, any information concerning the execution and delivery of this Agreement, or the transactions contemplated by this Agreement, to any third party.

**6.02 Records.** For a seven-year period following the Closing, Purchaser shall grant to Seller and its representatives, at Seller's request (and subject to Seller's reimbursement of Purchaser's out-of-pocket expenses), access to and right to make or obtain copies of those records and documents transferred by Seller to Purchaser in connection with the Closing which are related to the pre-Closing Business or the Assets as may be reasonably necessary for Seller's tax, employee benefit or financial reporting obligations or other investigations required by law or for Seller's dealings with, handling or discharging of any debt, obligation or Liability not assumed by Purchaser at the Closing. If Purchaser elects to dispose of such records, Purchaser shall first give Seller sixty (60) days' written notice, during which period Seller shall have the right at Seller's expense to obtain the records without further consideration to Purchaser. Purchaser shall make

its employees available to assist Seller in gaining access to such records as shall be reasonably necessary hereunder.

6.03 **Spare Parts**.   For a period of five years, so long as Purchaser deems it commercially viable, Purchaser shall continue to manufacture or supply certain spare parts for the product models described in Schedule 6.03; provided, however, that Seller shall timely make available to Purchaser the technical information and drawings in the possession of Seller or its Affiliates necessary to enable Purchaser to manufacture or supply these spare parts. Purchaser shall (i) notify Seller of accidents or incidents involving the foregoing products; and (ii) provided it receives similar cooperation, reasonably cooperate with Seller in connection with litigation involving such products.   Purchaser shall assume responsibility in any product liability matter only for the parts and service it supplies, and Seller shall retain any and all responsibility for the underlying products in such cases.

6.04 **Use of Patents**.  Purchaser hereby grants Seller effective at Closing a nonexclusive, nonassignable royalty-free, fully paid, perpetual license to use for purpose of its business the patents listed on Schedule 6.04; provided, however, that Seller shall not use such patents in a manner that enables Seller or any of its Affiliates to compete with Purchaser in any manner or at any time; and provided, further, that Purchaser shall be entitled promptly to terminate such license in the event of such prohibited use.   In addition, Seller may not sublicense the use of such patent; provided, however, that, subject to continuation of the limitations on use set forth in this Section 6.06 and provided that at least 14

# EXHIBIT "A"
# (Part 2)

days written notice has been given to Purchaser, such license shall be freely assignable to any acquiror of all or substantially all of the assets of Seller. Nothing herein shall create any obligation on the part of Purchaser to renew or maintain the registrations of such patents or to defend such patents in any proceeding.

6.05 **Product Identification**. Immediately following the Closing, Purchaser shall make certain that the serial number plates of all products manufactured, shipped or sold by Purchaser in the conduct of the Business reflect the name "Powerscreen" or other tradename of Purchaser and do not reflect the name JLG Industries, Inc. or any trademark of Seller not included in the Assets.

6.06 **Accounts Receivable**. Purchaser shall exercise reasonable commercial diligence in the collection of Accounts Receivable within the first 120 days following the Closing.

6.07 **Guaranty by Powerscreen International**. Powerscreen International hereby unconditionally and irrevocably guarantees the complete and timely performance by the Purchaser of each and all of the Purchaser's obligations under this Agreement.

### Section 7

### The Closing

7.01 **Effective Time and Place**. The Closing shall occur in conjunction with the execution and delivery of this Agreement in the offices of Brown, Todd & Heyburn PLLC, 3200 Providian Center, Louisville, Kentucky, or at such other place or time as the parties may mutually agree. The Closing shall be deemed effective at 11:59 p.m. EDT on the Closing Date.

7.02 <u>Deliveries</u>.  At the Closing, the parties shall make all of the deliveries contemplated in this Agreement, including, without limitation, the deliveries set forth on <u>Schedule 7.02</u>.

### Section 8

### <u>Survival of Representations and Warranties--Indemnification</u>

8.01  <u>Survival</u>.  Each of the parties' representations and warranties set forth in this Agreement shall survive the Closing for a period of fifteen months, except as to any matter (a) for which a claim has been submitted in writing to Seller or Purchaser prior to such date and identified as a claim for indemnification pursuant to this <u>Section 8</u>; or (b)  which is related to Seller's title to the Assets, any Tax or environmental claim of any nature, for which any cause of action in favor of Purchaser shall expire only upon the expiration of the applicable statute of limitations. Each of the parties' covenants and agreements set forth in this Agreement shall survive the Closing for the maximum period permitted by law.

8.02  <u>Indemnity by Seller</u>.  Subject to the limitations set forth in <u>Section 8.03</u> and to the specific environmental indemnity provisions of Section 8.04, Seller shall indemnify and hold Purchaser harmless from and against, and shall pay to Purchaser the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to Purchaser, either directly or indirectly, from (a) any Liabilities not assumed by Purchaser at the Closing; (b) any litigation pending at the Closing against, by or affecting the Division, the Business or the Assets; (c) any claims against Purchaser for products liability

which result from incidents or injuries occurring prior to the Closing; (d) any inaccuracy in any representation or warranty by Seller contained in this Agreement or any of the Other Agreements; and (e) any breach of any covenant or agreement by Seller contained in this Agreement or in any of the Other Agreements.

8.03  **Seller's Indemnification Limitations**.  With respect to any indemnity claims pursuant to Section 8.02(d), Seller's liability shall be limited to losses, damages, costs and expenses (including reasonable attorneys' fees) incurred by Purchaser ("Losses") which, singly or when aggregated with other Losses, exceed $50,000; provided, however, that upon Purchaser's successful assertion of a claim or claims against Seller for at least $50,000 in aggregated Losses, Purchaser shall be entitled to recover the full amount of its claims for such aggregated Losses, including the $50,000 base amount.  Seller's indemnification obligations hereunder shall be limited to the equivalent of the Purchase Price (less cash of $750,000) plus any expenses of Purchaser in enforcing its rights under this Agreement.

8.04  **Environmental Indemnity by Seller**.  Without in any way limiting the indemnity obligations of Seller pursuant to Section 8.02:

(a)    The definitions in Section 3.25 shall apply to this Section 8.04.

(b)    Seller agrees to indemnify, defend and hold harmless Purchaser, and Purchaser's officers, directors, shareholders, employees, tenants, contractors, assigns, successors, and affiliate

- 53 -

corporations, from and against any and all Environmental Claims arising from, caused by, or related to any and all Adverse Environmental Conditions that are unknown and existing on or in the Real Property as of the Closing Date.

(c) The known Adverse Environmental Conditions existing on or in the Real Property prior to the Closing Date are set forth in Schedule 3.25. Seller represents that these Adverse Environmental Conditions have been the subject of Remedial Action and are in compliance with applicable Environmental Law and Applicable Standards as described in "Draft Environmental Site Assessment and Remedial Activities Report, JLG Industries, Inc., York, Pennsylvania Site," Groundwater Sciences Corporation, (May 14, 1996), hereinafter the "Report". Seller agrees to indemnify, defend and hold harmless Purchaser, and Purchaser's officers, directors, shareholders, employees, tenants, contractors, assigns, successors, and affiliate corporations, from and against any and all Environmental Claims arising from, caused by, or related to any failure of the actions described in the Report to remediate the Real Property to a condition that does not violate any Environmental Law or is not in excess of Applicable Standards. Purchaser does not assume from Seller any liability for the actions described in the Report.

(d) Without limiting the foregoing, the indemnification provided by this section shall specifically cover and include Remedial Action. The performance of Remedial Action shall be

conducted, performed or arranged by Seller, and all Remedial Action shall be conducted in the name of Seller. Seller shall obtain all necessary licenses, manifests, permits and approvals to perform such Remedial Action. All Remedial Action, and the disposal of all waste generated by the Remedial Action, shall be performed in accordance with Environmental Law.

(e) If the performance of Remedial Action is required pursuant to this Section 8.03 after the Closing Date:

(1) Seller shall have the right to enter upon the Real Property to perform Remedial Action necessary to comply with the obligations of Seller hereunder. All access shall be during daylight hours except by agreement of the parties. Seller shall give at least 3 business days notice to Purchaser of its intent to enter the Real Property for the initial performance of Remedial Action. The notice shall describe the activities to be performed and the amount of time estimated to complete the activities;

(2) The activities of Seller shall be conducted in a manner to minimize interference with Purchaser's use of the Real Property in the conduct of its business to the extent practicable;

(3) Purchaser shall cooperate with Seller to make reasonable accommodations in its business activities to allow for performance of Remedial Action, to the extent that such cooperation does not require Purchaser to shut down any of its manufacturing activities;

(4) Purchaser may observe the performance of Remedial Action by Seller to determine that such Remedial Action is performed in conformance with applicable Environmental Law. Purchaser may split any samples taken by Seller.

(f) By entering into this Agreement, Purchaser does not assume from Seller any liability or responsibility for any Environmental Claim arising from any existing Adverse Environmental Conditions, whether known or unknown.

(g) The provisions of this Section 8.04 shall survive the Closing Date for a period equal to the applicable statute of limitations with respect any Environmental Claim.

8.05 Indemnity by Purchaser. Subject to the limitations set forth in Section 8.06, Purchaser shall indemnify and hold Seller harmless from and against, and shall pay to Seller the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to Seller, either directly or indirectly, from any (a) inaccuracy in any representation or warranty by Purchaser contained in this Agreement or in any of the Other Agreements; (b) any breach of any covenant or agreement by Purchaser contained in this Agreement or in any of the Other Agreements; (c) any Assumed Liability; and (d) any product liability claim resulting from incidents or injuries occurring following the Closing.

8.06 Purchaser's Indemnification Limitations. With respect to any indemnity claims pursuant to Section 8.05(a), Purchaser's liability shall be limited to losses, damages, costs and expenses

(including reasonable attorneys' fees) incurred by Seller ("Losses") which, singly or when aggregated with other Losses, exceed $50,000; provided, however, that upon Seller's successful assertion of a claim or claims against Purchaser for at least $50,000 in aggregated Losses, Seller shall be entitled to recover the full amount of its claim for such aggregated Losses, including the $50,000 base amount. Purchaser's indemnification obligations hereunder shall be limited to a total of $1,000,000, plus the amount of any Assumed Liabilities and the expenses of Seller in enforcing its rights under this Agreement.

8.07  **Remedies; Right of Offset.**  In the absence of fraud, the indemnification rights provided in this Section 8 shall be the sole and exclusive remedy available to each of the parties to this Agreement as against the other party for any misrepresentation, breach of warranty or failure to fulfill any covenant or agreement contained herein or in connection with any of the transactions contemplated by this Agreement or the Other Agreements; provided, however, that the Purchaser shall be entitled to specific performance of the sale of the Assets and to injunctive relief prohibiting or restricting violations of Sections 5.02, 5.03 5.04, 5.06, 5.07, and 5.08 of this Agreement; and Seller shall be entitled to any and all remedies at law or in equity with respect to any breach by Purchaser of its obligation to pay the Assumed Liabilities or of its obligation to pay the Purchase Price in accordance with the terms of this Agreement. Without limiting the foregoing, each party hereby agrees to pay promptly upon receipt of notice from the other party the amounts which such party may owe to

the other from time to time by reason of the provisions of this Agreement or otherwise.

8.08  **Penalties and Interest**.  If any party fails to pay an amount when due under this Agreement, in addition to any other penalties or obligations, the defaulting party's debt shall accrue interest at the prime rate of PNC Bank plus 2%, as that rate is adjusted from time to time.  For purposes of this Section 8.08, the Purchase Price Adjustment shall not be deemed due until mutually accepted by the parties or until completion of arbitration pursuant to Section 2.05 hereof.

### Section 9

### Miscellaneous

9.01  **Notices**.  Any notices or other communications required or permitted hereunder shall be deemed to have been duly given (a) if delivered in person and a receipt is given; (b) if communicated by confirmed facsimile utilizing the fax numbers referenced below; (c) if sent by overnight delivery with a national overnight courier service, and addressed as set forth below; or (d) if sent by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

        (a)  If to Seller or Fulton:

            JLG Industries, Inc.
            1 JLG Drive
            McConnellsburg, Pennsylvania 17233-9533
            Attention: Thomas D. Singer

            Fax: 717-485-6462

            with a copy to:

            Covington & Burling
            1201 Pennsylvania Avenue, N.W.
            Washington, D.C. 20044-7566

Attention: W. Andrew Jack

Fax: 202-662-6291

(b)    If to Purchaser or Powerscreen Holdings:

Powerscreen USC Inc.
c/o Powerscreen International PLC
Coalisland Road
Dungannon, Northern Ireland   BT71 4DR
Attention:  Shay McKeown/Barry Cosgrove

Fax:  011-441-86-874-8816

with a copy to:

Brown, Todd & Heyburn PLLC
3200 Providian Center
Louisville, Kentucky 40202-3363
Attention: Jay Middleton Tannon

Fax:  502-581-1087

or if sent to such substituted address as any party has given to the others in writing in accordance with this <u>Section 9.01</u>.

9.02  <u>**Waivers**</u>.  No waiver or failure to insist upon strict compliance with any obligation, covenant, agreement or condition of this Agreement shall operate as a waiver of, or an estoppel with respect to, any subsequent or other failure.

9.03  <u>**Expenses**</u>.  Each party shall assume its respective expenses incurred in connection with the transactions contemplated by this Agreement.  None of Seller's expenses related to the transaction contemplated in this Agreement (other than normal wages and salaries, but not overtime or bonuses, paid by Seller to the Division's employees) shall be charged against or paid by the Division.

9.04  <u>**Headings; Interpretation**</u>.  The headings in this Agreement have been included solely for ease of reference and shall not be considered in the interpretation or construction of this Agreement.

All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, as appropriate.

9.05   **Annexes and Schedules**.  The Annexes and Schedules to this Agreement are incorporated herein by reference and expressly made a part hereof.

9.06   **Entire Agreement**.  All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Agreement.   There are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth herein or on an Annex or Schedule delivered in connection herewith.

9.07   **Representations and Warranties**.  Except where a party has actual knowledge, the representations and warranties of each party contained herein shall not be deemed to be waived or otherwise affected by any investigation made by any other party hereto.  As used in this Agreement, the term "Seller's knowledge" and all other references to matters which are known or to Seller, shall refer to matters which are known by David Black, Charles Diller, or Thomas Singer after consultation with Lawrence Weber, the General Manager of the Division, Jerry Lute, the Division's Director of Product Engineering, and Scott Smith, the Division Director of After Sales Service.

9.08   **Currency**.  All amounts referenced in this Agreement have been stated in U.S. dollars.

9.09   **Brokers**.  The parties covenant and agree with one another that, except for retention of Peers & Co. by Seller, they have not

dealt with any broker or finder in connection with any of the transactions contemplated in this Agreement; and, insofar as they know, no broker or other Entity is entitled to a commission or finders' fee in connection with these transactions. Seller shall be responsible for any and all fees and expenses of Peers & Co. Each party shall indemnify and hold the other parties harmless from and against any claim by any agent or broker claiming by or through it for any fee or other compensation due or allegedly due that broker or agent.

9.10 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

9.11 **Severability**. If any provision of this Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired. If any court shall determine that any provision of this Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

9.12 **Benefit and Binding Effect**. This Agreement shall be binding upon, and shall inure to the benefit of, Seller, Purchaser, Fulton, Powerscreen Holdings and each of their respective successors and assigns; provided, however, that no party to this Agreement shall assign its rights or obligations hereunder without the express written consent of the other party, which consent shall

not be unreasonably withheld; and provided further that no third party beneficiaries shall be created hereby.

9.13 **Risk of Loss**. The risk of any loss or damage to any of the Assets by fire or any other casualty or cause shall be borne by Seller at all times through the Closing, and by Purchaser thereafter. If, prior to the consummation of the Closing, the Assets shall be damaged or destroyed to the extent that the Division's manufacturing capacity would be materially impaired for at least 30 days, either Seller or Purchaser may terminate this Agreement; and, upon such termination, no party to this Agreement shall have any further obligation hereunder to the others. If neither Seller nor Purchaser elect to terminate this Agreement pursuant to this Section 9.13, upon the Closing, Purchaser shall be entitled to all insurance proceeds relating to the casualty to the Assets, and Seller shall not have any further liability to Purchaser as a result of such casualty.

9.14 **Further Assurances**. Following the Closing, from time to time at another party's request and without further consideration, a party shall execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions as the requesting party may reasonably propose, in order more effectively to convey and transfer any of the Assets. In addition, any monies collected by a party which are due and payable to another party shall be promptly remitted to such party upon receipt thereof.

9.15 **Sales and Transfer Taxes and Fees**. Except for the 2% transfer tax on Real Property and Vehicle transfer taxes to be

shared equally by Purchaser and Seller, all sales and transfer taxes, and all recording, filing and other fees (including any penalties or interest), incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by Seller. The parties shall assist each other in the filing of all necessary tax returns and other documentation with respect to all such taxes and fees; and, if required by applicable law, the parties shall join in the execution of any such tax returns or other documentation.

9.16  **Prorations and Adjustments.**  All ad valorem and property taxes pertaining to the Real Property, Equipment and Vehicles and all utility payments shall be prorated as of the Closing Date, so that, as between the Sellers and the Purchaser, the Sellers shall be responsible for all ad valorem property taxes allocable to the period ending on the Closing Date, and the Purchaser shall be responsible for all ad valorem property taxes allocable thereafter.

9.17  **Arbitration.**  Should arbitration be required pursuant to Section 2.05 of this Agreement, the parties shall timely execute and deliver an engagement letter with Coopers & Lybrand LLP; but if the parties are unable to conclude such arrangement within 15 days of commencing the effort to obtain such engagement letter, the controversy, dispute or claim shall be submitted for arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association or any successor thereof.  Arbitration shall take place at an appointed time and place in Wilmington, Delaware.

In the event the parties utilize the American Arbitration Association, each of Purchaser and Seller shall select one (1) arbitrator (who shall not be counsel for or otherwise associated with any such party); and the two (2) so designated shall select a third arbitrator. If either party shall fail to designate an arbitrator within seven (7) calendar days after arbitration is requested, or if the two (2) arbitrators shall fail to select a third arbitrator within fourteen (14) calendar days after arbitration is requested, then such arbitrator shall be selected by the American Arbitration Association or any successor thereto upon application of either party. Judgment upon any award of the majority of arbitrators shall be binding and shall be entered in a court of competent jurisdiction. The arbitrators may grant any relief which might be granted by a court of general jurisdiction, including, without limitation, an award of damages and/or injunctive relief; and the arbitrators may in their discretion assess the cost of the arbitration, including the reasonable fees of the arbitrators and reasonable attorneys' fees, against either or both parties, in such proportions as the arbitrators shall determine.

9.18 **Governing Law**. This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware. Subject to the provisions of <u>Section 9.17</u>, the parties further consent to the exclusive jurisdiction of the U.S. federal courts within the State of Delaware in any action hereunder.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date set forth in the preamble hereto, but actually on the dates set forth below.

POWERSCREEN USC INC.

By _____

Title: _____

Date: _____

JLG INDUSTRIES, INC.

By _____

Title: Exec. V.P. & CFO

Date: May 22, 1996

FULTON INTERNATIONAL, INC.

By _____

Title: Secretary

Date: May 22, 1996

POWERSCREEN INTERNATIONAL PLC

By _____

Title: _____

Date: _____

SCHEDULE A

Current Models of Equipment

A.     Cranes:

> Model 600BT Crane
> Model 1000J Crane
> Model 1250J Crane
> Model 1400J Crane
> Model 1500J Crane
> Model 1700J Crane
> Model 2000J Crane
> Model 2250J Crane
> Model 2300J Crane
> Model 2800J Crane

B.     Unloaders:

> Model 60-18 Unloader
> Model 60-26E Unloader
> Model 60-26C Unloader
> Model 110-26 Unloader
> Model 110-35 Unloader
> Model M-26E Unloader
> Model M-26C Unloader
> Model M-21-8E Unloader
> Model M-21-8C Unloader
> Model PC-16E Unloader
> Model PC-16C Unloader
> Model 300-25 Unloader
> Model 300-35 Unloader
> Model KTS 146KTS Unloader
> Model KTS 146BBH Unloader
> Model KTS 146KBB Unloader
> Model 300-45 Unloader
> Model 55-26 Unloader
> Model 150-26 Unloader
> Model 50-15 Unloader

C.     Miscellaneous:

> Taxi-King Swing Cab
> TailGator mobile rough terrain forklift

SCHEDULE 1.01(e)

Assumed Contracts

1.  Stipulated Settlement Agreement between U.S. Truck Cranes, Inc., Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.) and JLG Industries, Inc. (to be assigned to Purchaser except to the extent of Hiab's obligation to indemnify Seller as specified therein for accidents and incidents occurring prior to the Closing Date)

2.  Distributor Sales & Service Agreements, with a listing of current Distributors dated as of May 13, 1996 and copies of Seller's standard form Agreements having been provided to Purchaser. Changes thereto will have been made from May 13, 1996 to the date hereof. The files containing the Agreements are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

3.  Agreement dated May 1, 1979 by and between Frank Spalluto, Paul Baldasarre and Garden State Engine and Equipment Co., Inc.

4.  Security Agreements (Equipment and Inventory), with a listing dated as of May 14, 1996 of Distributors which have entered into the same and a copy of Seller's standard form Agreement having been provided to Purchaser. Changes thereto will have been made from May 14, 1996 to the date hereof. The files containing the Agreements are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

5.  Purchase orders issued by Seller in the ordinary course of its business. As of May 17, 1996 those purchase orders having extended contract terms, fixed prices or other provisions have been issued to: Engine Distributors, Inc., Wire Rope Corporation of America, Custom Hydraulics, Inc., Y.E.I., Hydraulic Fitting Co., Inc., Lehigh Valley Plastics, Inc., Lindstrom Machine Shop, The James Walker Co., D.L. Metals, Inc., Bearings, Inc., Advanced Fluid Connectors, Inc., K-D Manitou, The Sherwin-Williams Company, 3M Co. Engineering Div. and Fairfax Environmental. In addition, joint purchasing arrangements with Seller's McConnellsburg operation for the purchases of certain items.

6.  Maintenance and service agreements with the following: Quark Xpress, Summagraphics Corporation, York Calculator Company, Hewlett-Packard Company, Phillips Office Products, Rasna Corporation, and Print-O-Stat, Inc.

7.  Agreement with Marlin Industrial Division, Inc. relating to employee communication service.

8.  Agreement with Quality Copy Products relating to a copier.

Schedule 1.01(j)

Practices and Policies

See Schedule 1.01(l)

SCHEDULE 1.01(f)

Assumed Liabilities

1.    Subject to Section 5.07, all warranty liabilities and obligations for products sold by the Division prior to the Closing Date.

2.    The liabilities and obligations reflected on the Closing Financial Statements, being specifically warranty and accounts payable (excluding any accounts payable relating to environmental consulting or remediation).

3.    All liabilities and obligations arising from or relating to the Assumed Contracts assigned to Purchaser.

4.    All liabilities and obligations expressly assumed by Purchaser pursuant to the terms of this Agreement.

5.    All liabilities and obligations arising from or related to any product retrofit, recall and other programs of a similar nature, including Field Service Bulletins and Field Service Changes and letter campaigns, issued prior to the Closing Date.

6.    Liability for all claims, demands, expenses and actions in law or in equity at any time made or brought by anyone or any entity for any damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution or service of i) all unloaders and boom truck cranes and parts therefore which were manufactured and/or sold by either by Seller, U.S. Truck Cranes, Inc. or USTC Indiana, Inc., or which are specified in the Stipulated Settlement Agreement (item 1, Schedule 1.01(k)), excepting however those cranes being the models specifically identified in Schedule 6.03, and ii) any unloader or crane product manufactured and sold by Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.), Dico Company, Inc., Dyneer Corporation, York Stone, Side-O-Matic Unloader Corporation, Greater Iowa Corporation, Beloit Corporation or Elberfeld Manufacturing Company, Inc. as and to the extent only that Seller is alleged to have liability for the same.

7.    All liabilities and obligations arising from operation by Purchaser of the Business or ownership of the Assets after the Closing Date, including any claims, demands, expenses and actions in law or in equity at any time made or brought by anyone or any entity for damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution and use of any part sold by Purchaser for or any service rendered by Purchaser for any product, including those cranes being the models specifically identified in Schedule 6.03.

SCHEDULE 1.01(k)

Contracts

1. Stipulated Settlement Agreement between U.S. Truck Cranes, Inc., Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.) and JLG Industries, Inc.

2. Distributor Sales & Service Agreements, with a listing of Distributors dated as of March 7, 1996 and copies of Seller's standard form Agreements having been provided to Purchaser. Changes thereto will have been made from March 7, 1996 to the date hereof. The files containing the Agreements are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

3. Agreement dated May 1, 1979 by and between Frank Spalluto, Paul Baldasarre and Garden State Engine and Equipment Co., Inc.

4. Security Agreements (Equipment and Inventory), with a listing dated as of February 23, 1996 of Distributors which have entered into the same and a copy of Seller's standard form Agreement having been provided to Purchaser. Changes thereto will have been made from February 23, 1996 to the date hereof. The files containing the Agreements are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

5. Non-Qualified Stock Option Agreements dated July 25, 1995, July 21, 1994 and March 31, 1993 by and between JLG Industries, Inc. and Lawrence J. Weber.

6. Non-Qualified Stock Option Agreements dated July 21, 1994 by and between JLG Industries, Inc. and Theodore C. Knox.

7. Indemnification Agreement dated July 15, 1991 by and between JLG Industries, Inc. and Lawrence J. Weber.

8. Deferred Compensation Benefit Agreement dated July 15, 1991 by and between JLG Industries, Inc. and Lawrence J. Weber.

9. Restricted Stock Agreements dated September 6, 1995 by and between JLG Industries, Inc. and the following employees of the Division: Thomas Conrad, Milfred L. Keefer, Gerald E. Lute, Kenneth E. Michael, Harry S. Smith and Lawrence J. Weber; with the same are subject to an October 25, 1995 memorandum.

10. Separation Provisions regarding Theodore C. Knox and Frederick R. Goode

11. Letter Agreements dated October 25, 1995 with eleven (11) employees of the Division, namely Harry S. Smith, Milfred L. Keefer, David L. Bagley, Dennis D. Faust, Ronnie E. Riggs, Michael J. Mikita, Gerald E. Lute, Lynn L. Oakman, Bradley S. Buchter,

12. Ford Motor Credit Company Agreement relating the 120 day floor plan financing (original agreement can not be located; Agreement is not assignable).

13. Purchase orders issued by Seller in the ordinary course of its business. As of May 17, 1996 those purchase orders having extended contract terms, fixed prices or other provisions have been issued to: Engine Distributors, Inc., Wire Rope Corporation of America, Custom Hydraulics, Inc., Y.E.I., Hydraulic Fitting Co., Inc., Lehigh Valley Plastics, Inc., Lindstrom Machine Shop, The James Walker Co., D.L. Metals, Inc., Bearings, Inc., Advanced Fluid Connectors, Inc., K-D Manitou, The Sherwin-Williams Company, 3M Co. Engineering Div. and Fairfax Environmental. In addition, joint purchasing arrangements with Seller's McConnellsburg operation for the purchases of certain items.

14. Maintenance and service agreements with the following: Quark Xpress, Summagraphics Corporation, York Calculator Company, Hewlett-Packard Company, Phillips Office Products, Rasna Corporation, and Print-O-Stat, Inc.

15. Agreement with Marlin Industrial Division, Inc. relating to employee communication service.

16. Agreement with Quality Copy Products relating to a copier.

17. Agreement with International Business Machines Corporation for customized operational services.

18. Software License Agreement with Rasna Corporation.

19. Agreement with Parametric Technology Corporation for PTC licensed products.

20. Sales orders issued by Seller for the sales of products and parts and quotations issued for the sales of products and parts.

21. Recourse arrangements with various commercial financial companies and banks relating to equipment purchases and leases by distributors of Sellers.

22. Seller's contracts for the service, maintenance and support of its computers and computer related equipment under which the Division's computers and computer related equipment is serviced, maintenanced and supported.

23. Agreement with Micro Control, Inc. for CADAM maintenance dated March 9, 1996.

Annex 1.01(l)

Current Financial Statements

Attached and labeled as Annex 1.01(l) - Attachments A are the Current Financial Statements.

Annex 1.01(1)
1 of 20

Material Handling Division
Unaudited Pro Forma Balance Sheet
April 30, 1996
(000's omitted)

## ASSETS

Current assets

| | |
|---|---|
| Accounts receivable, less allowance for doubtful accounts of $25 | $4,209 |
| Inventories | 6,600 |
| Other prepaids | 17 |
| Total current assets | 10,826 |

Property, plant & equipment

| | |
|---|---|
| Land & improvements | 421 |
| Buildings & improvements | 1,116 |
| Machinery & equipment | 3,021 |
| | 4,558 |
| Less allow for depr | (2,436) |
| Net property, plant & equipment | 2,122 |

Other assets

| | |
|---|---|
| Total Assets | $12,948 |

## LIABILITIES & DIVISIONAL INVESTMENT

Included liabilities:

| | |
|---|---|
| Accounts Payable | 1,655 |
| Warranty | 287 |
| Other | |
| | 1,942 |

Excluded Liabilities
Compensation and benefits:

| | |
|---|---|
| Bonuses | 343 |
| Vacation | 60 |
| Pension | 85 |
| Workmens' compensation | 52 |
| Accrued Advertising | 61 |
| Prepaid medical | (39) |
| Product liability | 565 |
| Divisional Investment | 9,869 |
| Total Liabilities and Divisional Investment | $12,948 |

**Notes to Unaudited Pro Forma Balance Sheet:**
**April 30, 1996**

**Accounts Receivable**
The books and records of the Division include an allocation of the Company's total accounts receivable based on the Material Handling Division's sales to total Company sales. For this pro forma balance sheet presentation, accounts receivable has been adjusted to reflect all machine and service parts billings specifically relating to the Division, except for service parts billings that relate to customers common to both the Material Handling and Lift Divisions.

**Allowance for Doubtful Accounts**
The books and records of the Division include an allocation of the Company's total allowance for doubtful accounts based on the Division's sales to total Company sales. For this pro forma balance sheet presentation, the allowance for doubtful accounts was determined based on specific customer amounts which are considered uncollectible.

**Inventories**
Inventories are stated at cost using the FIFO method. A LIFO reserve included on the books and records of the Division has been excluded from this pro forma balance sheet. Also excluded from this pro forma balance sheet are certain inventory valuation reserves treated as a special deduction from net assets in determining the cash to be paid at closing. For a further discussion of inventories, see the attached "Assumptions, Methods and Procedures Used in Valuing Inventories at January 31, 1996."

**Other Prepaids**
Includes prepaid property taxes, promotional items, and security deposits.

**Property, Plant & Equipment**
Property, plant and equipment is stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method, based on useful lives of 15 years for land improvements, 10 to 20 years for buildings and improvements, and 3 to 10 years for machinery and equipment.

**Liabilities and Accrued Expenses**
Certain liabilities, including accounts payable, compensation and benefit accruals, workmen's compensation claims, accrued advertising, as well as prepaid medical were not specifically identified by division on the Company's books and records, therefore they were not included on the books and records of the Division. However, amounts relating to these accounts were subsequently segregated and included in this pro forma balance sheet.

**Warranty**
The warranty accrual was calculated based on the historical claims experience of the Division as well as other subjective criteria. The pro forma balance sheet excludes certain warranty provisions treated as a special deduction from net assets in determining the cash to be paid at closing. For a further discussion of the warranty reserves, see the attached "Assumptions, Methods and Procedures Used in Establishing the Procedures Used in Establishing the Warranty Reserves at January 31, 1996."

Material Handling Division
Unaudited Pro Forma Income Statement
Nine Months Ended April 30, 1996
(in thousands of dollars)

| | | % |
|---|---|---|
| **Revenues:** | | |
| Boom truck cranes | $8,689 | 52.7 |
| Unloaders | 5,305 | 32.2 |
| Service parts | 2,420 | 14.7 |
| Other | 72 | 0.4 |
| | 16,486 | 100.0 |
| **Cost of sales:** | | |
| Boom truck cranes | | |
| Material | 3,595 | |
| Labor | 720 | |
| Overhead | 2,300 | |
| | 6,615 | |
| Unloaders | | |
| Material | 2,294 | |
| Labor | 411 | |
| Overhead | 1,283 | |
| | 3,988 | |
| Service parts | | |
| Material | 814 | |
| Labor | 77 | |
| Overhead | 243 | |
| | 1,134 | |
| Other | | |
| Material | (3) | |
| Labor | - | |
| Overhead | - | |
| | (3) | |
| Total cost of sales | | |
| Material | 6,700 | |
| Labor | 1,208 | |
| Overhead | 3,826 | |
| | 11,734 | |
| **Gross Margin:** | | |
| Boom truck cranes | 2,074 | 23.9 |
| Unloaders | 1,317 | 24.8 |
| Service parts | 1,286 | 53.1 |
| Other | 75 | 104.2 |
| Subtotal before production variances | 4,752 | 28.8 |
| Production variances | 199 | |
| | 4,553 | 27.6 |
| **Other cost of sales:** | | |
| Inventory reserves | 135 | |
| Freight-in | 185 | |
| Warranty & field service | 879 | |
| Product liability | 35 | |
| Other | - | |
| | 1,234 | 7.5 |
| Gross profit | 3,319 | 20.1 |
| **Selling, general & administrative expenses:** | | |
| Selling | 1,081 | |
| General & administrative | 468 | |
| Product development | 843 | |
| | 2,392 | 14.5 |
| Operating profit | $927 | 5.6 |

See the accompanying notes in this unaudited pro forma income statement

**Notes to the Unaudited Pro Forma Income Statement:**
**Period Ended April 30, 1996**

**General**
The pro forma income statement includes certain rounding differences when compared to the books and records of the Division.

**Production Variances**
The pro forma income statement includes certain adjustments relating to a vacation accrual per an agreement made with the original USTC employees and an adjustment relating to a prior year medical expense reimbursement.

**Inventory reserves**
The pro forma income statement excludes certain Inventory valuation provisions which are treated as a separate deduction from net assets in determining the cash to be paid at closing.

**Warranty and Field Service**
The pro forma income statement excludes certain warranty provisions which are treated as a separate deduction from net assets in determining the cash to be paid at closing.

**Product Liability**
Product liability was arbitrarily allocated to the books and records of the Division. The pro forma income statement reflects cash paid and/or reserves established relative to certain incidents incurred during fiscal 1996.

**Other**
The books and records of the Division include a LIFO provision for unloader products. Since inventories as reflected on the pro forma balance sheet are on a FIFO basis, this provision was excluded from the pro forma income statement.

**Selling**
The pro forma income statement has been adjusted to include a vacation accrual per the agreement made with the original USTC employees and an adjustment made for a prior year medical reimbursement.

**General & administrative**
The books and records of the Division do not reflect a bad debt expense. Additionally, the allowance for doubtful accounts as of April 30, 1996 has not been included in this pro forma income statement. Expenses of $8 on the books and records of the Division have been inadvertently excluded from expense in presenting this pro forma income statement.

**Product development**
The pro forma income statement includes an adjustment for a prior year medical reimbursement.

Material Handling Division
Assumptions, Methods and Procedures used in valuing Inventories at January 31, 1996

| | G/L Bal 1-31-96 | Cost In Excess of NRV |
|---|---|---|
| | 43.0 | |
| Finished Machines | 1,086.0 | 153.2 |
| Machines In Process | | |
| Consignment | 1,246.0 | 28.9 |
| Truck Chassis | 270.0 | |
| Fab Parts - In Process | 1,610.0 | 309.9 |
| Fab Parts - Stocked | 2,837.0 | |
| Raw Material & Purchased Parts | | |
| Subtotal | 7,092.0 | 492.0 |
| Less: Scrap recovery @ 5% | | (19.8) |
| Cost In Excess of NRV | | 472.2 |
| Inventory Valuation Reserve: | | |
| Charged directly to work order | (54.0) | |
| Contra-Account | (265.0) | |
| Overhead Spreedback | 253.0 | |
| G/L Balance @ 1-31-96 | 7,026.0 | |

The analysis and discussions attached hereto are an integral part of this summary schedule.

Material Handing - January 1996
Fab Parts - Stocked
Raw Materials & Purchased Parts

| | G/L Bal 1-31-96 | Cost in Excess of NRV | Explanation |
|---|---|---|---|
| Current production | 3,389.0 | | Production parts |
| Excess - Demand > 24 months | 183.3 | 45.8 | NRV @ 75% |
| 50-15 | 98.3 | | Good Inventory. Product discontinued but saleable. |
| 55-26 | 13.9 | 13.9 | Obsolete. No FY 96 forecast |
| 150-26 | 10.9 | 10.9 | Obsolete. No FY 96 forecast |
| 150-45 | 6.9 | 6.9 | Obsolete. No FY 96 forecast |
| 300-25/35/45 | 110.0 | 20.0 | Product is saleable.Some parts physically deteriorated |
| 1044 JP | 12.4 | 10.7 | Balance for service parts |
| DEICER | 1.3 | 1.3 | Balance for service parts |
| 1400 & 2300 JBT | 16.2 | 13.9 | Balance for service parts |
| Out of Production - Demand < 24 months | 223.3 | | Useable as service parts |
| Obsolete | 161.5 | 161.5 | No demand |
| Rusted Parts- All Machines | 10.0 | 10.0 | Parts physically deteriorated |
| McCbg Cylinders | 211.0 | 15.0 | No demand |
| | | | |
| Total | 4,447.0 | 309.9 | |

• Identifies machines and parts having no sales value except for scrap recovery at 5%.

aterial Handing - January 1996

| In Process | Machine Serial # | Truck Serial # | WIP Report | Truck Chassis | G/L Bal 1-31-96 | Cost In Ecess of NRV | | | Explanation |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Machine | Truck | Total | |
| 1000JBT | 3200 | | 7.6 | | 7.6 | | | | |
| 1000JBT | 3201 | | 7.5 | | 7.5 | | | | |
| 1000JBT | 3209 | | 1.1 | | 1.1 | | | | |
| 1000JBT | 3210 | | 1.1 | | 1.1 | | | | |
| 1000JBT | 3211 | | 0.7 | | 0.7 | | | | Has service parts value of 6.0 |
| 1044JP | 2549 | 5282 | 38.9 | 27.5 | 68.4 | 32.9 | 10.0 | 42.9 | |
| 1410JBT | 3203 | 15722 | 6.2 | 28.1 | 34.3 | | | | |
| 1410JBT | 3204 | 16640 | 6.2 | 28.1 | 34.3 | | | | |
| 1410JBT | 3208 | | 1.3 | | 1.3 | | | | |
| 1500JBT | 3202 | 02563 | 7.9 | 39.9 | 47.8 | | | | |
| 1500JBT | 3205 | 77604 | 6.0 | 28.6 | 34.6 | | | | |
| 1500JBT | 3213 | | 0.9 | | 0.9 | | | | |
| 1500JBT | 3214 | | 0.9 | | 0.9 | | | | |
| 1500JBT | 3215 | | 0.9 | | 0.9 | | | | |
| 1700JBT | 3183 | | 21.6 | | 21.6 | | | | |
| 1700JBT | 3206 | 02567 | 1.4 | 45.3 | 46.7 | | | | |
| 2000JBT | 2986 | 30932 | 57.2 | 46.7 | 103.9 | | | | |
| 2250JBT | 3111 | 40750 | 53.5 | 55.4 | 108.9 | | | | |
| 2250JBT | 3158 | 7040 | 19.3 | 46.5 | 65.8 | | | | |
| 2250JBT | 3207 | 7041 | 1.4 | 46.5 | 47.9 | | | | |
| 2250JBT | 3212 | | 1.1 | | 1.1 | | | | |
| 2800JBT | 3087 | 36312 | 71.4 | 55.4 | 126.8 | | | | |
| 2800JBT | 3098 | | 30.4 | | 30.4 | | | | |
| 2800JBT | 3199 | | 25.2 | | 25.2 | | | | |
| DEICER | 3164 | | 7.2 | | 7.2 | | | | |
| DEICER | 3165 | | 7.4 | | 7.4 | | | | |
| SC | 2950 | 24008 | 104.7 | 46.7 | 151.4 | | | | |
| 110-26 | 943 | | 0.7 | | 0.7 | | | | |
| 110-26 | 945 | | 0.7 | | 0.7 | | | | |
| 110-35 | 629 | 303781 | 28.5 | 38.9 | 67.4 | 28.5 | 18.9 | 47.4 | Crane value at 0, truck at 20.0 |
| 110-35 | 938 | | 0.8 | | 0.8 | | | | |
| 110-35 | 939 | | 0.8 | | 0.8 | | | | |
| 110-35 | 940 | | 0.8 | | 0.0 | | | | |
| 110-35 | 939 | | 0.8 | | 0.8 | | | | |
| 110-35 | 940 | | 0.7 | | 0.7 | | | | |
| 110-35 | 944 | | 0.7 | | 0.7 | | | | |
| 110-35 | 946 | | 0.7 | | 0.7 | | | | |

Handing - January 1996

| ocess | Machine Serial # | Truck Serial # | WIP Report | Truck Chassis | G/L Bal 1-31-96 | Cost in Excess of NRV Machine | Truck | Total | Explanation |
|---|---|---|---|---|---|---|---|---|---|
| | 947 | | 0.7 | | 0.7 | | | | |
| | 395 | 14820 | 54.6 | 58.8 | 113.4 | | | | Sold in Feb |
| | 942 | | 1.5 | | 1.5 | | | | |
| | 451 | | 25.4 | | 25.4 | 25.4 | | 25.4 | Crane value at 0 |
| | 620 | | 15.3 | | 15.3 | 2.9 | | 2.9 | Rework to sell |
| | 621 | | 21.2 | | 21.2 | 2.9 | | 2.9 | Rework to sell |
| | 631 | | 18.7 | | 18.7 | 2.9 | | 2.9 | Rework to sell |
| | 632 | | 19.7 | | 19.7 | 2.9 | | 2.9 | Rework to sell |
| | 659 | | 10.1 | | 10.1 | 2.8 | | 2.8 | Rework to sell |
| | 617 | | 18.7 | | 18.7 | 2.8 | | 2.8 | Rework to sell |
| | 660 | | 9.5 | | 9.5 | 2.8 | | 2.8 | Rework to sell |
| | 937 | | 1.0 | | 1.0 | | | | |
| | 941 | | 0.9 | | 0.9 | | | | |
| | 933 | | 7.7 | | 7.7 | | | | |
| | 934 | | 7.6 | | 7.6 | | | | |
| | 935 | | 4.4 | | 4.4 | | | | |
| | 936 | | 4.5 | | 4.5 | | | | |
| | 890 | | 18.8 | | 18.8 | | | | |
| NG | 3095 | 38326 | 94.1 | 57.5 | 151.6 | 13.8 | | 13.8 | Rework to sell |
| | 1 | | 36.8 | | 36.8 | 19.3 | | 19.3 | Proto 1- write down for sale |
| | 2 | | 30.8 | | 30.8 | 13.3 | | 13.3 | Proto 2- write down for sale |
| | 3 | | 19.1 | | 19.1 | | | | |
| | 4 | | 16.5 | | 16.5 | | | | |
| | 5 | | 0.2 | | 0.2 | | | | |
| | 6 | | 0.2 | | 0.2 | | | | |
| | 7 | | 0.2 | | 0.2 | | | | |
| | 8 | | 0.2 | | 0.2 | | | | |
| | 9 | | 0.2 | | 0.2 | | | | |
| | 10 | | 0.2 | | 0.2 | | | | |
| | | 40751 | | 55.4 | 55.4 | | | | |
| | | 77606 | | 28.6 | 28.6 | | | | |
| | | 78912 | | 28.6 | 28.6 | | | | |
| | | 80149 | | 28.6 | 28.6 | | | | |
| | | 2828 | | 45.4 | 45.4 | | | | |
| | | 2829 | | 45.4 | 45.4 | | | | |

Handing - January 1996

| rocess | Machine Serial # | Truck Serial # | WIP Report | Truck Chassis | G/L Bal 1-31-96 | Cost in Ecess of NRV | | | Explanation |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Machine | Truck | Total | |
| | | 2830 | | 45.4 | 45.4 | | | | |
| | | 2831 | | 45.4 | 45.4 | | | | |
| | | 7042 | | 46.5 | 46.5 | | | | |
| | | 12723 | | 27.5 | 27.5 | | | | |
| | | 15725 | | 28.4 | 28.4 | | | | |
| | | 15721 | | 28.1 | 28.1 | | | | |
| | | 15726 | | 28.3 | 28.3 | | | | |
| | | 15728 | | 28.3 | 28.3 | | | | |
| | | 15729 | | 29.5 | 29.5 | | | | |
| | | 16642 | | 28.1 | 28.1 | | | | |
| | | 16641 | | 28.1 | 28.1 | | | | |
| ders | | | 124.5 | | 124.5 | | | | |
| | | | 1,086.0 | 1,245.5 | 2,331.5 | 153.2 | 28.9 | 182.1 | |

ifies machines and parts having no sales value except for scrap recovery at 5%.

MATERIAL HANDLING
MANUFACTURING OVERHEAD SPREADBACK
JANUARY 96

OVERHEAD @ STANDARD

| INVENTORIES | ACCOUNTS | LAB | OH | RATE |
|---|---|---|---|---|
| UNSHIPPED PARTS | 11512-11513 | | | |
| FAB PARTS | 11531-11532 | | | |
| WIP | 11534-11535 | 304,782 | 933,057 | 3.061 |
| CONSIGNMENT | 11562-11563 | | | |
| FINISHED GOODS | 11565-11566 | | | |
| | | 304,782 | 933,057 | 3.061 |

CALCULATION OF ROLLING AVERAGE USING OH @ ACTUAL COST

| | LABOR $ | OH $ | OH RATE |
|---|---|---|---|
| DEC POOL | 362,478 | 1,395,540 | 3.85 |
| JAN | 79,507 | 321,632 | 4.05 |
| JAN AVG RATE | 441,985 | 1,717,172 | 3.89 |

| SPREADBACK | RATE | DIRECT LABOR | DIRECT OVERHEAD |
|---|---|---|---|
| JAN | 3.89 | 79,507 | 309,282 |
| DEC | 3.89 | 125,840 | 489,518 |
| NOV | 3.89 | 99,435 | 386,802 |
| | | 304,782 | 1,185,602 |
| | | 304,782 | |

| | |
|---|---|
| LESS O/H @ STANDARD | 933,057 |
| TOTAL MANUFACTURING O/H SPREADBACK | 252,545 |
| LESS PRELIMINARY BALANCE ACCOUNT 11540 | 272,660 |
| NET ADJUSTMENT INC/(EXP) | (20,115) |

## ASSUMPTIONS, METHODS AND PROCEDURES
## USED IN VALUING INVENTORIES AT
## JANUARY 31, 1996

The following inventory valuations were determined based on the books and records of the Division, discussions and judgements made by the Division's personnel based on their knowledge of the products, the marketplace in which the products are sold and in certain instances the physical inspection of the inventory items. All costs reflected in this analysis are on a FIFO basis. Net realizable value (NRV) used in this analysis is the estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal.

**FINISHED GOODS** - Finished goods are those units which have a machine status of "Ready for Shipment". These machines are current production machines built to a customer order or built for stock. These units have no cost in excess of NRV.

**IN PROCESS MACHINES** - These are machines (excluding truck chassis) that are in various stages of completion. The majority of these machines are current production machines. Each machine with an identified serial number was examined and all except the following were established as having an NRV in excess of cost:

<u>1044 JP (SN 2549)</u> -- This machine is an R&D prototype which has salvageable service parts estimated at $6,000. The balance of $32,900 was established as an NRV reserve.

<u>110-35 (SN 629)</u> -- R&D prototype machine was determined to have no value and an NRV reserve of $28,500 was established.

<u>50-15 (SN 451)</u> -- R&D prototype. Machine determined to have no value, and an NRV reserve of $25,400 was established.

<u>50-15 (SN 617, 620, 621, 631, 632, 659, 660)</u> -- Machines are saleable after investing an estimated $20,000 in total for all seven machines for rework and repairs. This amount was established as an NRV reserve.

<u>Taxi-King (SN 3095)</u> -- Machine is saleable after investing an estimated $13,800 for rework and repairs. This amount was established as an NRV reserve.

<u>TG's (Proto 1 and Proto 2)</u> -- These machines are saleable at an estimated $35,000 in total for the two machines, resulting in a total NRV reserve of $32,600 for the two machines.

**TRUCK CHASSIS** -- Truck chassis were examined and their NRV was estimated based on their condition, age and mileage, resulting in the following NRV reserves:

<u>93 Ford (SN 5282)</u> -- Estimated realizable value is $17,500, resulting in an NRV reserve of $10,000.

<u>87 Autocar (SN 303781)</u> -- Estimated realizable value is $20,000, resulting in an NRV reserve of $18,900.

**FAB PARTS - IN PROCESS** -- Represents work in process orders for current products. These orders have no cost in excess of NRV.

**FAB PARTS - STOCKED AND RAW MATERIALS AND PURCHASED PARTS** -- All stock parts, including fabricated parts, raw materials and purchased parts, were reviewed with respect to their NRV based on the following criteria:

<u>Current Production</u>

-- Compared 24 months usage of active parts against existing inventory to generate a listing of parts in excess of 24 months supply ($469,100). The 24 months usage was determined by using actual usage for the period January 1, 1995 through February 29, 1996 (14 months) and extrapolating that into the equivalent of 24 months usage. Parts representing 24 months usage were categorized as "current production" and valued at cost.

-- From this excess listing, all parts relating to new products were excluded. These parts were also valued at cost and categorized as current production.

-- Customer Service reviewed the remaining parts and retained $45,800 as useable within 24 months and these were valued at cost and categorized as current production.

-- This balance in excess of 24 months usage ($183,300) was valued at an estimated NRV of 75%, or $137,500, resulting in a cost in excess of NRV reserve of $45,800.

<u>Out of Production</u> -- Parts relating to certain products not in current production were identified and valued as follows:

<u>55-26, 150-26, 150-45</u> -- These are in-house production parts that have no forecasted demand and no service value. An NRV reserve at 100%, or $31,700, was established.

<u>300-25/35/45</u> -- This is a saleable product but some parts are physically deteriorated from the weather. An NRV reserve of $20,000 was established for these parts representing the cost to rework these parts into useable condition.

<u>1044JP, DEICER, 1400, 2300JBT</u> -- These products will no longer be produced. Service has elected to retain $3,000 of the parts as saleable in the next 24 months. The balance of $25,900 was established as an NRV reserve.

<u>Other</u> -- All other out of production parts ($384,800) were reviewed and $223,300 was determined useable at full value as service parts over the next 24 months.

<u>Obsolete</u> -- The balance of $161,500 was determined not useable and an NRV reserve of $161,500 established.

## OTHER VALUATIONS

<u>Rusted Parts - All Machines</u> -- A visual inspection of all parts resulted in $10,000 of parts that had physical deterioration due to rust. An NRV reserve of $10,000 was established for these parts.

<u>McConnellsburg Cylinders</u> -- Certain parts are manufactured in McConnellsburg. These were reviewed as to useability within 24 months and an NRV reserve of $15,000 was established for these parts.

**SCRAP RECOVERY** -- All parts and machines not saleable for which an NRV was established ($396,700) was considered as scrap and an estimated recovery of 5%, or $19,800, was estimated.

**OVERHEAD SPREADBACK** -- Overhead for the current month at actual cost is added to the overhead pool at actual cost as of the beginning of the month in order to recalculate (using actual labor) an average actual overhead rate. The resulting actual overhead rate is then used to calculate the cost of goods sold for the current month and to revalue overhead in inventory at the end of the month at actual cost.

# ASSUMPTIONS, METHODS AND PROCEDURES USED IN ESTABLISHING THE WARRANTY RESERVES AT JANUARY 31, 1996

## General Reserve

1. The warranty experience of machines sold during the 12 month period 1/31/94 to 1/31/95 was examined.

2. This time period represents the most recent 12 months of machine sales on which the warranty coverage has elapsed.

3. A listing of these machines that includes warranty claims by machine (in dollars) and net sales of each machine is generated by product line.

4. Total warranty claim dollars are divided into net sales dollars to develop a claim rate as a percent of sales; unloaders - 1.25%, cranes - .90%.

5. These percentages are multiplied by the last 12 months of sales and then weighted by time remaining in the warranty period. The 12 months range from Jan. 96 through Feb. 95. Jan. 96 sales have a weighting factor of 12/12 or 1.0; Dec. 95, 11/12 or .9167; Nov. 95, 10/12 or .8333; continuing to Feb. 95 which is 1/12 or .0833.

6. These calculations result in reserve amounts of $35,767 for unloaders and $58,733 for cranes. Total general reserve is $94,500.

## 5-Year Structural

The 5-year structural reserve of $40,500 was based on subjective discussions with Customer Service personnel at York concerning known problems in the field and the anticipated cost associated with the repairs. This amount was checked for reasonableness by reference to total annual structural claims for fiscal years 1995 and 1994.

JLG INDUSTRIES
MATERIAL HANDLING DIVISON
WARRANTY RESERVE ANALYSIS
QUARTER ENDING 1/27/96
EXPERIENCE 1/31/94 - 1/31/95

Weighting Factor

| | |
|---|---|
| B | 0.0833 |
| AR | 0.1667 |
| R | 0.2500 |
| AY | 0.3333 |
| N | 0.4167 |
| L | 0.5000 |
| JG | 0.5833 |
| P | 0.6667 |
| ET | 0.7500 |
| OV | 0.8333 |
| EC | 0.9167 |
| N | 1.0000 |

Warranty as a % of Sales

| | |
|---|---|
| UNLOADERS | 0.0125 |
| CRANES | 0.0090 |

| MONTH | ******sales****** | | TOTAL | ******PERCENT****** | | FACTOR | UNLOADERS | CRANES | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | UNLOADERS | CRANES | | UNLOADERS | CRANES | | | | |
| | | | | | | | 1,058 | 660 | 1,718 |
| EB | 1,015,547 | 880,510 | 1,896,057 | 0.0125 | 0.0090 | 0.0833 | 2,118 | 1,919 | 4,037 |
| AR | 1,016,474 | 1,279,459 | 2,295,933 | 0.0125 | 0.0090 | 0.1667 | 2,487 | 2,810 | 5,298 |
| PR | 795,951 | 1,249,041 | 2,044,992 | 0.0125 | 0.0090 | 0.2500 | 1,442 | 4,452 | 5,894 |
| AY | 346,026 | 1,484,086 | 1,830,112 | 0.0125 | 0.0090 | 0.3333 | 1,265 | 5,347 | 6,612 |
| JN | 242,904 | 1,422,850 | 1,668,754 | 0.0125 | 0.0090 | 0.4167 | 298 | 4,673 | 4,971 |
| JL | 47,680 | 1,038,442 | 1,086,122 | 0.0125 | 0.0090 | 0.5000 | 1,625 | 4,818 | 6,443 |
| UG | 222,843 | 917,684 | 1,140,527 | 0.0125 | 0.0090 | 0.5833 | 3,025 | 3,677 | 6,702 |
| | 362,968 | 612,799 | 975,767 | 0.0125 | 0.0090 | 0.6667 | 5,554 | 7,864 | 13,418 |
| | 592,383 | 1,165,079 | 1,757,462 | 0.0125 | 0.0090 | 0.7500 | 3,993 | 6,144 | 10,137 |
| | 383,348 | 819,194 | 1,202,542 | 0.0125 | 0.0090 | 0.8333 | 4,747 | 5,716 | 10,463 |
| EC | 414,311 | 692,809 | 1,107,120 | 0.0125 | 0.0090 | 0.9167 | 8,155 | 10,652 | 18,808 |
| AN | 652,428 | 1,183,607 | 1,836,035 | 0.0125 | 0.0090 | 1.0000 | 35,767 | 58,733 | 94,500 |
| | 6,092,863 | 12,748,560 | 18,841,423 | | | | | | |

Letter Campaigns and Potential Warranty.

Previously issued letter campaigns and field service bulletins are periodically reviewed to identify those for which future claims for reimbursement may be anticipated to be received pursuant to the reimbursement plan, if any, announced in conjunction with each such letter campaign and field service bulletin. This identification is based on among other things, the form of the letter campaign or field service bulletin, the facts concerning each and its issuance, date of issuance, date of last claim and intended follow up action, together with the prior history of letter campaigns and field service bulletins and the judgment of those individuals doing the review. Estimated costs for each such letter campaign or field service bulletin so identified are made using among other things the number of units affected, number of units completed, the estimated cost of completion, the number of units for which parts have been ordered, the estimated number of units for which claims for reimbursement are anticipated, and the facts concerning each.

Potential warranty is established based on the evaluation and review of matters involving field units by appropriate product safety personnel, with input from service, engineering, marketing and management personnel. Those matters cover field units for which action may be considered or is being taken by reason of safety/reliability related problems or concerns. They usually involved three (3) basic areas. The first is recently issued or recommended letter campaigns or field service bulletins. For each of these, an estimated cost is established which is based on the number of units affected, the nature of the action taken, an estimated cost of completion and an estimated completion percentage, which percentage is based on the form, the facts concerning each and its issuance, intended follow-up action, together with the prior history of letter campaigns and field service bulletins and the judgment of the product safety personnel involved. The second area is where no action is recommend, but it is anticipated that specified action may be taken for customer relation reasons. Costs are estimated in a manner similar to that discussed above, with the number of units for which the action may be taken to be based on an estimate using service and marketing input. The third area is where it is decided that action would be taken, but only in response to customer complaints or claims for field units. Estimated costs are made using among other things, the number of units affected, nature of the action taken, the estimated cost of completion and the estimated number of units for which the action is expected to be taken.

# LETTER CAMPAIGNS

BT Extend Chain/Rod Update:

100% Completion cost = $13,966.40
Affected units = 55
Completed = 7
Parts ordered = 4                                         $2,793.00


Fiberglass Basket Attachment Replacement:

100% Completion cost = $4,960.62
Affected units = 42
Completed = 7
Parts ordered = 34                                        $4,015.74


Update of the Brake Cylinder Attach Plate
Installed on the Platform:

100% Completion cost = $1,738.90
Affected units = 11
Completed = 2
Parts ordered = 9                                         $1,423.74


Turntable Weldment Update:

100% Completion cost = $7,974.50
Affected units = 50
Completed = 4
Parts ordered = 46                                        $7,336.54


                                                          $15,569.02

**TOTAL:**

# POTENTIAL WARRANTY

## Capacity Alert for Overload System - FSB #96-3-1 (Yellow Headline):

Total cost for 100% completion = $31,500.00
Average % of completion for FSB = 33%
Approx. amount required = 33% x $31,500.00 = $10,395.00                $10,395.00

## "J" Series Cranes - Telescope Cylinder Scoring:

Machines involved (manufactured 6/95 to present) = 164
Potential problems = 30% (49 machines)
24 machines already completed (changed telescope cylinder)
49 - 24 = 25 potential machines remain to be completed
Average cost of telescope cylinder = $1,500.00 per machine
Labor cost = 12 hours @ $45.00 per hour = $540.00 per machine
Travel cost = $265.00 per machine
Total cost parts/labor = $2,305.00 per machine
Total cost estimate = $2,305.00 per machine x 25 = $57,625.00
Total cost estimate for 100% (140 machines) =
$2,305.00 per machine x 140 = $322,700.00                $57,625.00

## "J" Series Cranes - Telescope Cylinder Slow Retract Speed:

Machines involved = 73
Average cost of new telescope cylinders required = $1,866.00 per
machine
Travel/Labor cost = 18 hours @ $45.00 per hour = $810.00
Total cost parts/labor = $2,676.00 per machine
Total cost estimate for 100% (73 machines) =
$2,676.00 per machine x 73 = $195,348.00
No recommended action. Potentially replace cylinders on 5 machines
for customer relations = $2,676.00 per machine x 5 = $13,380.00                $13,380.00

# POTENTIAL WARRANTY

### 50-15 Unloader - Boom Modification and Turntable Bolt Replacement

Machines involved = 4
Parts cost = $150.00 per machine
Paint cost = $400.00 per machine
Labor cost = 11 hours @ $45.00 per hour = $495.00 per machine
Travel cost = 6 hours @ $53.00 per hour = $318.00 per machine
Total cost estimate = $1,363.00 per machine x 4 = $5,452.00

NOTE: If JLG personnel are required to travel to the machines and
complete the work, it is estimated to cost an additional $700.00 per
machine x 4 = $2,800.00 + $5,452.00 = $8,252.00.                     $8,252.00

### 2200BT - Boom Eye-Bolt:

Machines involved = 23
Travel/Labor cost to replace/rework eye-bolt mounting = $500.00 per
machine
Total cost estimate for approx. 75% (17 machines) =
$500.00 per machine x 17 = $8,500.00
Total cost estimate for 100% (23 machines) =
$500.00 per machine x 23 = $11,500.00
Recommend Letter Campaign to repair all machines subject to design
verification.                                                       $8,500.00

### BT - Pedestal Cracks:

Potential machines with low rear mount = 8
Material cost = $100.00 per machine
Labor cost = 32 hours @ $45.00 per hour = $1,440.00 per machine
Travel cost = $600.00 per machine
Total cost parts/labor = $2,040.00 per machine
Total cost estimate = $2,040.00 per machine x 8 = $16,320.00

Potential machines with front mount = 2
Total cost estimate = $1,780.00 per machine x 2 = $3,560.00        $19,880.00

# POTENTIAL WARRANTY

<u>755 Cranes - Brakes</u>

Machines involved = 108
Parts cost = $1,405.00 per machine
Labor cost = 24 hours @ $45.00 per hour = $1,080.00 per machine
Total cost parts/labor = $2,485.00 per machine

Potential Hertz machines involved = 24
Total cost estimate = $2,485.00 per machine x 24 = $59,640.00

Total cost estimate for 6 machines = $2,485.00 per machine x 6 = $14,910.00

NOTE:  Hertz machines have already been done once; therefore, we should not pay for them again.                                    $14,910.00


**TOTALS**                                                                         **$132,942.00**

SCHEDULE 1.01(o)

Equipment

Copy of Seller's Asset Status Report dated as of May 15, 1996 is attached and labeled as Schedule 1.01(o) - Attachment A.

Schedule 1.01(o) - ment A

```
IOA DATE  5/15/96                          COMPANY -  1 JLG INDUSTRIES                                        PAGE   1
TIME 14:11:15                             BOOK BASIS ASSET STATUS REPORT

ESS LEVEL  0005    JLG INDUSTRIES          ASSET TYPE/SUBTYPE  BLDGS 5201
```

| ..T COMP SRC NBR MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| I00456  FA  0001  IN PLANT OFFICE | 1/01/95-3 | 120 | 104.031 | STL | 6891.73 | 5974.58 | | 516.87 | 917.15 |
| I00466  FA  0001  CE REPAIRS | 7/02/95-3 | 120 | 110.014 | STL | 38464.00 | 35306.85 | | 2869.48 | 3157.15 |
| TYPE  5201 TOTAL | | | | | 45355.73 | 41281.43 | | 3386.35 | 4074.30 |
| I00396  FA  0001  IRAL HEAT/AIR ENG. OFFICE | 5/31/92-1 | 120 | 70.962 | STL | 3550.00 | 2140.86 | | 264.00 | 1409.14 |
| TYPE  5203 TOTAL | | | | | 3550.00 | 2140.86 | | 264.00 | 1409.14 |
| I00301  FA  0001  - ACQUSITION | 1/29/90-1 | 240 | 163.951 | STL | 740053.94 | 507720.85 | | 27071.06 | 235333.09 |
| I00300  FA  0001  PETING IN OFFICES | 7/01/90-1 | 120 | 48.981 | STL | 7225.47 | 2981.23 | | 547.79 | 4244.24 |
| I00389  FA  0001  LDING ENCLOSURE | 8/01/90-1 | 120 | 50.000 | STL | 50475.00 | 21252.64 | | 3825.47 | 29222.36 |
| I00390  FA  0001  PRESSOR ROOM | 11/28/90-1 | 231 | 164.913 | STL | 5043.50 | 4173.46 | | 227.77 | 1670.04 |
| I00393  FA  0001  HEAD DOOR @ DOCK EXTENSION | 6/02/91-1 | 120 | 60.028 | STL | 2825.00 | 1426.24 | | 213.84 | 1398.76 |
| I00440  FA  0001  CURTAIN NO-14-13-5  #520 | 9/04/94-3 | 120 | 100.110 | STL | 6731.00 | 5615.78 | | 504.82 | 1115.22 |
| I00441  FA  0001  CURTAIN NO-14-13-5  #520 | 9/04/94-3 | 120 | 100.110 | STL | 6731.00 | 5615.78 | | 504.82 | 1115.22 |
| I00493  FA  0001  F REPAIRS | 7/02/95-3 | 120 | 110.014 | STL | 212464.00 | 194782.96 | | 15934.77 | 17681.04 |
| I00500  FA  0001  1 PUMP RELOCATION | 10/02/95-3 | 120 | 113.004 | STL | 3950.00 | 3719.70 | | 230.30 | 230.30 |
| TYPE  5601 TOTAL | | | | | 1039288.91 | 747280.64 | | 49860.64 | 292010.27 |
| I00392  FA  0001  LDING ENCLOSURE - ASSBLY | 3/03/91-1 | 120 | 57.036 | STL | 8791.93 | 4210.20 | | 665.64 | 4573.65 |
| TYPE  5640 TOTAL | | | | | 8791.93 | 4210.20 | | 665.64 | 4573.65 |
| I00391  FA  0001  HEAD DOOR | 3/03/91-1 | 120 | 57.036 | STL | 6540.00 | 3137.02 | | 495.14 | 3402.18 |
| TYPE  5650 TOTAL | | | | | 6540.00 | 3137.02 | | 495.14 | 3402.18 |

DATE 5/15/96           COMPANY - 1  JLG INDUSTRIES                            PAGE   2
TIME 14:11:15           BOOK BASIS ASSET STATUS REPORT

LEVEL 0005    JLG INDUSTRIES           ASSET TYPE/SUBTYPE  BLDGS 5660

| COMP SRC / ASSET NBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 3511  FA  0001 ANT OFFICE W/ A/C | 2/01/96-3 | 120 | 117.051 | STL | 3398.89 | 3314.15 | | 84.74 | 84.74 |
| PE  5660 TOTAL | | | | | 3398.89 | 3314.15 | | 84.74 | 84.74 |
| 0508  FA  0001 ANT OFFICE W/ A/C | 2/01/96-3 | 120 | 117.051 | STL | 4216.93 | 4111.80 | | 105.13 | 105.13 |
| 1903  FA  0001 OP A/C UNIT | 6/06/94-1 | 120 | 97.000 | STL | 4995.00 | 4037.62 | | 374.63 | 957.30 |
| PE  5660 TOTAL | | | | | 9211.93 | 8149.42 | | 479.76 | 1062.51 |
| TYPE BLDGS TOTAL | | | | | 116147.39 | 809530.60 | | 55236.35 | 206616.79 |
| 0003  FA  0001 - ACQUISITION | 1/29/90- | | | | 185329.00 | 185329.00 | | | |
| PE  5601 TOTAL | | | | | 185329.00 | 185329.00 | | | |
| TYPE LAND TOTAL | | | | | 185329.00 | 185329.00 | | | |
| 0106  FA  0001 P - ACQUISITION | 1/29/90-1 | 180 | 103.951 | STL | 83699.00 | 40346.77 | | 4185.82 | 35342.23 |
| 0123  FA  0001 ING LOT RESTRIPING-YORK | 1/29/95-3 | 180 | 164.951 | STL | 3920.00 | 3592.26 | | 196.01 | 327.74 |
| 0132  FA  0001 K PARKG & RECEIVING AREAS | 7/02/95-3 | 180 | 170.014 | STL | 3625.00 | 3423.88 | | 181.26 | 201.12 |
| 0135  FA  0001 IC SYSTEM | 10/02/95-3 | 180 | 173.004 | STL | 40937.83 | 39352.22 | | 1585.61 | 1585.61 |
| 0141  FA  0001 PAD WATER RECOVERY SYSTEM | 3/05/96-3 | 180 | 178.040 | STL | 40630.35 | 40195.97 | | 442.38 | 442.38 |
| TYPE 5601 TOTAL | | | | | 127810.18 | 134911.10 | | 6591.00 | 37899.08 |
| 0110  FA  0001 AGE TANK PAD | 12/03/90-1 | 36 | | STL | 2610.00 | | | | 2610.00 |
| TYPE 5620 TOTAL | | | | | 2610.00 | | | | 2610.00 |
| 0124  FA  0001 K WASHING STATION | 1/29/95-3 | 180 | 164.951 | STL | 5200.00 | 4765.24 | | 260.01 | 434.76 |
| TYPE 5645 TOTAL | | | | | 5200.00 | 4765.24 | | 260.01 | 434.76 |
| 0109  FA  0001 EXPANSION & UPGRADE | 9/30/90-1 | 180 | 111.973 | STL | 33206.54 | 20660.43 | | 1660.61 | 12546.11 |

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

S LEVEL 0005    JLG INDUSTRIES    ASSET TYPE/SUBTYPE LDIMP 5650

| COMP SRC R MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 112 FA 0001 — XPANSION & UPGRADE | 4/29/91-1 | 180 | 118.077 | STL | 6400.00 | 4229.90 | | 320.24 | 2170.10 |
| 114 FA 0001 — , OF AREA AROUND INV BLDG | 8/01/92-1 | 180 | 135.000 | STL | 6066.00 | 4549.50 | | 303.30 | 1516.50 |
| 110 FA 0001 — IOP & ROAD REPAIR MAT MAN | 9/04/94-3 | 180 | 160.118 | STL | 8975.00 | 7903.67 | | 448.74 | 991.33 |
| PE   5650 TOTAL | | | | | 54647.54 | 37423.50 | | 2732.89 | 17224.04 |
| TYPE LDIMP TOTAL | | | | | 235267.72 | 177099.84 | | 9503.98 | 58167.08 |
| 099 FA 0001 — OAD DYNAMOMETER C659 | 10/30/94-3 | 60 | 41.959 | STL | 2980.00 | 2083.95 | | 447.01 | 896.05 |
| PE   5203 TOTAL | | | | | 2980.00 | 2083.95 | | 447.01 | 896.05 |
| 1406 FA 0001 — HYDRAULIC IRONWORKER | 1/29/90-1 | 60 | | STL | 5500.00 | | | | 5500.00 |
| 1508 FA 0001 — HO CRANES,2 5-T DB CRANES | 1/29/90-1 | 180 | 103.951 | STL | 80000.00 | 48526.44 | | 4201.30 | 35473.56 |
| 1533 FA 0001 — , SWEEPER, TENNANT NO 42HO | 1/29/90-1 | 60 | | STL | 1600.00 | | | | 1600.00 |
| 1537 FA 0001 | 1/29/90-1 | 60 | | STL | 9500.00 | | | | 9500.00 |
| 1583 FA 0001 — OMPRESSOR | 8/01/90-1 | 60 | | STL | 20280.03 | | | | 20280.03 |
| 1590 FA 0001 — BOOM LIFT #0300912450 | 12/30/90-1 | 60 | | STL | 30906.48 | | | 2044.19 | 30906.48 |
| 1618 FA 0001 — MATERIAL RACKS | 6/02/91-1 | 60 | | STL | 11225.59 | | | 1225.54 | 11225.59 |
| 1621 FA 0001 — AGE BINS | 6/30/91-1 | 60 | | STL | 19340.00 | | | 3211.53 | 19340.00 |
| 1625 FA 0001 — SYST - 2 AIR COMPRESSORS | 6/30/91-1 | 60 | | STL | 3312.50 | | | 549.84 | 3312.50 |
| 1676 FA 0001 — ANT FLOOR SWEEPER MODEL186 | 6/20/92-1 | 60 | 13.003 | STL | 6082.29 | 1560.56 | | 1016.07 | 5313.73 |
| 1939 FA 0001 — E GROUND STORAGE TANK-GAS | 1/29/95-3 | 60 | 44.951 | STL | 1864.00 | 1396.46 | | 279.61 | 467.54 |
| 1940 FA 0001 — E GRND STOR.TANK-DIES.FUEL | 1/29/95-3 | 60 | 44.951 | STL | 1864.00 | 1396.46 | | 279.61 | 467.54 |

```
DATE  5/15/96        JLG INDUSTRIES              COMPANY -  1  JLG INDUSTRIES                        PAGE   4
TIME 14:11:15                                    BOOK BASIS ASSET STATUS REPORT
```

ASSET TYPE/SUBTYPE  MAE  5601

| S LEVEL 0005 JLG INDUSTRIES<br>R RUN COE QTY | IN-SERV<br>DIE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 993  FA 0001<br>ORNER UPGRADE | 4/30/95-3 | 60 | 47.943 | STL | 6086.00 | 4862.90 | | 912.89 | 1223.02 |
| 994  FA 0001<br>ITAL DRILL | 4/30/95-3 | 60 | 47.943 | STL | 1888.95 | 1509.36 | | 283.34 | 379.59 |
| 007  FA 0001<br>ANE W/ USED HOIST | 4/30/95-3 | 60 | 47.943 | STL | 4995.00 | 3991.22 | | 749.25 | 1003.78 |
| 016  FA 0001<br>JIB CRANE | 6/04/95-3 | 60 | 49.094 | STL | 2510.00 | 2053.75 | | 376.49 | 456.25 |
| 020  FA 0001<br>CONTAINMENT | 6/04/95-3 | 60 | 49.094 | STL | 3759.91 | 3077.36 | | 564.00 | 682.55 |
| 047  FA 0001<br>R CART | 8/01/95-3 | 60 | 50.975 | STL | 1524.75 | 1295.42 | | 229.33 | 229.33 |
| 099  FA 0001<br>LEVER RACK | 3/05/96-3 | 60 | 58.040 | STL | 6950.00 | 6723.03 | | 226.97 | 226.97 |
| 999  FA 0001<br>ASSET CLEARING 5000 | 1/28/95- | | | | 52899.92 | 52899.92 | | | |
| 008  FA 0001<br>OLDING FOR BOOBT | 6/01/95-1 | 60 | | STL | 1716.80 | | | | 1716.80 |
| 0  FA 0001<br>IN STUD WELDER #961404 | 10/01/88-1 | 84 | | STL | 4172.30 | | | | 4172.30 |
| PE  5601  TOTAL | | | | | 282794.52 | 129300.96 | | 16650.84 | 153493.56 |
| 1401  FA 0001<br>IB CRANE | 1/29/90-1 | 60 | | STL | 554.00 | | | | 554.00 |
| 1490  FA 0001<br>L DRILL, TRM-1900 #1732 | 1/29/90-1 | 60 | | STL | 11000.00 | | | | 11000.00 |
| 1491  FA 0001<br>HERCULES AJAX, 20"X96" | 1/29/90-1 | 60 | | STL | 9000.00 | | | | 9000.00 |
| 1492  FA 0001<br>T LATHE, WAS. #5011661 | 1/29/90-1 | 60 | | STL | 2800.00 | | | | 2800.00 |
| 1493  FA 0001<br>T LATHE, G15HOLT, 6 HEADS | 1/29/90-1 | 60 | | STL | 2000.00 | | | | 2000.00 |
| 1494  FA 0001<br>T LATHE, G15HOLT, #324933 | 1/29/90-1 | 60 | | STL | 2000.00 | | | | 2000.00 |
| 1495  FA 0001<br>CENTER, WICKMAN,MODEL-14 | 1/29/90-1 | 120 | 43.951 | STL | 20000.00 | 7329.20 | | 1500.84 | 12670.80 |

DATE 5/15/96   LEVEL 0005   JLG INDUSTRIES

TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 5

| COMP SRC NBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET TYPE/SUBTYPE | ASSET COST(BASIS) | BOOK VALUE | MLC 5610 | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ...6 FA 0001 DRILL, CINCINNATI | 1/29/90-1 | 60 | | STL | | 3900.00 | | | | | 3900.00 |
| ...7 FA 0001 PRESS, PONEMATIC#220V66 | 1/29/90-1 | 60 | | STL | | 1400.00 | | | | | 1400.00 |
| ...8 FA 0001 LEBLOND #WHEEL - 1677 | 1/29/90-1 | 60 | | STL | | 12000.00 | | | | | 12000.00 |
| ...9 FA 0001 PUNCH, BRODGPRF #12BR-82374 | 1/29/90-1 | 60 | | STL | | 4300.00 | | | | | 4300.00 |
| ...01 FA 0001 PUNCH, CINN #3J5P11-42 | 1/29/90-1 | 120 | 43.951 | STL | | 15400.00 | 5643.68 | | | 1155.64 | 9756.52 |
| ...02 FA 0001 LATHE, FLOOR MOUNT. 1 TON | 1/29/90-1 | 60 | | STL | | 1100.00 | | | | | 1100.00 |
| ...03 FA 0001 LATHE, G15HOLT#377GX10 | 1/29/90-1 | 60 | | STL | | 7700.00 | | | | | 7700.00 |
| ...04 FA 0001 BORING MILL #42-36-12 | 1/29/90-1 | 120 | 43.951 | STL | | 35000.00 | 12826.09 | | | 2626.46 | 22173.91 |
| ...10 FA 0001 PRESSES, SET OF 3 PNHMIC | 1/29/90-1 | 60 | | STL | | 6100.00 | | | | | 6100.00 |
| ...11 FA 0001 PRESSES, SET OF 2 PNHMIC | 1/29/90-1 | 60 | | STL | | 4100.00 | | | | | 4100.00 |
| ...12 FA 0001 PRESSES, SET OF 3 PNHMIC | 1/29/90-1 | 60 | | STL | | 6100.00 | | | | | 6100.00 |
| ...14 FA 0001 DELTA, NO118-4705 | 1/29/90-1 | 60 | | STL | | 1500.00 | | | | | 1500.00 |
| ...26 FA 0001 KALAMAZOO, #2836611 | 1/29/90-1 | 60 | | STL | | 3000.00 | | | | | 3000.00 |
| 587 FA 0001 HOIST-ATTCHD TO 8201594 | 9/30/90-1 | 60 | | STL | | 1545.27 | | | | 25.08 | 1545.27 |
| 588 FA 0001 HOIST | 9/30/90-1 | 60 | | STL | | 1545.27 | | | | 25.08 | 1545.27 |
| 589 FA 0001 AU S/N 90990200 | 9/30/90-1 | 60 | | STL | | 37503.22 | | | | 609.92 | 37503.22 |
| 594 FA 0001 JIB CRANE-INCL HOIST | 11/28/90-1 | 60 | | STL | | 6540.57 | | | | 318.25 | 6540.57 |
| 596 FA 0001 L READOUT - LUCAS MILL | 11/28/90-1 | 60 | | STL | | 3907.00 | | | | 190.11 | 3907.00 |

DATE 5/15/96  
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES  
BOOK BASIS ASSET STATUS REPORT

PAGE 6

ASSET TYPE/SUBTYPE MAC 5610

LEVEL 0005 JLG INDUSTRIES

| R NBR CDE QTY | COMP SRC<br>IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 1710 FA 0001 1/31/93-1<br>HRIZ. SPINDLE MILLING MAC | | 60 | 20.000 | STL | 42096.80 | 14032.27 | | 6314.52 | 28064.53 |
| 1755 FA 0001 5/02/93-1<br>JIB CRANE & HOIST | | 60 | 24.000 | STL | 6964.29 | 2785.72 | | 1044.64 | 4178.57 |
| 1806 FA 0001 12/06/93-1<br>DIGIRULER/DIGITAL READOUT | | 60 | 31.000 | STL | 1430.30 | 743.16 | | 215.76 | 695.22 |
| 1893 FA 0001 10/30/94-3<br>UTORIZED HOISTS-M.H. C639 | | 60 | 41.959 | STL | 5095.64 | 3564.16 | | 764.50 | 1532.40 |
| 1937 FA 0001 1/29/95-3<br>S CNC KNEE MILL | | 60 | 44.951 | STL | 29054.90 | 21267.31 | | 4350.22 | 7207.59 |
| 1972 FA 0001 4/02/95-3<br>FOSDICK RADIAL DRILL | | 60 | 47.022 | STL | 11861.27 | 9295.66 | | 1779.20 | 2565.61 |
| 2063 FA 0001 10/02/95-3<br>ONTAL SPINDLE MILL MACHN | | 60 | 53.004 | STL | 255110.78 | 225400.35 | | 29622.43 | 29622.43 |
| 0070 FA 0001 1/29/90-1<br>TOOLING, DIES | | 36 | | STL | 65100.00 | 65100.00 | | | 65100.00 |
| PE   5610 TOTAL | | | | | 616790.39 | 303425.40 | | 50550.65 | 313322.99 |
| 1483 FA 0001 1/29/90-1<br>HOME CANTILEVER J906FCT | | 60 | | STL | 1300.00 | | | | 1300.00 |
| 1487 FA 0001 1/29/90-1<br>HOIST W/TROLLEY | | 60 | | STL | 1300.00 | | | | 1300.00 |
| 1505 FA 0001 1/29/90-1<br>NG POSITIONER, 36x50 TOP | | 60 | | STL | 2200.00 | | | | 2200.00 |
| 1517 FA 0001 1/29/90-1<br>RANE 1-T CAPACITY | | 60 | | STL | 1200.00 | | | | 1200.00 |
| 1520 FA 0001 1/29/90-1<br>IF BURNING TABLES | | 60 | | STL | 1840.00 | | | | 1840.00 |
| 1521 FA 0001 1/29/90-1<br>ING POSITIONER | | 60 | | STL | 1400.00 | | | | 1400.00 |
| 1527 FA 0001 1/29/90-1<br>4. PACIFIC #5-10356 | | 120 | 43.951 | STL | 55000.00 | 20155.30 | | 4127.20 | 34844.70 |
| 1528 FA 0001 1/29/90-1<br>RANE 1-T CAPACITY | | 60 | | STL | 1100.00 | | | | 1100.00 |
| 1530 FA 0001 1/29/90-1<br>. BRAKE, CIN #J1594 | | 120 | 43.951 | STL | 60000.00 | 21987.60 | | 4502.40 | 38012.40 |

# EXHIBIT "A"
# (Part 3)

RUN DATE 5/15/96
TIME 14:11:15

SS LEVEL  0005     JLG INDUSTRIES

COMPANY - 1  JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE MDE   5620

PAGE  7

| T ITEM NBR | COMP COE | SRC QTY | IN-SERV DTE-DPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11531 HYDRAULIC, DAKE #147084 | FA | 0001 | 1/29/90-1 | 60 | | STL | 1400.00 | | | | 1400.00 |
| 11532 ULIC LIFT TABLE 30"X22" | FA | 0001 | 1/29/90-1 | 60 | | STL | 2300.00 | | | | 2300.00 |
| 01535 RANE 1 TON CAPACITY | FA | 0001 | 1/29/90-1 | 60 | | STL | 1300.00 | | | | 1300.00 |
| 01563 AWELD 651 #018504 W/BOOM | FA | 0001 | 7/01/90-1 | 60 | | STL | 4580.00 | | | | 4580.00 |
| 01564 AWELD 651 #026390 W/BOOM | FA | 0001 | 7/01/90-1 | 60 | | STL | 4580.00 | | | | 4580.00 |
| 01565 AWELD 651 #026392 W/BOOM | FA | 0001 | 7/01/90-1 | 60 | | STL | 4580.00 | | | | 4580.00 |
| 01567 AWELD 451 #330065 W/FEED | FA | 0001 | 7/01/90-1 | 60 | | STL | 2898.00 | | | | 2898.00 |
| 01568 AWELD 451 #051952 W/FEED | FA | 0001 | 7/01/90-1 | 60 | | STL | 2898.00 | | | | 2898.00 |
| 01569 AWELD 451 #058996 W/FEED | FA | 0001 | 7/01/90-1 | 60 | | STL | 2899.00 | | | | 2899.00 |
| 01593 NG SYSTEM - CUTTING MACH | FA | 0001 | 11/28/90-1 | 60 | | STL | 16446.67 | | | 800.27 | 16446.67 |
| 01595 CRANE | FA | 0001 | 11/28/90-1 | 60 | | STL | 6540.58 | | | 318.25 | 6540.58 |
| 01597 0 AMP FEEDS-CUTTING MACH | FA | 0001 | 11/28/90-1 | 60 | | STL | 18513.00 | | | 900.81 | 18513.00 |
| 01607 M MODEL 26 AIR CLEANER | FA | 0001 | 3/03/91-1 | 60 | | STL | 2379.50 | | | 244.07 | 2379.50 |
| 01616 ING POSITIONER | FA | 0001 | 4/08/91-1 | 60 | | STL | 5900.00 | | | 776.74 | 5900.00 |
| 01627 UE BOX WELDER & CONVEYOR | FA | 0001 | 6/28/92-1 | 60 | 13.003 | STL | 131133.72 | 29807.14 | | 19375.11 | 101246.58 |
| 01678 RSION TO BURN TABLE | FA | 0001 | 6/28/92-1 | 60 | 13.003 | STL | 26629.57 | 6069.24 | | 3934.53 | 20560.33 |
| 01691 TABLE VACUUM LIFTER | FA | 0001 | 10/04/92-1 | 60 | 17.000 | STL | 14149.39 | 4008.99 | | 2122.41 | 10140.40 |
| 01719 ER DUAL SWINGARC BOOM | FA | 0001 | 1/31/93-1 | 60 | 20.000 | STL | 4595.00 | 1531.67 | | 689.25 | 3063.33 |

IA DATE 5/15/96    JLG INDUSTRIES    COMPANY - 1 JLG INDUSTRIES    PAGE 8
TIME 14:11:15    0005    BOOK BASIS ASSET STATUS REPORT
.SS LEVEL

| .T COMP SRC ·ER NBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | ASSET TYPE/SUBTYPE MLE 5620 CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| .1257 FA 0001 5/02/93-1 .R SWINGARC BOOM ASSEMBLY. | 60 | 24.000 | STL | | 4919.00 | 1967.60 | | 737.85 | 2951.40 |
| .1174 FA 0001 7/04/93-1 .R DIAL SWINGARC WELD BOOM | 60 | 26.000 | STL | | 3533.00 | 1530.97 | | 529.95 | 2002.03 |
| .1184 FA 0001 9/05/93-1 SWINGARC BOOM WELD SET | 60 | 28.000 | STL | | 5210.90 | 2431.74 | | 781.65 | 2779.16 |
| .1030 FA 0001 4/04/94-1 STANDING JIB CRANE | 60 | 35.000 | STL | | 6759.00 | 4109.43 | | 1056.70 | 2649.57 |
| .1031 FA 0001 4/04/94-1 IRIC CHAIN HOIST & FESTOON | 60 | 35.000 | STL | | 1740.00 | 1015.01 | | 261.00 | 724.99 |
| .1032 FA 0001 4/04/94-1 LYNN ELECTRIC HOIST | 60 | 35.000 | STL | | 1260.00 | 735.01 | | 189.00 | 524.99 |
| .1033 FA 0002 4/04/94-1 TAGLINE FESTOONS | 60 | 35.000 | STL | | 348.86 | 203.51 | | 52.33 | 145.35 |
| .1034 FA 0002 4/04/94-1 DUFF LYNN ELECTRIC HOISTS | 60 | 35.000 | STL | | 2780.00 | 1621.67 | | 417.00 | 1158.33 |
| .1035 FA 0002 4/04/94-1 BRACKET JIB CRANE | 60 | 35.000 | STL | | 1330.00 | 775.83 | | 199.51 | 554.17 |
| .1962 FA 0001 4/02/95-1 IRIZED 3 TON HOIST | 60 | 47.022 | STL | | 2497.00 | 1956.89 | | 374.56 | 540.11 |
| .01963 FA 0001 4/02/95-3 .ER WELDING EQUIPMENT | 60 | 47.022 | STL | | 16012.00 | 12548.58 | | 2401.81 | 3463.42 |
| .01970 FA 0001 4/02/95-3 .GKETS & 2 DEEP CELL BATTS | 60 | 47.022 | STL | | 3110.20 | 2437.45 | | 466.54 | 672.75 |
| .01992 FA 0001 4/30/95-3 .ERY POWERED LIFTING MAGNET | 60 | 47.943 | STL | | 3819.61 | 3052.03 | | 572.94 | 767.58 |
| .02093 FA 0001 3/05/96-3 SWING ARC WELDERS | 60 | 58.040 | STL | | 16471.00 | 15933.10 | | 537.90 | 537.90 |
| .50079 FA 0001 1/29/90-1 .S TOOLING, DIES | 36 | | STL | | 65100.00 | | | | 65100.00 |
| .01603B FA 0001 3/03/91-1 4512 THERMAL CUTTING MACH | 60 | | STL | | 181916.50 | | | 10720.49 | 181916.50 |
| .01603B FA 0001 3/03/91-1 4/WATER TABLES - TCM 4512 | 60 | | STL | | 37262.86 | | | 3834.61 | 37262.86 |
| .-03 01 FA 0001 3/03/91-1 IING MACHINE COMPUTER SYST | 60 | | STL | | 8650.14 | | | 890.16 | 8650.14 |

DATE 5/15/96  
TIME 14:11:15  LEVEL 0005   JLG INDUSTRIES

COMPANY - 1  JLG INDUSTRIES  
BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE HAL  5620

PAGE 9

| COMP NBR | SRC CDE | QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02 , MACH INSTALL & OTHER | FA | 0001 | 3/03/91-1 | 60 | | STL | 5765.04 | | | 593.26 | 5765.04 |
| 01 ABLE EURODRIVE GEARMOTOR | FA | 0001 | 3/31/91-1 | 60 | | STL | 3120.79 | | | 362.22 | 3120.79 |
| G EQUIPMENT | FA | 0001 | 1/03/94-1 | 60 | 32.000 | STL | 10030.00 | 5349.33 | | 1504.51 | 4680.67 |
| LD PLASMA CUTTING SYST. | FA | 0001 | 1/03/94-1 | 60 | 32.000 | STL | 4975.00 | 2653.33 | | 746.26 | 2321.67 |
| C 5620 TOTAL | | | | | | | 765673.33 | 141961.42 | | 73022.25 | 623711.91 |
| 506 8'X16' WITH LADDER | FA | 0001 | 1/29/90-1 | 60 | | STL | 3000.00 | | | | 3000.00 |
| 509 RANE, J 15-T DR.1 5-TON | FA | 0001 | 1/29/90-1 | 180 | 103.951 | STL | 90000.00 | 51992.60 | | 4501.49 | 38007.40 |
| 515 HOMEMADE 3'X24' CYLINDE | FA | 0001 | 1/29/90-1 | 60 | | STL | 1000.00 | | | | 1000.00 |
| 516 HIT RUGGOR STRAION ENG | FA | 0001 | 1/29/90-1 | 60 | | STL | 2300.00 | | | | 2300.00 |
| 592 4G CABINET | FA | 0001 | 9/30/90-1 | 60 | | STL | 1755.70 | | | 28.49 | 1755.70 |
| 603 TIC TORQUE WRENCH | FA | 0001 | 8/01/92-1 | 60 | 15.000 | STL | 3510.00 | 877.50 | | 528.50 | 2632.50 |
| 045 MACHINES & PUMP | FA | 0001 | 7/04/94-1 | 60 | 38.000 | STL | 10545.00 | 6678.51 | | 1581.75 | 3866.49 |
| 046 JT HORIZONTAL DRILL | FA | 0001 | 7/04/94-1 | 60 | 30.000 | STL | 3044.11 | 1941.12 | | 459.73 | 1102.99 |
| 918 4G CABINET | FA | 0001 | 9/30/90-1 | 60 | | STL | 1755.69 | | | 28.49 | 1755.69 |
| PE 5630 TOTAL | | | | | | | 116910.50 | 61489.73 | | 7126.45 | 55420.77 |
| 402 COLIFT SN20230039 | FA | 0001 | 1/29/90-1 | 60 | | STL | 1500.00 | | | | 1500.00 |
| 524 ESSURE CLEANER, KARCHER | FA | 0001 | 1/29/90-1 | 60 | | STL | 1860.00 | | | | 1860.00 |
| 561 4G EQUIPMENT | FA | 0001 | 7/01/90-1 | 60 | | STL | 4845.50 | | | | 4845.50 |

IOA DATE  5/15/96
TIME 14:11:15

COMPANY - 1  JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE  10

ESS LEVEL  0005   JLG INDUSTRIES

ASSET TYPE/SUBTYPE MAL  5640

| .LT COMP SRC<br>BER NBR CDE QTY | IN-SERV<br>DTE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| /01562  FA  0001<br>RETE TEST PAD | 7/01/90-1 | 60 | | STL | 9257.58 | | | | 9257.58 |
| /01749  FA  0001<br>SO DR TORQUE WRENCH | 5/02/93-1 | 60 | 24.000 | STL | 1409.07 | 563.63 | | 211.36 | 845.44 |
| 201750  FA  0001<br>E PREPPER 45-725 | 5/02/93-1 | 60 | 24.000 | STL | 1915.00 | 765.99 | | 207.26 | 1149.01 |
| 201782  FA  0001<br>CHER HDS 890 PRESSURE WASHE | 9/05/93-1 | 60 | 28.000 | STL | 3807.00 | 1813.94 | | 593.05 | 2073.06 |
| 202021  FA  0001<br>0 CELLS | 6/04/95-3 | 60 | 49.094 | STL | 14102.00 | 11530.56 | | 2115.27 | 2563.44 |
| ITYPE  5640  TOTAL | | | | | 38776.15 | 14682.12 | | 3196.94 | 24094.03 |
| 201602  FA  0001<br>EL BLAST CLEANING MACHINE | 1/27/91-1 | 60 | | STL | 142655.84 | | | 11647.23 | 142655.84 |
| 201605  FA  0001<br>DOWNDRAFT PAINT BOOTH | 3/03/91-1 | 60 | | STL | 89674.70 | | | 9228.16 | 89674.70 |
| 201606  FA  0001<br>IOBLAST & DOWNDRAFT PIT | 3/03/91-1 | 60 | | STL | 29600.00 | | | 3046.05 | 29600.00 |
| 201838  FA  0001<br>ICK WASH MEZEANINE | 4/04/94-1 | 60 | 35.000 | STL | 7125.00 | 4156.26 | | 1068.75 | 2968.74 |
| 1602 01  FA  0001<br>AST MACHINE INSTALLATION | 3/03/91-1 | 60 | | STL | 26531.37 | | | 2730.27 | 26531.37 |
| 1605 01  FA  0001<br>NVEYOR SYSTEM - PAINT BOOTH | 3/03/91-1 | 60 | | STL | 49366.22 | | | 5000.13 | 49366.22 |
| 1605 02  FA  0001<br>PAIR & RELOC - PAINT BOOTH | 3/03/91-1 | 60 | | STL | 12024.30 | | | 1237.39 | 12024.30 |
| BTYPE  5645  TOTAL | | | | | 356977.43 | 4156.26 | | 34037.98 | 352821.17 |
| 201404  FA  0001<br>401A FORKLIFT SN 10701 | 1/29/90-1 | 60 | | STL | 5000.00 | | | | 5000.00 |
| 201405  FA  0001<br>15UM FORKLIFT SW545 | 1/29/90-1 | 60 | | STL | 7400.00 | | | | 7400.00 |
| 201519  FA  0001<br>ACTOR, J.DEERE, #1489451 | 1/29/90-1 | 60 | | STL | 14000.00 | | | | 14000.00 |
| 201529  FA  0001<br>RK TRUCK, CAT.#JV0TO0337 | 1/29/90-1 | 60 | | STL | 6300.00 | | | | 6300.00 |

DATE  5/15/96
TIME 14:11:15

COMPANY -  1  JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE  11

LEVEL  0005    JLG INDUSTRIES                    ASSET TYPE/SUBTYPE  MAE    5650

| COMP SRC MBR COE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 14   FA  0001 UCK, 10Y #403FCZS-10701 | 1/29/90-1 | 60 | | STL | 9400.00 | | | | 9400.00 |
| 38   FA  0001 BINS, SHELVES | 1/29/90-1 | 60 | | STL | 31843.00 | | | | 31843.00 |
| 84   FA  0001 | 8/01/90-1 | 60 | | STL | 11318.68 | | | | 11318.68 |
| 90   FA  0001 FORKLIFT SN 11508 | 9/30/90-1 | 60 | | STL | 16049.46 | | | 260.46 | 16049.46 |
| 39   FA  0001 PROTO #1 SN 5801 | 12/01/91-1 | 60 | 6.979 | STL | 10500.00 | 1221.82 | | 1575.63 | 9270.18 |
| 20   FA  0001 .L SHEET LIFTER | 1/31/93-1 | 60 | 20.000 | STL | 6225.24 | 2075.00 | | 933.79 | 4150.16 |
| 21   FA  0001 .L SPREADER BEAM | 1/31/93-1 | 60 | 20.000 | STL | 1190.57 | 396.86 | | 178.50 | 793.71 |
| 22   FA  0001 IIC DOOR OPNRS & RADIOS | 1/31/93-1 | 60 | 20.000 | STL | 1090.00 | 363.33 | | 163.51 | 726.67 |
| 847  FA  0001 FORK TRUCK SN 75730 | 7/04/94-1 | 60 | 30.000 | STL | 21499.00 | 13616.03 | | 3224.86 | 7882.97 |
| 919  FA  0001 LINE SHELVING #840 | 1/01/95-3 | 60 | 44.031 | STL | 3159.12 | 2310.29 | | 473.86 | 840.83 |
| 927  FA  0001 IRONIX FLOOR SCALE | 1/29/95-3 | 60 | 44.951 | STL | 1975.00 | 1479.62 | | 296.26 | 495.38 |
| 960  FA  0001 ANE W/ 1 TON HOIST | 3/05/95-3 | 60 | 46.102 | STL | 3315.00 | 2547.11 | | 497.25 | 767.89 |
| 996  FA  0001 STRIP DOOR | 4/30/95-3 | 60 | 47.943 | STL | 1632.40 | 1304.35 | | 244.87 | 328.05 |
| 061  FA  0001 RUCK CAB S/N 0DCLZ275 | 10/02/95-3 | 60 | 53.004 | STL | 2977.18 | 2630.04 | | 347.14 | 347.14 |
| 02   FA  0001 .7 YARD CRANE | 3/31/91-1 | 30 | | STL | 71255.09 | | | | 71255.09 |
| 018  FA  0001 - Y7 YARD CRANE | 9/02/90-1 | 60 | | STL | 6437.00 | | | 5.84 | 6437.00 |
| E    5650 TOTAL | | | | | 232566.74 | 27952.53 | | 8202.05 | 204614.21 |
| 507  FA  0001 R. INTERNAL #3565SGJ1 | 1/29/90-1 | 60 | | STL | 3500.00 | | | | 3500.00 |

RUN DATE 5/15/96
TIME 14:11:15

SS LEVEL   0005      JLG INDUSTRIES

COMPANY - 1  JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE   12

| ITEM  COMP SRC<br>NBR  CDE  QTY | IN-SERV<br>DTE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| TYPE/SUBTYPE MAE | | | | | | | 5660 | | |
| 12009  FA  0001  4/30/95-3<br>CABLE WELDER | | 60 | 47.943 | STL | 1590.00 | 1274.77 | | 238.80 | 315.23 |
| TYPE  5660  TOTAL | | | | | 5090.00 | 1274.77 | | 238.80 | 3815.23 |
| J1891  FA  0001 10/30/94-3<br>WEST PAD-YORK C611 | | 60 | 41.959 | STL | 16050.00 | 11783.47 | | 2527.49 | 5066.53 |
| TYPE  5680  TOTAL | | | | | 16050.00 | 11783.47 | | 2527.49 | 5066.53 |
| TYPE MAE  TOTAL | | | | | 2435417.06 | 698160.61 | | 196000.46 | 1232256.45 |
| J1977  FA  0001 10/30/94-3<br>PC-MAT'L HANDLING C614 | | 60 | 41.959 | STL | 5296.36 | 3703.83 | | 794.45 | 1592.53 |
| J1978  FA  0001 10/30/94-3<br>MS OFFICE PRO V4.3 C614 | | 60 | 41.959 | STL | 569.00 | 397.92 | | 85.35 | 171.08 |
| J1981  FA  0001 10/30/94-3<br>UPGRADE PHONE SYSTEM C516 | | 60 | 41.959 | STL | 9040.74 | 6322.32 | | 1356.12 | 2718.42 |
| J1990  FA  0001  1/01/95-3<br>MOVEABLE PLANT OFFICE #562 | | 60 | 44.031 | STL | 8109.00 | 5950.60 | | 1216.35 | 2158.32 |
| J2139  FA  0001  4/02/95-3<br>590T/IM PC W/MONITOR | | 60 | 47.022 | STL | 3622.63 | 2839.04 | | 543.41 | 783.59 |
| J2149  FA  0001  4/02/95-3<br>5100T/IM W/MONITOR | | 60 | 47.022 | STL | 4303.06 | 3372.30 | | 645.47 | 930.76 |
| J2155  FA  0001  4/30/95-3<br>THINKPAD MOBILE KIT | | 60 | 47.943 | STL | 7385.94 | 5901.67 | | 1107.90 | 1404.27 |
| J2240  FA  0001 11/01/95-3<br>MIN RING MAU | | 60 | 54.014 | STL | 2475.10 | 2227.36 | | 247.74 | 247.74 |
| TYPE  5201  TOTAL | | | | | 40801.83 | 30715.12 | | 5996.79 | 10086.71 |
| K01714  FA  0001  4/26/92-3<br>MODEL 56 SN23FGN11 PC | | 60 | 11.011 | STL | 4028.00 | 792.91 | | 604.20 | 3235.09 |
| K01723  FA  0001  6/28/92-1<br>INKJET PLOTTER #C1633B | | 60 | 13.803 | STL | 8682.86 | 1978.94 | | 1282.91 | 6703.92 |
| K01724  FA  0001  6/28/92-1<br>VN SOFTWARE | | 60 | 13.803 | STL | 20405.00 | 4650.58 | | 3014.85 | 15754.42 |
| K01725  FA  0001  6/28/92-1<br>VN INSTALLATION | | 60 | 13.803 | STL | 17997.70 | 4101.92 | | 2659.10 | 13895.78 |
| K01726  FA  0001  6/28/92-1<br>MODEL 90 PC SN 23I6D12 | | 60 | 13.803 | STL | 8511.97 | 1939.98 | | 1257.66 | 6511.99 |

DATE 5/15/96
TIME 16:11:15

COMPANY - 1   JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 13

LEVEL 0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE 0ABE 5203

| ASSET NBR CDE QTY | COMP SRC | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|
| 1727 FA 0001 SM23TRD13 MODEL 90 PC SM23TRD02 | | 6/28/92-1 | 60 | 13.003 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |
| 1728 FA 0001 SM23TRD02 MODEL 90 PC SM23TRD02 | | 6/28/92-1 | 60 | 13.003 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |
| 1729 FA 0001 SM23TRD0 MODEL 90 SERVER SM23TRWHB | | 6/28/92-1 | 60 | 13.003 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |
| 1730 FA 0001 SM23TRWHB MODEL 90 SERVER SM23TRWHB | | 6/28/92-1 | 60 | 13.003 | STL | 12281.99 | 2799.24 | | 1814.67 | 9402.75 |
| 1731 FA 0001 SM23XPJH3 SS TOKERING SM23XPJH3 | | 6/28/92-1 | 60 | 13.003 | STL | 4706.40 | 1072.65 | | 695.30 | 3633.75 |
| 1732 FA 0001 SM23XPJH9 SS TOKERING SM23XPJH9 | | 6/28/92-1 | 60 | 13.003 | STL | 4706.40 | 1072.65 | | 695.30 | 3633.75 |
| 1738 FA 0001 X 4060133 X 4060133 | | 10/04/92-1 | 60 | 17.000 | STL | 2133.73 | 604.56 | | 320.05 | 1529.17 |
| 1855 FA 0001 466 COMPUTER & EQUIP. | | 10/04/93-1 | 60 | 29.000 | STL | 6470.00 | 3088.60 | | 950.53 | 3381.40 |
| 1856 FA 0001 466 COMP. & RELATED EQUIP | | 10/04/93-1 | 60 | 29.000 | STL | 6471.00 | 3089.09 | | 950.60 | 3381.91 |
| 1857 FA 0001 466 COMP. & RELATED EQUIP | | 10/04/93-1 | 60 | 29.000 | STL | 6471.00 | 3089.09 | | 950.60 | 3381.91 |
| 1858 FA 0001 020AI7-5 TEK MAU 020AI7-5 | | 10/04/93-1 | 60 | 29.000 | STL | 1297.00 | 626.88 | | 194.56 | 670.12 |
| 1859 FA 0003 SOFTWARE | | 10/04/93-1 | 36 | 5.000 | STL | 27518.63 | 3022.02 | | 6079.67 | 23606.61 |
| 2032 FA 0001 MINITOWER W/MONITOR&STIWR | | 1/29/95-3 | 60 | 44.951 | STL | 9755.98 | 7308.97 | | 1463.40 | 2447.01 |
| 2033 FA 0001 CADAM SOFTWARE-YK ENG. | | 1/29/95-3 | 36 | 20.951 | STL | 7597.00 | 4421.19 | | 1899.24 | 3175.81 |
| 2243 FA 0001 WORKSTATION | | 11/01/95-3 | 60 | 54.014 | STL | 25094.96 | 22592.06 | | 2502.90 | 2502.90 |
| 2240 FA 0001 5100/2M PC | | 12/04/95-3 | 60 | 55.040 | STL | 4280.61 | 3927.31 | | 353.30 | 353.30 |
| 2268 FA 0001 MECHANICA STRUCTURE SFIWRE | | 2/01/96-3 | 36 | 33.051 | STL | 16000.00 | 14670.32 | | 1329.68 | 1329.68 |
| 2269 FA 0001 ENGINEERING CAD SOFTWARE | | 2/01/96-3 | 36 | 33.051 | STL | 17000.00 | 15587.21 | | 1412.79 | 1412.79 |

RUN DATE 5/15/96  COMPANY - 1 JLG INDUSTRIES  PAGE 14
TIME 14:11:15  BOOK BASIS ASSET STATUS REPORT

SS LEVEL 0005 JLG INDUSTRIES  ASSET TYPE/SUBTYPE 01&E 5203

| ASSET NBR / DESCRIPTION | COMP SRC | COE | QTY | IN-SERV DTE/OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| .2272 RESTORE EXT. DRIVE - CAD | FA | 0001 | | 2/01/96-3 | 60 | 57.051 | STL | 1092.67 | 1038.19 | | 54.48 | 54.48 |
| ..5 TKER 2303-2 COPIER | FA | 0001 | | 1/03/94-1 | 60 | 32.000 | STL | 1590.00 | 848.01 | | 238.50 | 741.99 |
| PE 5203 TOTAL | | | | | | | | 239628.81 | 108942.31 | | 35321.67 | 130686.50 |
| .1901 466/MXV PC | FA | 0001 | | 6/06/94-1 | 60 | 37.000 | STL | 3158.56 | 1947.79 | | 473.78 | 1210.77 |
| .2249 5100/XM PC | FA | 0001 | | 12/04/95-3 | 60 | 55.040 | STL | 4280.61 | 3902.70 | | 377.91 | 377.91 |
| PE 5204 TOTAL | | | | | | | | 7439.17 | 5850.49 | | 851.69 | 1588.68 |
| .01472 IE CONTROLLER #59746 | FA | 0001 | | 2/01/89-3 | 60 | | STL | 5002.98 | | | | 5002.98 |
| .01580 [ERMINAL & 180 CPS PRINTER | FA | 0001 | | 1/29/90-1 | 60 | | STL | 920.00 | | | | 920.00 |
| .01581 UTER EQUIP - MODEM | FA | 0001 | | 1/29/90-1 | 60 | | STL | 2300.00 | | | | 2300.00 |
| .01593 PRINT MACHINE | FA | 0001 | | 1/29/90-1 | 60 | | STL | 1400.00 | | | | 1400.00 |
| .01584 H FAX M35 | FA | 0001 | | 1/29/90-1 | 60 | | STL | 1800.00 | | | | 1800.00 |
| .01587 A PHONE SYSTEM NO IV | FA | 0001 | | 1/29/90-1 | 120 | 43.951 | STL | 15000.00 | 5496.89 | | 1125.63 | 9503.11 |
| .01588 OF TYPEWRITERS | FA | 0001 | | 1/29/90-1 | 60 | | STL | 3300.00 | | | | 3300.00 |
| .01590 WRITER, CANON, HP 200X | FA | 0001 | | 1/29/90-1 | 60 | | STL | 2600.00 | | | | 2600.00 |
| .01591 I, MACH, PITNEY BOWES #1746 | FA | 0001 | | 1/29/90-1 | 60 | | STL | 1100.00 | | | | 1100.00 |
| .01593 IER, CANON NP-270F | FA | 0001 | | 1/29/90-1 | 60 | | STL | 3000.00 | | | | 3000.00 |
| .01596 HIBA FAX MACHINE | FA | 0001 | | 1/29/90-1 | 60 | | STL | 2200.00 | | | | 2200.00 |
| .01598 OFFICE FURNITURE | FA | 0001 | | 1/29/90-1 | 60 | | STL | 23925.00 | | | | 23925.00 |

DATE 5/15/96
TIME 14:11:15

COMPANY 1  JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 15

.S LEVEL  0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE  OTAE 5601

| COMP SRC R MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| .631    FA  0001 / 50 #23767764 | 7/01/90-1 | 60 | | STL | 3237.24 | | | | 3237.24 |
| .632    FA  0001 / 30 #23273928 | 7/01/90-1 | 60 | | STL | 1889.90 | | | | 1889.90 |
| .634    FA  0001 .00D TERMINAL SN 2550 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .635    FA  0001 .00D TERMINAL SN 2551 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .636    FA  0001 .000 TERMINAL SN 2554 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .637    FA  0001 .000 TERMINAL SN 2553 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .638    FA  0001 .000 TERMINAL SN 2554 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .639    FA  0001 .000 TERMINAL SN 2555 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .1640   FA  0001 .000 TERMINAL SN2556 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .1641   FA  0001 .000 TERMINAL SN2557 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .1642   FA  0001 .000 TERMINAL SN2558 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| .1643   FA  0001 .50 TERMINAL SN 799 | 7/01/90-1 | 60 | | STL | 706.64 | | | | 706.64 |
| .1644   FA  0001 .000 CONTROLLER #0081024 | 7/01/90-1 | 60 | | STL | 826.80 | | | | 826.80 |
| .1662   FA  0001 .C CONTROLLER #008I024 | 8/01/90-1 | 60 | | STL | 4552.70 | | | | 4552.70 |
| .1670   FA  0001 .DISPLAY STATION | 8/01/90-1 | 60 | | STL | 973.65 | | | | 973.65 |
| .2073   FA  0001 .590/RH PC W/ MONITOR | 1/29/95-3 | 60 | 44.951 | STL | 4811.34 | 3604.55 | | 721.71 | 1206.79 |
| .2074   FA  0001 .590/SP SCSI BASE | 1/29/95-3 | 60 | 44.951 | STL | 10595.10 | 7937.63 | | 1589.26 | 2657.47 |
| .2075   FA  0001 .44XER II HR KIT PC FLAIMED | 1/29/95-3 | 60 | 44.951 | STL | 1097.27 | 822.05 | | 164.60 | 275.22 |

DATE 5/15/96                COMPANY - I JLG INDUSTRIES                    PAGE 16
TIME 14:11:15                BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE 0 &E 5601

| S LEVEL 0005 JLG INDUSTRIES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| R | COMP SRC MBR COE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
| 798  FA 0001 OASIS PRINTER 11898 | | 6/01/87-1 | 60 | | STL | 6871.00 | | | | 6871.00 |
| 0808  FA 0001 RI SN 80797 | | 6/01/88-1 | 60 | | STL | 948.70 | | | | 948.70 |
| 0838  FA 0001 102 PRINTER | | 3/03/91-1 | 60 | | STL | 5988.52 | | | | 5988.52 |
| 0858  FA 0001 4G DEVICE #90082 | | 3/03/91-1 | 60 | | STL | 1174.86 | | 120.90 | | 1174.86 |
| 0868  FA 0001 C CONTROLLER #67331 | | 3/03/91-1 | 60 | | STL | 4951.41 | | 509.54 | | 4951.41 |
| PE  5601 TOTAL | | | | | | 127091.85 | 17861.12 | 4231.64 | | 109230.73 |
| 6268  FA 0001 CRT SN N6J70 | | 6/03/90-1 | 60 | | STL | 1038.29 | | | | 1038.29 |
| PE  5640 TOTAL | | | | | | 1038.29 | | | | 1038.29 |
| 1684  FA 0001 102 PRINTER #CV738 | | 3/03/91-1 | 60 | | STL | 5988.51 | | 616.26 | | 5988.51 |
| 2213  FA 0001 5100/XMT PC | | 7/02/95-3 | 60 | 50.014 | STL | 4654.46 | 3879.78 | 699.17 | | 774.68 |
| PE  5650 TOTAL | | | | | | 10642.97 | 3879.78 | 1314.43 | | 6763.19 |
| 1630  FA 0001 0 50 #237685802 | | 7/01/90-1 | 60 | | STL | 5540.62 | | | | 5540.62 |
| 1741  FA 0001 028 LASERPRINTER | | 10/04/92-1 | 60 | 17.000 | STL | 6035.72 | 1710.12 | 905.36 | | 4325.60 |
| 1624  FA 0001 CRT SN N6162 | | 6/03/90-1 | 60 | | STL | 1038.29 | | | | 1038.29 |
| 1627  FA 0001 PRINTER 400 CPS SN DV159 | | 6/03/90-1 | 60 | | STL | 6360.55 | | | | 6360.55 |
| PE  5653 TOTAL | | | | | | 18975.18 | 1710.12 | 905.36 | | 12265.06 |
| 01595  FA 0001 LNTRE, TANDON | | 1/29/90-1 | 60 | | STL | 3500.00 | | | | 3500.00 |
| 01840  FA 0001 ICAM PROD MILLING SOFTWARE | | 9/05/93-1 | 36 | 4.000 | STL | 3430.00 | 381.10 | 857.51 | | 3048.90 |
| 01846  FA 0001 433/L PC | | 9/05/93-1 | 60 | 28.000 | STL | 2908.64 | 1357.35 | 436.31 | | 1551.29 |

S LEVEL 0005 JLG INDUSTRIES

ASSET TYPE/SUBTYPE DFAE 5680

| R NBR | SRC | QTY | COE | IN-SERV DTE-DPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 961 D STATION C#49I | FA | 0001 | | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| 962 M CAD STATION C#49I | FA | 0001 | | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| 963 M CAD STATION C#49I | FA | 0001 | | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| 964 M CAD STATION C#49I | FA | 0001 | | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| 965 M CAD STATION C#49I | FA | 0001 | | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| 993 D STATION #615 3O1993 | FA | 0001 | | 1/01/95-3 | 60 | 44.031 | STL | 12372.37 | 9079.32 | | 1855.83 | 3293.05 |
| 015 33/L PC -D. MCMILLAN | FA | 0001 | | 1/29/95-3 | 60 | 44.951 | STL | 3067.64 | 2290.20 | | 460.16 | 769.44 |
| 085 LL 590/XM PC W/MONITOR | FA | 0001 | | 1/29/95-3 | 60 | 44.951 | STL | 6507.77 | 4075.49 | | 976.16 | 1632.28 |
| 106 CAN 21FS MONITOR (2) | FA | 0002 | | 3/05/95-3 | 60 | 46.102 | STL | 3720.84 | 2858.94 | | 550.12 | 861.90 |
| 134 D'L MEMORY & HD SPACE | FA | 0001 | | 4/02/95-3 | 60 | 47.022 | STL | 3911.03 | 3065.07 | | 586.66 | 845.96 |
| 166 100/XM PC | FA | 0001 | | 4/30/95-3 | 60 | 47.943 | STL | 4211.79 | 3365.40 | | 631.77 | 846.39 |
| 177 RKSTATION | FA | 0001 | | 4/30/95-3 | 60 | 47.943 | STL | 5904.38 | 4683.56 | | 883.31 | 1220.82 |
| 178 ENVER UPGRADE | FA | 0001 | | 4/30/95-3 | 60 | 47.943 | STL | 6076.82 | 4855.64 | | 911.52 | 1221.18 |
| 189 90/XM PC | FA | 0001 | | 6/04/95-3 | 60 | 49.094 | STL | 4905.14 | 4013.50 | | 735.76 | 891.64 |
| 214 100/XMT PC | FA | 0001 | | 7/02/95-3 | 60 | 50.014 | STL | 4654.49 | 3879.81 | | 698.17 | 774.68 |
| 'E 5680 TOTAL | | | | | | | | 80393.91 | 55359.08 | | 11874.73 | 25034.93 |
| TYPE DFAE TOTAL | | | | | | | | 526012.01 | 224310.02 | | 60496.31 | 301693.99 |
| EVEL 0005 TOTAL | | | | | | | | 449073.18 | 2094438.07 | | 321317.10 | 2403735.11 |
| Y 1 TOTAL | | | | | | | | 449073.18 | 2094438.07 | | 321317.10 | 2403735.11 |

* REPORT COMPLETED *******

Case 1:06-cv-00677-SLR   Document 1-4   Filed 11/02/2006   Page 12 of 48

```
OA DATE 5/15/96                        COMPANY -  7  EQUIPMENT SERVICES                              PAGE    1
TIME 9:10:03                           BOOK BASIS ASSET STATUS REPORT

CSS LEVEL  0005    JLG INDUSTRIES                  ASSET TYPE/SUBTYPE OFEE  5253
```

| CT COMP SRC<br>BER MBR COE QTY | IN-SERV<br>DIE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 01716   FA 0001  4/26/92-3<br>MODEL 56 5R23FGCO0 PC | | 60 | 11.011 | STL | 4028.00 | 792.91 | | 604.20 | 3235.09 |
| .01718   FA 0001  5/31/92-3<br>.60X SPIRIT 61 P.C. | | 60 | 12.962 | STL | 1378.00 | 297.68 | | 206.71 | 1080.32 |
| .01902   FA 0001  6/06/94-1<br>4100/MXV PC | | 60 | 37.000 | STL | 3687.50 | 2273.95 | | 553.14 | 1413.55 |
| 102175   FA 0001  4/30/95-3<br>590/XM PC | | 60 | 47.943 | STL | 3407.48 | 2722.73 | | 511.11 | 684.75 |
| 102215   FA 0001  7/02/95-3<br>.5100/XHI PC | | 60 | 50.014 | STL | 4654.49 | 3079.81 | | 698.17 | 774.68 |
| TYPE  5253  TOTAL | | | | | 17155.47 | 9967.08 | | 2573.33 | 7188.39 |
| J01806   FA 0001  1/29/90-1<br>CAMERA - PANASONIC | | 60 | | STL | 1075.00 | | | | 1075.00 |
| J01597   FA 0001  1/29/90-1<br>C OFFICE FURNITURE | | 60 | | STL | 7975.00 | | | | 7975.00 |
| 01620B   FA 0001  6/03/90-1<br>4-12 DOT BAND PRINTER | | 60 | | STL | 12555.17 | | | | 12555.17 |
| 01623B   FA 0001  6/03/90-1<br>6 CRT SM M493 | | 60 | | STL | 1038.29 | | | | 1038.29 |
| TYPE  5250  TOTAL | | | | | 23443.46 | | | | 23443.46 |
| 302176   FA 0001  4/30/95-3<br>L 590/XM PC | | 60 | 47.943 | STL | 3407.48 | 2722.73 | | 511.11 | 684.75 |
| 302224   FA 0001  9/04/95-3<br>ROFICHE READER/PRINTER | | 60 | 52.053 | STL | 5079.52 | 4386.42 | | 693.10 | 693.10 |
| 302284   FA 0001  3/05/96-3<br>L 5133/GXM 67HMB | | 60 | 58.040 | STL | 3521.53 | 3406.53 | | 115.00 | 115.00 |
| 302285   FA 0001  3/05/96-3<br>L 5133/GXM 67HMG | | 60 | 58.040 | STL | 3521.53 | 3406.53 | | 115.00 | 115.00 |
| 302286   FA 0001  3/05/96-3<br>L 5133/GXM 67HML | | 60 | 58.040 | STL | 3521.52 | 3406.52 | | 115.00 | 115.00 |
| ITYPE  5692  TOTAL | | | | | 19051.58 | 17328.73 | | 1549.21 | 1722.85 |
| .ET TYPE OFEE TOTAL | | | | | 59650.51 | 27295.81 | | 4122.54 | 32354.70 |
| IC LEVEL 0005 TOTAL | | | | | 59650.51 | 27295.81 | | 4122.54 | 32354.70 |

A DATE 5/15/96
TIME 9:10:03

COMPANY 7 EQUIPMENT SERVICES
BOOK BASIS ASSET STATUS REPORT

PAGE 2

SS LEVEL 0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE OTHE 5692

| T COMP SRC<br>NBR CDE QTY | IN-SERV<br>DIE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| ANY 7 TOTAL | | | | | 59650.51 | 27295.81 | | 4122.54 | 32354.70 |

*** REPORT COMPLETED *******

mpany l Total

4,498,173.18    2,094,438.07    321,317.10    2,403,735.11

Total

4,557,823.69    2,121,733.86    325,439.64    2,436,089.81

JLG Industries, Inc.
Materials-handling Division Assets
April 30, 1996

Assets conveying to MHD, on Lift Division books:

| Asset # | Description | Book Value |
|---|---|---|
| 301756 | IBM PS/2 56SLC  S/N 23-FGX70 | 992 |
| 201640 | CM2558 Proto #1 S/N 5803 | 1,454 |
| 301433 | NEC Multispeed HD  S/N 7Y01215HA | 0 |
| | Total | $2,446 |

SCHEDULE 1.01(p)

Excluded Assets

1.  Cash in excess of $750,000.

2.  The computer and computer related equipment listed on the attached schedule dated January 27, 1996 and labeled Schedule 1.01(p) - Attachments A.

3.  Employee Benefit Plans identified in Schedule 3.22.

4.  Insurance Policies identified in Schedule 3.15, item A.

5.  The name JLG Industries, Inc. and any trade names and trademarks of Seller not expressly set forth in Schedule 3.12.  (See Section 5.10).

6.  Other Prepaids as reflected on the Current and Closing Financial Statements.

7.  Accounts Receivable, which as of the Closing Date have not been paid within 120 days of the invoice date, together with the applicable reserve.

8.  All software which execute on the McConnellsburg based AS/400 system. McConnellsburg based server software AS/400 emulation licenses, such as Rumba and Elite products.

9.  Cray TIE-12AC Multiplexor.

Schedule 1.01(p) – Attachment A

JLG Industries, Inc.
Materials-handling Division Assets
April 30, 1996

Assets on MHD's books, not conveying (unless AS/400 solution is installed within 6 months):

| Asset # | Description | Book Value |
|---|---|---|
| 301408B | IBM 3196 Workstation  S/N 88-BD797 | 0 |
| 301678 | IBM 3476 Workstation  S/N 88-G7087 | 0 |
| 301623B | IBM 3476 Workstation S/N 88-M4493 | 0 |
| 301626B | IBM 3476 Workstation  S/N 88-M6170 | 0 |
| 301684 | IBM 4224 - 102 IPDS Printer  S/N 11-GV738 | 0 |
| 301627B | IBM 4224 - 102 IPDS Printer S/N 11-DY159 | 0 |
| 301683B | IBM 4224 - 102 IPDS Printer S/N 11-GA188 | 0 |
| 301620B | IBM 4234 - 012 IPDS Printer S/N 41-D2274 | 0 |
| 301741 | IBM 4028 - AS1 Laser Printer S/N 01-A4329 | 1,710 |
| 301472 | IBM 5394 - O1B Remote Wkstn Controller S/N 23-59746 | 0 |
| 301686B | IBM 5394 - O1B Remote Wkstn Controller S/N 23-67331 | 0 |
| 301662 | IBM 5394 - O1B Remote Wkstn Controller S/N 23-59745 | 0 |
| 301685B | MTS354 Modem Sharing Device  S/N 9008 | 0 |
|  | Total | $1,710 |

SCHEDULE 1.01(q)

Financial Statements

Attached and labeled as Schedule 1.01(q) - Attachment A are the Financial Statements.

Material Handling Division
Unaudited Pro Forma Balance Sheets
As of July 31,
(in thousands of dollars)

| | 1995 | 1994 | 1993 |
|---|---|---|---|
| ASSETS | | | |
| Current assets | | | |
| Accounts receivable | $3,003 | $2,602 | $2,207 |
| Inventories | 7,180 | 6,898 | 4,964 |
| Other prepaids | 51 | 54 | 21 |
| Total current assets | 10,234 | 9,554 | 7,192 |
| | | | |
| Property, plant & equipment | | | |
| Land & improvements | 339 | 317 | 317 |
| Buildings & improvements | 1,101 | 834 | 828 |
| Machinery & equipment | 2,624 | 2,365 | 2,191 |
| | 4,064 | 3,516 | 3,336 |
| Less allow for depreciation | (2,135) | (1,699) | (1,270) |
| Net property, plant & equipment | 1,929 | 1,817 | 2,066 |
| | | | |
| Total Assets | $12,163 | $11,371 | $9,258 |
| | | | |
| LIABILITIES & DIVISIONAL INVESTMENT | | | |
| Warranty | 301 | 202 | 155 |
| Product liability | 655 | 808 | 1,109 |
| Divisional Investment | 11,207 | 10,361 | 7,994 |
| Total Liabilities and Divisional Investment | $12,163 | $11,371 | $9,258 |

See the accompanying notes to these unaudited pro forma balance sheets.

Notes to Unaudited Pro Forma Balance Sheets:
Fiscal Years 1993 through 1995

### Accounts Receivable

For 1994 and 1995, the books and records of the Division included an allocation of the Company's total accounts receivable based on the Material Handling Division's sales to total Company sales. In 1993, the books and records of the Division did not include any allocation for accounts receivable. For this pro forma balance sheet presentation prior to 1995, accounts receivable includes specific machines and service parts billings for all Material Handling Division customers, except those common to both the Material Handling and Lift Divisions. Also included is an estimate of machine billings for common customers. Service parts billings for common customers could not be determined, therefore no such amounts are included in accounts receivable.

In 1995, accounts receivable includes machine and service parts billings for all Material Handling Division customers, except for service parts billings relating to customers common to both Divisions. Service parts billings relating to common customers could not be determined, therefore no amounts are included in accounts receivable.

### Allowance for Doubtful Accounts

In 1993, no allowance for doubtful accounts was reflected on the books and records of the Division. For 1994 and 1995, the books and records of the Division included an allocation of the Company's total allowance for doubtful accounts based on the Division's sales to total Company sales. For these pro forma balance sheets, no allowance for doubtful accounts have been provided.

### Inventories

Inventories are stated at cost using the FIFO method. A LIFO reserve included on the books and records of the Material Handling Division has been excluded from these pro forma balance sheets.

### Other Prepaids

Includes prepaid property taxes, promotional items, and security deposits.

### Property, Plant & Equipment

Property, plant and equipment is stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method, based on useful lives of 15 years for land improvements, 10 to 20 years for buildings and improvements, and 3 to 10 years for machinery and equipment. The pro forma balance sheets for fiscal years 1993 through 1995 include small adjustments for office equipment physically located at the Material Handling Division but erroneously included as assets of the Lift Division.

### Other Assets

In 1993, the books and records of the Division included a $38 investment in USTC of Indiana, a discontinued operation, and therefore has been excluded from these pro forma balance sheets. The pro forma balance sheets also exclude certain miscellaneous clearing accounts included on the books and records of the Division.

### Liabilities and Accrued Expenses

The books and records of the Division included miscellaneous other accrued expenses which erroneously relate to the Lift Division, therefore they were excluded from these pro forma balance sheets.

### Warranty

The warranty accrual was calculated based on the historical claims experience of the Division, as well as other subjective criteria.

Material Handling, Div. 500
Unaudited Pro Forma Income Statements
Fiscal Years Ended July 31,
(in thousands of dollars)

| | 1995 | % | 1994 | % | 1993 | % | |
|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | |
| Boom truck cranes | $12,462 | 55.7 | $9,742 | 53.2 | $5,584 | 44.2 | |
| Unloaders | 6,079 | 27.2 | 5,552 | 30.3 | 4,372 | 34.6 | |
| Service parts | 3,808 | 17.0 | 2,964 | 16.2 | 2,491 | 19.7 | |
| Other | 34 | 0.2 | 51 | 0.3 | 181 | 1.4 | |
| | 22,383 | 100.0 | 18,309 | 100.0 | 12,628 | 100.0 | |
| Cost of sales: | | | | | | | |
| Boom truck cranes | | | | | | | |
| Material | 5,081 | | 4,188 | | 2,477 | | |
| Labor | 1,019 | | 875 | | 487 | | |
| Overhead | 3,198 | | 2,954 | | 1,614 | | |
| | 9,298 | | 8,017 | | 4,578 | | |
| Unloaders | | | | | | | |
| Material | 2,504 | | 2,262 | | 1,748 | | |
| Labor | 474 | | 475 | | 367 | | |
| Overhead | 1,440 | | 1,624 | | 1,255 | | |
| | 4,418 | | 4,361 | | 3,370 | | |
| Service parts | | | | | | | |
| Material | 1,262 | | 1,042 | | 979 | | |
| Labor | 134 | | 102 | | 86 | | |
| Overhead | 409 | | 349 | | 287 | | |
| | 1,805 | | 1,493 | | 1,352 | | |
| Other | | | | | | | |
| Material | | | 10 | | 150 | | |
| Labor | | | 5 | | 8 | | |
| Overhead | | | 11 | | 20 | | |
| | | | 26 | | 178 | | |
| Total cost of sales | | | | | | | |
| Material | 8,847 | | 7,502 | | 5,354 | | |
| Labor | 1,627 | | 1,457 | | 948 | | |
| Overhead | 5,047 | | 4,938 | | 3,176 | | |
| | 15,521 | | 13,897 | | 9,478 | | |
| Gross Margin: | | | | | | | |
| Boom truck cranes | 3,164 | 25.4 | 1,725 | 17.7 | 1,006 | 18.0 | |
| Unloaders | 1,661 | 27.3 | 1,191 | 21.5 | 1,002 | 22.9 | |
| Service parts | 2,003 | 52.6 | 1,471 | 49.6 | 1,139 | 45.7 | |
| Other | 34 | 100.0 | 25 | 49.0 | 3 | 1.7 | |
| Subtotal before production variances | 6,862 | 30.7 | 4,412 | 24.1 | 3,150 | 24.9 | |
| Production variances | 110 | | (604) | | 453 | | |
| | 6,752 | 30.2 | 5,016 | 27.4 | 2,697 | 21.4 | |
| Other cost of sales: | | | | | | | |
| Inventory reserves | 142 | | 208 | | 168 | | |
| Freight-in | 252 | | 187 | | 121 | | |
| Warranty & field service | 1,178 | | 854 | | 478 | | |
| Product liability | 59 | | 145 | | 77 | | A |
| Other | 41 | | 2 | | (1) | | B |
| | 1,672 | 7.5 | 1,396 | 7.6 | 843 | 6.7 | |
| Gross profit | 5,080 | 22.7 | 3,620 | 19.8 | 1,854 | 14.7 | |
| Selling, general & administrative expenses: | | | | | | | |
| Selling | 1,103 | | 1,095 | | 1,019 | | |
| General & administrative | 573 | | 412 | | 356 | | C |
| Product development | 1,221 | | 1,022 | | 787 | | |
| | 2,897 | 12.9 | 2,529 | 13.8 | 2,162 | 17.1 | |

Notes to Unaudited Pro Forma Income Statements:
Fiscal Years 1993 through 1995

A) Product liability expense was arbitrarily allocated to the books and records of the Division. For these pro forma income statements, product liability expense is determined based on cash paid during the period as well as provisions for outstanding cases, all relating to claims and incidents incurred during the period.

B) The books and records of the Division included a LIFO accrual for unloader products. Since inventories for balance sheet purposes are presented on a FIFO basis, this provision was excluded from this pro forma income statement.

C) The books and records of the Division do not reflect a bad debt expense. These pro forma income statements reflect actual bad debt experience incurred during the relevant years.

SCHEDULE 1.01(t)

Inventory

Attached and labeled as Schedule 1.01(t) - Attachment A an Inventory Summary as of April 30, 1996.

Schedule 1.01(r) - Attachment A

Material Handling Division
Inventory Summary
April 30, 1996
(in thousands)

| | Cranes McCbg | Cranes York | Unloaders | Total |
|---|---|---|---|---|
| Machines | | 43 | | 43 |
| - In Process | | 560 | 513 | 1,073 |
| - Consignment | | | | |
| Truck Chassis | | 608 | | 608 |
| Fabricated Parts - In Process | | 122 | 89 | 211 |
| | | | | |
| Stock Parts | | | | |
| - Raw Material & Purchased Parts | 169 | 1,801 | 1,360 | 3,330 |
| - Fabricated Parts | | 865 | 653 | 1,518 |
| | 169 | 3,999 | 2,615 | 6,783 |
| | | | | |
| Production Variances | | | | 107 |
| Inventory Valuation Reserves | | | | (290) |
| | | | | 6,600 |

SCHEDULE 1.01(u)

Liabilities

1.  All warranty liabilities and obligations for products sold by the Division.

2.  All liabilities and obligations reflected on the financial statements for the Division.

3.  All liabilities and obligations arising from or relating to the Contracts identified in Schedule 1.01(k).

4.  Liabilities and obligations to employees of the Division, including those arising from or relating to the Employee Benefit Plans identified in Schedule 3.22.

5.  Liabilities and obligations arising from or relating to the Environmental Matters identified in Schedule 3.25.

6.  All liabilities and obligations arising from or related to any product retrofit, recall and other programs of a similar nature, including Field Service Bulletins, Field Service Changes, and letter campaigns.

7.  Liabilities and obligations arising from accidents or incidents relating to the design, manufacture, assembly, sale, distribution or service of i) unloaders, boom truck cranes, including those cranes being the models specifically identified in Schedule 6.03 and parts therefore which were manufactured and/or sold by either by Seller, U.S. Truck Cranes, Inc. or USTC Indiana, Inc. or which are specified in the Stipulated Settlement Agreement (item 1, Schedule 1.01(k)), and ii) any unloader or crane product manufactured and sold by Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.) Dico Company, Inc., Dyneer Corporation, York Stone, Greater Iowa Corporation, Beloit Corporation Elberfeld Manufacturing Company, Inc. and any other company which manufactured and sold a product related to Seller's Business, as and to the extent only that Seller is alleged to have liability for the same.

8.  Liabilities and obligations for workers compensation claims.

SCHEDULE 1.01(x)

Permits

1.   Permit for Installation of Sewage Disposal System Dated 9/8/95 (Application L 49442).

2.   Permit for Source & Air Cleaning Device: Eight Wheel Rotoblast Machine dated July 1, 1993 and Permit No. 67-323-026.

3.   Storage Tank Certificate, No. 223284.

4.   General Permit For Discharges of Storm Water From Industrial Activities, NPDES Permit No. PAR 113539.

5.   Acknowledgment of Notification of Hazardous Waste Activity, EPA I.D. Number PAD 031395346.

6.   Four (4) Occupancy Permits, Commonwealth of Pennsylvania, Department of Labor and Industry.

7.   Pennsylvania Department of Transportation - Vehicle Dealers License.

8,   Federal excise tax permit.

9.   Pennsylvania sales and use tax license.

10.  Pennsylvania unemployment tax registration.

11.  Federal I.D. number.

12.  Pennsylvania registration for payroll taxes.

Copies of items 1, 2, 3, 4, 5, and 6 has been provided to Purchaser.
None of the Permits are transferable.

## SCHEDULE 1.01(y)
## CALCULATION OF PURCHASE PRICE

Purchase Price Calculation Based on 4/30/96 Balance Sheet:

| | | |
|---|---:|---:|
| Assets to be purchased | | 12,948,542 |
| Less included liabilities | | 1,941,310 |
| Net assets per balance sheet | | 11,007,232 |
| | | |
| Less other adjustments: | | |
| Inventory costs in excess of NRV | | |
| at 1/31/96 per Annex 1.01(l) | 472,200 | |
| Book reserves at 4/30/96 | 289,858 | |
| | | ( 182,342) |
| | | |
| Warranty provisions at 1/31/96 | | |
| per Annex 1.01(l) | | |
| - General | 94,500 | |
| - Structural | 40,500 | |
| - Specific issues | 132,942 | |
| - Letter campaign | 15,569 | |
| | 283,511 | |
| Book reserve at 4/30/96 | 286,966 | |
| | | |
| | | 3,455 |
| Accounts receivable in excess of 120 days, | | |
| net of related allowance for doubtful | | |
| account | | ( 154,936) |
| Excluded other prepaids | | ( 16,966) |
| Adjusted net asset value | | 10,656,443 |
| Premium | | 554,000 |
| | | 11,210,443 |
| Cash to be deposited in purchaser's account at closing | | 750,000 |
| Cash to be paid to seller at closing | | 11,960,443 |

SCHEDULE 1.01(z)

Real Property

ALL that certain property situate, lying and being in Jackson Township, York County, Pennsylvania, bounded, limited and described as follows, to wit:

BEGINNING at a point formed by the intersection of the centerline of Township Road No. 482 and the centerline of the sixty (60) foot wide right of way of the Western Maryland Railway Co.; and running thence along the centerline of the sixty (60) foot wide right of way of the Western Maryland Railway Co. N 83 degrees 44 minutes 00 seconds East 1122.43 feet to a point at lands now or formerly of Charles H. Klingensmith; and running thence along said last mentioned lands South 12 degrees 03 minutes 00 seconds East 303.83 feet to a point; and running thence along same South 26 degrees 38 minutes 00 seconds West 506.57 feet to a point; and running thence by a newly made dividing line along lands of Medusa Portland Cement Co. due west 952.06 feet to a point in the centerline of Township Road No. 482; and running thence along the centerline of Township Road No. 482 due north 627.43 feet to a point on the centerline of the sixty (60) foot wide right of way of the Western Maryland Railway Co. and the place of BEGINNING. Containing 17.3353 acres. Being the same premises which the York County Industrial Development Authority by its Deed dated July 21, 1993 and recorded in the Office of the Recorder of Deeds and for York County, Pennsylvania in Record Book 0720, Page 0966, granted and conveyed unto JLG Industries, Inc.

SCHEDULE 1.01(aa)

Required Consents

None

SCHEDULE 1.01(cc)

Vehicles

1987 Chevrolet Truck, s/n 1GCDR14H9HF310881
1987 Plymouth Sedan, s/n 1P3BJ46K7HC226259
Ford Trucks in the Division's Inventory for which Manufacturers Statement of origin may or
      may not have been received.
1984 Western-Star, s/n 2WKPDCJG8EK909904
1987 Autocar, s/n 1WBUCCCE1HU303781
1985 Hobbs, s/n 1H5PO4528FN001208 (Title held by seller by reason of warranty dispute with
      the Division)

## SCHEDULE 2.06

### Preliminary Allocation of Purchase Price

Price = Net Asset Value Plus $554,000 Plus $750,000

Price = $10,656,443    Plus $554,000 Plus $750,000

Price = $11,960,443

Asset / Liability Values

| | |
|---|---:|
| Cash | 750,000 |
| Accounts Receivable | 4,054,000 |
| Inventories | 6,600,000 |
| Prepaid Assets | 0 |
| Machinery & Equipment | 935,000 |
| Land & Improvements | 355,000 |
| Building & Improvements | 1,037,400 |
| Intangible Assets (Excl. Noncompete Agreement) | 250,000 |
| Covenant Not To Compete | 100,000 |
| | |
| Extra Inventory Reserve | (182,000) |
| Accounts Payable | (1,655,000) |
| Warranty Reserve | (284,000) |
| | |
| Price Paid | 11,960,400 |

SCHEDULE 3.01

Foreign Qualifications

1.    Jurisdiction in which Seller owns or leases real property used solely or exclusively by the Division:

      Pennsylvania

2.    Jurisdiction in which Seller employs personnel on behalf of the Division:

      Pennsylvania.  Regional managers employed by the Division reside in Utah, Pennsylvania, Georgia, Arizona and Oregon

3.    Certificate of Incorporation of Seller (Attached)

4.    Bylaws of Seller (Attached)

SCHEDULE 3.05

Liens

Liens, based on lien searches dated January 12, 1996 (York County) and January 29, 1996 (Secretary of the Commonwealth, Pennsylvania), are to Department of Commerce (MELF) and Ford Motor Credit Company.  Copies of said lien searches have been provided to Purchaser.

SCHEDULE 3.08

Inventory

Division's Inventory and Assets are located at:

- York, Pennsylvania
- McConnellsburg, Pennsylvania
- on consignment
- with the Division's regional managers
- various locations for tooling, jigs and fixtures in possession of vendors and for work in process in possession of subcontractors
- various locations for display and/or show purposes

SCHEDULE 3.09

Contracts and Purchase Orders

1.    Contracts identified in Schedule 1.01(k) and invoices and sales orders for Division
      products and parts and purchase orders by the Division in the ordinary course of business.

2.    To extent that reserves have been established for such as reflected in the Current
      Financial Statements and except for certain discontinued and certain R&D/prototype
      units, as reflected in the Inventory valuation included in the Schedules.

3.    As to (d)(iii) Joint purchasing arrangements with Seller and parts and components
      sourced by the Division from the Seller.  Termination of the service, maintenance and
      support of the Division's computers and computer related equipment under the Seller's
      contracts for such service, maintenance and support.  Termination of Ford Motor Credit
      Company Agreement.

SCHEDULE 3.12

Intellectual Property

<u>Patents</u>

| Exhibit | Case No. | Title | Country | Registration/ Application No. | Issue Date | Expiration Date |
|---|---|---|---|---|---|---|
| A* | 113 | Channel & Plate Telescopic Crane Boom | Italy | 1059156 | 4/15/76 | |
| B* | 123 | Telescopic Boom Construction | U.S. Canada | 4,406,375 1,182,076 | 9/27/83 2/5/85 | 9/27/00 2/5/02 |
| C* | 125 | Boom Limit Safety Control System (with Back-Up System) | Canada S. Africa | 1,201,793 81/3798 | 3/11/86 6/30/82 | 3/11/03 6/8/01 |
| D* | 201 | Truck Mounted Crane and Method of Constructing Same | U.S. Canada | 4,194,639 1,096,818 | 3/25/80 3/3/81 | 5/12/97 3/3/98 |
| E* | 202 | Design for Truck Mounted Crane | U.S. | 251,239 | 3/6/79 | 5/12/97 |
| F* | 203 | Design for Crane Upper Works | U.S. Benelux | 251,242 0376802 | 3/6/79 6/14/78 | 5/12/97 |
| G* | 205 | Outrigger Beam and Jack Construction | U.S. Canada | 4151786 1,078,810 | 5/1/79 6/3/80 | 5/12/97 6/3/97 |
| H* | 206A | Industrial Crane | U.S. Canada | 4216869 1,117,075 | 8/12/80 1/26/82 | 9/21/97 1/26/99 |
| I* | 206B | Industrial Crane Housing Configuration | Canada | 1,151,601 | 8/9/83 | 8/9/00 |
| J | 701 | Crane Having Boom Rest | U.S. Canada | 5,402,898 1382649 | 4/4/95 | 7/21/12 |
| K | 701 Div 1 | Swing Away Hoist Mount | U.S. | 08/326,920 | | |
| L* | | Remote Control Apparatus for a Machine Such as a Crane | U.S. | 4508014 | 4/2/85 | 4/2/02 |
| M* | | Rolling Base for Truck Crane | U.S. | 4599032 | 7/8/86 | 7/8/03 |

## Trademarks

| Exhibit | Title | Country | Registration/ Application No. | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| N* | Jiffy-Lift Eagle | U.S. | 1,301,274 | 10/23/84 | 10/23/04 |
| O* | Shock Guard | U.S. | 1,366,472 | 10/22/85 | 10/22/05 |
| P* | Side-o-Matic | U.S. | 1,261,485 | 12/20/83 | 12/20/03 |
| Q | Tail-Gator | U.S. | | | |
| R | Taxi-King | U.S. | | | |
| S* | Versa-Tel | U.S. | 938/074 | 7/18/72 | 7/18/02 |
| | Panoview | U.S. | 1,114,391 | 3/6/79 | 3/6/99 |
| | | Canada | 254,790 | 1/16/81 | 1/16/11 |
| | | Japan | 78418 | | |
| | | Switzerland | 306,484 | | |
| | | Venezuela | 101.800-F | 4/6/83 | 4/6/98 |
| | | Venezuela | 101.799-F | 4/6/83 | 4/6/98 |

*Held by Fulton International, Inc.                                    As of 3/5/96

Copies of each of these registrations or applications have been provided to Purchaser.  The files for these are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

Pursuant to the terms of its Distributor Sales and Service Agreements, Seller licenses to its distributors the right to use Seller's Trademarks.

Agreement dated May 1, 1979 by and between Frank Spallute, Paul Baldasarre and Garden State Engine and Equipment Co., Inc.

SCHEDULE 3.13

Litigation and Pending Proceedings

1.　The matters identified in Schedule 1.01(u) Liabilities, Schedule 3.15 Insurance and Schedule 3.25 Environmental Matters.

2.　JLG Industries, Inc. v. United Truck Rental & Equipment Leasing, Inc., which is pending in the U. S. District Court for the District of Hawaii.

SCHEDULE 3.15

Insurance

A. Insurance Policies

| TYPE | INSURER | LIMITS |
|------|---------|--------|
| Business Auto/Trucks | Royal Insurance Company of America | $1,000,000 |
| General Liability | Royal Insurance Company of America | $10,000,000 |
| Workers' Compensation & Employer's Liability | Royal Insurance Company of America | Statutory/ $1,000,000 |
| Foreign Liability | Great Northern Insurance Company | $1,000,000 |
| Umbrella Liability | Federal Insurance Company | $4,000,000 |
| Excess Liability | Zurich RE(UK) Ltd | $10,000,000 |
| Excess Liability | Chubb Atlantic Indemnity Ltd. | $10,000,000 |
| Property/Business Interruption | Protection Mutual Insurance Company | All risk |
| Ocean Marine & Transit | INA | $1,000,000/ $250,000 |
| Fiduciary Liability | Federal Insurance Company | $10,000,000 |
| Crime Coverage | Federal Insurance Company | $3,000,000 |
| Directors & Officers Liability | Old Republic Insurance Company | $10,000,000 |
| Directors & Officers Liability | Federal Insurance Company | $5,000,000 |
| Travel Accident | Federal Insurance Company | $250,000/ $1,250,000 |

(POLICY TERM: August 1, 1995-July 31, 1996)

B. Workers Compensation Claims. PMA Group loss runs as of November 2, 1995 for the policy years 90-91, 91-92, 92-93, 93-94 and 94-95 and Royal Insurance Company claim listing as of March 8, 1996 for the policy year 95-96 having been provided to Purchaser. In addition thereto, there would be claims and incidents occurring since said dates.

C. Attached and labeled Schedule 3.15 - Attachment A is a listing dated as of March 15, 1996 of all accidents, claims and lawsuits against Seller and/or involving the Seller's boom truck crane and unloader product lines, which have an occurrence date after January, 1990 and which were reported to Seller after January, 1990, excluding however those cranes being the models specifically identified in Schedule 6.05. Attachment A includes all accidents, claims and lawsuits against Seller and involving the products listed in paragraph 1 of the Stipulated Settlement Agreement item 1 of Schedule 1.01(k), which have an occurrence date after January, 1990 and which were reported to Seller after January, 1990.

SCHEDULE 3.15 - ATTACHMENT A

4/15/96

| DATE | NAME | MODEL | SERIAL NO | STATE | A.A. | I.ART | NO POIR | CLAIM NO | EIV | AU | OR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/5/90 | HYDRO CONDUIT CORP. | M-21 | ? | TX | 3/5/90 | X | | | | A | R |
| 3/23/90 | SMITH, WILLIAM | 1218BT | 0408901863 | CA | | | | | 89-90 | L | R |
| 4/24/90 | BAKER, WARREN | 1250BT | 0408901677 | NC | | 5/7/90 | | | | A | R |
| 5/10/90 | SMITH, JAMES | m-21 | 7G00556 | PA | 6/6/90 | X | | | | A | R |
| 5/18/90 | SEAY, JAMES L. | M21-8 | 3-2378 | TN | 7/10/90 | X | | | | A | R |
| 5/30/90 | HALVERSON, GREGORY D. | SIDE-O-MATIC | 8D0124 | ME | 7/10/90 | X | | | | A | R |
| 7/9/90 | SCRANTON CRAFTSMEN | 110-35 | 8A0058 | PA | | | | | 91-92 | L | R |
| 7/12/90 | WAELENS, DANA | B4520 | 7F0081 | MI | | | | | 91-92 | L | R |
| 7/24/90 | RICHBOURG SALES | 800BT | 0408600752 | SC | | | | | 89-90 | L | R |
| 8/18/90 | MAJOR, RANDY W. | 110-35 | 9D0090 | IN | | | | | 90-91 | L | R |
| 8/22/90 | ANDERSON, CHUCK | TE7035 | 8D0130 | MI | | | | | 90-91 | L | R |
| 10/7/90 | MCCOY, TONY (MD CASUALTY CO.) | 1700BT | 0408801211 | GA | | | | | 90-91 | A | R |
| 10/7/90 | MD CASUALTY CO. (MCCOY, TONY) | 1700BT | 0408801211 | GA | | | | | 90-91 | A | R |
| 10/11/90 | ROSA v. FLA POWER & LIGHT | 60-21 | 8666 | FL | NO | NO | | | N/A | A | O |
| 11/9/90 | MATTES ELECTRIC | 800BT | 0408400547 | DE | 7/12/91 | ? | | ? | N/A | A | R |
| 12/1/90 | ALICE ROOFING & SHEET | 1218BT | 0408801217 | TX | 12/20/91 | ? | | | N/A | A | R |
| 2/6/91 | SZATHMARY SUPPLY CO. | 146KTS | ? | NJ | 5/2/91 | NO | | | N/A | A | O |
| 2/19/91 | PFEIFFER, CHRIS | 60-26 | 8L0165 | PA | 4/5/91 | 4/3/91 | | 339 L30071 | 90-91 | L | O |
| 3/25/91 | DIAS (MIDDLESEX INS. CO) | 300-25 | 8G0155 | MA | 5/2/91 | 5/2/91 | | 326 L6374I | 90-91 | A | O |
| 4/12/91 | MILLER, FRED P. | M21 | 800166E | TX | | | | | N/A | L | O |
| 4/17/91 | JACKSON, LONNIE | DICO TR4025 | 7D0119 | KY | 7/12/91 | NO | | | N/A | A | R |
| 5/9/91 | ROTHROCK, CHARLES | M21IEFY | 9217 | PA | | | | | 92-93 | A | O |
| 7/19/91 | STAR RENTALS (NO INJURY) | 1000BT | 0409007060 | WA | 7/31/91 | NO | | | N/A | L | R |
| 7/19/91 | SZAFRANSKI, ROBERT | 60-21TR | 7G0123Y | FL | | | | | 91-92 | A | R |
| 8/12/91 | COTE/ST, OEAN | 1300BT | 0408600813 | MA | 9/5/91 | 9/5/91 | | ? | 91-92 | A | O |
| 8/16/91 | EWINO, JOE | M21-8 | 0800000007 | IL | 9/5/91 | 9/5/91 | | | 91-92 | A | O |
| 8/17/91 | BROYLES v. HOLSTON ELECT. | DICO | ? | TN | N/A | N/A | X | N/A | N/A | L | O |
| 8/18/91 | FERRARA, GEORGE | 800BT | 0408901620 | CA | 12/10/91 | 12/10/91 | | ? | 91-92 | A | O |
| 9/9/91 | WARWICK INS. CO. | - | | NJ | | | | | N/A | A | O |
| 9/12/91 | REED, ROOER J. | 1250BT | 0409002010 | PA | | | | | 91-92 | L | R |
| 9/24/91 | ERBY, JAMES | DICO B4520 | 6I0388 | MO | 11/8/91 | NO | | | N/A | A | O |

SCHEDULE 3.15 - ATTACHMENT A

| DATE | NAME | MODEL | SERIAL NO. | STATE | A&A | HART | NO FOIR | CLAIM NO. | F/V | Adj. | O/R |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/7/91 | BULLOCK, DONNIE | 1250BT | 0408901377 | FL | 1/1/492 | 1/1/492 | 1/1/492 | 627 L 26552 | 91-92 | L | O |
| 11/21/91 | FORD, STEVEN | 1250BT | 0409001831 | IL | 1/1/492 | 1/1/492 | 1/1/492 | 634 L 21547 | 91-92 | < | O |
| 11/23/91 | REDDY/SANTMYER | 1000IT | 0409002113 | MD | 3/1/792 | NO | | | N/A | < | O |
| 12/9/91 | BONNER, FLOYD W. | DICO | ? | MA | TDS | TDS | | 721 L 96624 | 94-95 | L | O |
| 1/29/92 | LISTAL ERECTION CORP. | 1500IT | 0408701045 | MN | 2/11/92 | NO | | | N/A | < | O |
| 2/15/92 | DETHLEHEM STEEL | 800IT | 0408700993 | IN | 4/9/92 | NO | | ? | 91-92 | < | O |
| 3/8/91 | KELLY, MELVIN | 1700BT | 0408801181 | VA | 4/9/92 | 4/9/92 | | | N/A | < | O |
| 3/9/92 | AMERICAN EQUIPMENT CO. | 1000BT | 0409002037 | OH | 4/9/92 | NO | | | N/A | < | O |
| 3/21/92 | HOOAN, LEE | 1400BT | 0408901553 | WA | 4/9/92 | NO | | | 91-92 | < | O |
| 4/15/92 | PENDER, BILL | 3018 | ? | IA | 7/30/92 | 7/30/92 | | | 91-92 | < | O |
| 4/1/792 | DIETCH, DAN | 40-21 | c50339 | IA | 7/30/92 | 7/30/92 | | | 91-92 | L | O |
| 5/5/92 | McCRACKEN, RICHARD | 45-17 | 3140 | MO | N/A | N/A | X | N/A | N/A | < | O |
| 6/19/92 | DORMIRE v. DETROIT EDISON | DICO | 7H0042Y | MI | N/A | N/A | | N/A | N/A | < | O |
| 7/8/92 | CMI | 1700ABIT | 040002347 | IN | NO | NO | | | N/A | < | O |
| 7/13/92 | AMERICON | 1000IBT | 040002344 | MN | NO | NO | | | N/A | < | O |
| 8/5/92 | MILZ, MICHAEL | M-26 | ? | MN | 8/26/93 | 8/26/93 | X | ? | N/A | L | O |
| 9/1/92 | ROBERT R. OLDHAM, INC. | PC16E | 0800000217 | OH | TDS | TDS | | 661 L 2636 | 94-95 | L | O |
| 9/23/92 | HARDY, WARREN | UNLOADER | | IL | 1/1/493 | NO | | | N/A | < | O |
| 9/29/92 | PAIKIN EQUIPMENT | 1250BT | 0408701038 | CANADA | 1/1/493 | NO | | | N/A | < | O |
| 10/16/92 | SYRACUSE LADDER & SCAFF. | 1500BT | 0408901547 | NJ | NO | NO | | | N/A | < | O |
| 11/5/92 | HIESELL, RODNEY | 1400BT | 0408901636 | NV | 1/1/493 | 8/26/93 | | ? | 92-93 | < | O |
| 11/4/92 | INQUIPCO | 1250BT | 0408901637 | NV | NO | NO | | | N/A | < | O |
| 11/4/92 | MCLELLAND, RAY | 1700BT | 0408901595 | CA | NO | NO | | | N/A | < | O |
| 11/16/92 | STAR RENTALS | 1000IIT | 040002479 | WA | NO | NO | | | N/A | < | O |
| 1/1/93 | HOXWORTH, KEVIN | M21-8 | 8100553 | MO | 3/21/293 | NO | | | N/A | < | O |
| 4/15/93 | HERTZ EQUIPMENT RENTAL | 1250BT | 0408901115 | FL | 7/12/93 | 7/12/93 | | | N/A | < | O |
| 5/27/93 | CIANBRO CORPORATION | 1250BT | 0408901149 | MA | 7/12/93 | 7/12/93 | | | N/A | < | O |
| 6/8/93 | LOWES OF MAITLAND | 146KTS | 8I100846 | FL | 7/2/93 | 7/29/92 | | | N/A | < | O |
| 7/1/93 | HERTZ EQUIPMENT RENTAL | 800IT | 0408901477 | OH | 7/29/92 | NO | | | N/A | < | O |
| 8/1/93 | NEARE, MARTIN | 800IT | 0408701015 | OH | 10/12/92 | NO | | | N/A | < | O |
| 8/18/93 | ATLANTIC CRANE | 1218IIT | 0408901824 | NJ | 12/17/93 | 12/17/93 | | 6671 61412 | 91-94 | < | O |

4/15/96

## SCHEDULE 3.15 - ATTACHMENT A

| DATE | NAME | MODEL | SERIAL NO | STATE | AAA | HART | NO POIR | CLAIM NO | F/Y | A/L | O/R |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/7/93 | BUILDING ERECTION SERVICES | 2200BT | ? | MO | NO | NO | X | | N/A | A | O |
| 11/4/93 | KRAIN, TERRY | 2250BT | 0400002330 | CANADA | 12/17/93 | 12/17/93 | | 944 L 60183 | 93-94 | L | O |
| 11/4/93 | KOMRO, LAWRENCE | PC16 | 81D088E | WI | 12/17/93 | NO | | | N/A | A | O |
| 1/5/94 | BRUDER, INC. | 110-35 | 9C0080 | OH | TDS | TDS | | 734 LP 72338 | 93-94 | L | R |
| 2/28/94 | HERRERA, PEDRO | 1250BT | 0408901521 | TX | 4/7/94 | 4/7/94 | | ? | 93-94 | A | O |
| 4/16/94 | JOANN TRUCKINO | 1500BT | 0400002641 | CANADA | 6/8/94 | 6/8/94 | | 944 L 67689 | 93-94 | A | O |
| 5/27/94 | RICHBOURG SALES | 800DT | 0408901614 | MS | 7/28/94 | NO | | | N/A | A | O |
| 7/21/94 | STAR RENTALS | 1400BT | 0400002167 | WA | 7/28/94 | NO | | | N/A | A | O |
| 8/1/94 | WEBER CO., INC. | 800BT | 0408400495 | PA | TDS | TDS | | 734 LP 75028 | 94-95 | L | O |
| 8/26/94 | PACO | 1500BT | 0400002501 | WA | 9/14/94 | NO | | | N/A | A | O |
| 9/27/94 | RICHBOURG SALES | 2250BT | 0400002502 | SC | 11/8/94 | NO | | | N/A | A | O |
| 10/20/94 | HARSHFIELD CONCRETE | PC16C | 0800000558 | IN | 12/1/94 | NO | X | | N/A | A | O |
| 10/23/94 | CANWEST CRANE | 1500BT | 0400002590 | CANADA | 11/8/94 | NO | | | N/A | A | O |
| 12/1/94 | MOORES LUMBER | 146KTSM | 810137 | VA | NO | NO | X | | N/A | A | O |
| 12/8/94 | WEST MAIN RENTALS | 800BT | 0408600785 | OR | NO | NO | X | | N/A | A | O |
| 12/17/94 | CANWEST CRANE | 2250BT | 0400002531 | CANADA | 1/1/95 | NO | | | N/A | A | O |
| 4/12/95 | BORO'S CONCRETE SERVICES | PC-16 | 8C0099E | LA | 5/1/95 | NO | | | N/A | A | O |
| 4/26/95 | NYEHOLT STEEL CO. | 1500BT | 0400002800 | MI | 6/9/95 | NO | | | N/A | A | O |
| 5/31/95 | STAR RENTALS | 1400BT | 0400002033 | WA | 6/9/95 | NO | | | N/A | A | O |
| 7/21/95 | UNITED CRANE & SHOVEL | 2200BT | 0400001921 | NJ | 2/9/96 | NO | | | N/A | A | O |
| 7/26/95 | BRAMBLES EQUIPMENT | 1250BT | 0408801130 | LA | 7/31/95 | NO | | | N/A | A | O |
| 8/8/95 | EQUIPCO RENTALS | 1400BT | 0400001779 | VA | 9/11/95 | NO | | | N/A | A | O |
| 8/26/95 | D.C. BATES EQUIPMENT | 20-23 | 7G0193Y | MA | 9/11/95 | NO | | | N/A | A | O |
| 8/29/95 | BELCHER ROOFING | IGGDI010 | 0408700950 | NJ | 10/9/95 | NO | | | N/A | A | O |
| 9/28/95 | B & B ELECTRIC | 1500BT | 0400002290 | KY | 11/8/95 | NO | | | N/A | A | O |
| 10/6/95 | CLAPP, THOMAS | 2250BT | 0400003075 | MI | 11/8/95 | 11/8/95 | | 788 L 01972 | 95-96 | A | O |
| 10/23/95 | GIBBS ELECTRIC | 1500BT | 0400002832 | SC | 11/8/95 | NO | | | N/A | A | O |
| 10/31/95 | MERCER EQUIPMENT | 1500BT | 0400002486 | NC | 2/9/96 | NO | | | N/A | A | O |
| 11/1/95 | PACO | 1250BT | 0400002317 | WA | 3/14/96 | NO | | | N/A | A | O |
| 11/6/95 | GIUFFRE BROS. CRANES | 1500BT | 400002673 | WI | 3/14/96 | NO | | | N/A | A | O |
| 12/18/95 | CORAM, LOREN | 2200BT | 0409001917 | KS | 2/9/96 | 2/9/96 | | 788 L 02396 | 95-96 | A | O |

SCHEDULE 3.15 - ATTACHMENT A

4/15/96

| DATE | NAME | MODEL | SERIAL NO | STATE | A.A.A | HART | NO POIR | CLAIM NO. | FIY | A/L | O/R |
|------|------|-------|-----------|-------|-------|------|---------|-----------|-----|-----|-----|
| 1/16/96 | YOCH, JOHN ROBERT | PC-16 | 8F0098E | IL | 2/9/96 | 2/9/96 | | 788 L 00398 | 95-96 | A | O |
| 2/6/96 | EISENHART, JAMES | 125-26 | 8L0012 | PA | 3/14/96 | NO | | | N/A | A | O |
| 2/10/96 | BABST, LANCE | 1500HT | 0400002796 | TX | 3/14/96 | NO | | | N/A | A | O |
| 2/23/96 | PIERCE, KEITH | 2800HT | 400002781 | NJ | 3/14/96 | 3/14/96 | | | 95-96 | A | O |

Page 4

SCHEDULE 3.16

Warranty Obligations

(a)   Division's Warranty expenses
      8/1/93 - 7/31/94      $854,000
      8/1/94 - 7/31/95      $1,178,000
      8/1/95 - 4/30/96      $916,000


(b)   Pending Warranty Claims: Information relative to warranty claims outstanding at any
      particular date is not available, however, warranty claims paid for the month of April,
      1996 were $26,099.50.


(c)   The Division's current procedures for handling warranty claims are reflected in the
      Division's standard form warranties for each of its three (3) product lines and its Service
      and Parts Policies Handbook; copies of which have been provided to Purchaser.

SCHEDULE 3.18

Working Relationships

Set forth below and dated as of May 14, 1996 are all distributors of the Division, which have been terminated within the past two years:

Primeco, Inc.
Great Northern Equipment, Inc.
American High Reach, Inc.
Crest Truck Equipment Co., Inc.
Truck Hydraulic Equipment
Northern Truck Equipment Corp.
Fontaine Truck Equipment Company
CanWest Crane & Equipment Ltd.
Mi-Jack Products, Inc.
Rylan, Inc.
Sisco Equipment Rental and Sales, Inc.
Brambles Equipment Services, Inc.
Lancaster Automobile Spring Co., Inc.
W. H. Green & Sons, Inc.
Coast Crane of Utah, Inc.
V&H, Inc.
Anthony Crane Rental, L.P. (as respects Distributor Sales & Service Agreement for Georgia APR only)
Hi-Tech Pump & Crane, Inc.

SCHEDULE 3.19

Customers and Suppliers

A.     Division's Ten Largest Customers - Unloaders (FY1995)

| | Company | Machines and Service Parts |
|---|---|---|
| 1. | Fallsway Equipment | $1,652,242.64 |
| 2. | Busey Truck Equipment | $1,219,629.01 |
| 3. | Garden State Equipment | $ 969,947.21 |
| 4. | Smith Truck Cranes | $ 706,531.66 |
| 5. | American Truck Crane | $ 630,555.64 |
| 6. | Truck Service Center | $ 541,073.08 |
| 7. | MacQueen Equipment | $ 468,454.75 |
| 8. | DC Bates | $ 458,900.32 |
| 9. | Twin States | $ 237,458.40 |
| 10. | Owsley & Sons | $ 220,305.93 |

B.     Division's Ten Largest Customers - Boom Trucks (FY1995)

| | | |
|---|---|---|
| 1. | Prime Equipment | $1,775,952.18 |
| 2. | American Equipment | $1,115,562.31 |
| 3. | Anthony Crane Rental | $1,040,255.66 |
| 4. | Hertz Equipment | $ 978,938.67 |
| 5. | Richbourg Sales | $ 966,667.39 |
| 6. | KMH Equipment | $ 667,413.82 |
| 7. | Perfection Equipment | $ 548,735.09 |

| | | |
|---|---|---|
| 8. | Art's Equipment Rental | $ 458,470.93 |
| 9. | Great Pacific Equipment | $ 440,427.34 |
| 10. | Siems Rental & Sales | $ 363,612.70 |

C. Division's Ten Largest Suppliers (FY1995)

| | | |
|---|---|---|
| 1. | Keystone Ford | $4,133.938.00 |
| 2. | Robinson Steel | $ 748,908.00 |
| 3. | Olympic Steel | $ 733,471.00 |
| 4. | Texas Hyd. | $ 628,700.00 |
| 5. | Braden Winch | $ 527,265.00 |
| 6. | Kaydon Bearing | $ 512,298.00 |
| 7. | Marmom/Keystone | $ 323,106.00 |
| 8. | Commercial Int. | $ 311,944.00 |
| 9. | Eskridge Eng. | $ 228,166.00 |
| 10. | Wireco | $ 206,454.00 |

In addition to the foregoing, parts and components are sourced by the Division from the Seller. The parts and components involved and the dollar amount involved have been provided to Purchaser.

D.    As to suppliers, sourcing by the Division from Seller of parts and components will terminate following the Closing subject to Section 5.06 and joint purchasing arrangements with Seller will terminate following the Closing. Anthony Crane Rental, Hertz Equipment Rental Corporation, and Prime Equipment have indicated an intention to reduce their levels of purchases of the Division's products. As to other customers, the business of each customer with the Division is a function of the requirements of the customer, market conditions and competitive conditions and would be subject to the effect, if any, of the Seller's sale of the Assets of the Purchaser.

# EXHIBIT "A"
# (Part 4)

SCHEDULE 3.20

Employees

Attached is a listing as of May 14, 1996 setting forth the name of each employee of the Division, their current base salary/hourly rate and their base salary/hourly rate as of July 31, 1995. In addition, the regional managers receive commissions under a commission policy.

PR170 DATE  5/14/06                          HR UNITED REPORT GENERATION
TIME  15:15.00

AUTHOR: BECKY        TITLE: YORK EMPLOYEE

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 7/31/75 Rate |
|------|------|------|------|------|
| 5020 | AWKKEY, KEITH H | 03/15/88 | 13.7800 | 13.20 |
| 5143 | AWKKEY, RONALD L | 08/26/91 | 13.9000 | 13.10 |
| 5313 | AUCKEY, JOSEPH A | 03/13/95 | 33000.0000 | 31080. |
| 7039 | BAGLEY, DAVID L | 09/12/88 | 58080.0000 | 58080. |
| 5086 | BECKER, SCOTT M | 12/17/84 | 38232.0000 | 38232. |
| 5089 | BELCHER, ROGER L | 01/21/95 | 13.4000 | 12.95 |
| 5302 | BERGER, SHELDON E | 03/14/94 | 13.9000 | 13.28 |
| 5329 | GILLETT, DAVID F | 06/19/95 | 8.4500 | 8.45 |
| 5037 | BOSLEY, FREETON E | 04/18/83 | 15.2900 | 14.56 |
| 5278 | BOYLE, LYNN A | 06/20/94 | 8.8700 | 8.45 |
| 5345 | BRADY, PETER A | 02/05/96 | 8.7000 | |
| 5357 | BRICKNER, GARY H | 03/04/96 | 8.5000 | |
| 5305 | BRISSON, LLOYD E | 11/21/94 | 8.8700 | 8.45 |
| 5174 | BROHH, THOMAS L | 03/03/92 | 13.1600 | 12.06 |
| 5313 | BUCHTER, BRADLEY E | 02/13/95 | 41500.0000 | 38400. |
| 5113 | CALDWELL, BURKELL K | 04/15/85 | 10.7500 | |
| 5144 | CHESHIER, JAMES A | 08/27/91 | 10.3900 | 10.09 |
| 5720 | CONRAD, THOMAS | 05/16/92 | 51750.0000 | 51600. 49920. |
| 5367 | CRAKE, THOMAS H | 03/13/96 | 9.1500 | |
| 5027 | CROWE, STANLEY R | 03/12/90 | 14.0900 | 13.45 |
| 7086 | DENNIS, SHENORA L | 04/20/92 | 9.8000 | 9.40 |
| 5401 | DETWILER, RICHARD A | 03/05/90 | 10.5700 | 10.26 |
| 5314 | DIFFENDERFER, JR, JAMES A | 03/06/75 | 10.3500 | 10.00 |
| 5034 | DOLHEINER, ROGGER L | 09/12/94 | 9.5000 | 8.30 |
| 5274 | DOLL, KENNETH L | 06/06/94 | 10.2200 | 9.95 |
| 5408 | DOLL JR., STERLING E | 03/26/90 | 11.2600 | 10.93 |
| 5007 | DOLL SR., STERLING E | 06/09/83 | 14.6700 | 14.02 |
| 5273 | EICHOLTZ, RICHARD E | 05/31/94 | 12.9100 | 10.66 |
| 7115 | EMRICH, BRIAN K | 04/03/95 | 34344.0000 | 34.344. |
| 5299 | EVANS, DAVID C | 10/10/94 | 11.3600 | 10.04 |
| 5159 | FAUST, DENNIS D | 09/16/79 | 46960.0000 | 43920. |
| 5110 | FISSEL, GARRY L | 05/18/92 | 41080.0000 | 41080. |
| 5363 | FOGLE, KEITH A | 03/11/96 | 8.4500 | |
| 5353 | FRANTZ, JEFFREY L | 02/20/96 | 8.4500 | |
| 5156 | GABRIEL, JOSEPH J | 09/23/91 | 43659.0000 | 41580. |
| 5285 | GEISELMAN, BRUCE A | 06/13/83 | 14.9100 | 14.62 |
| 5366 | GENTZLER, TOBIAS H | 03/11/96 | 8.4500 | |
| 5350 | GERRICK, SCOTT A | 02/20/96 | 11.0000 | |
| 5155 | GIBBONS, JONATHAN M | 09/20/91 | 12.2900 | 12.29 |
| 5016 | GILBERT, GARY E | 05/02/83 | 13.7800 | 13.38 |
| 7054 | GINGRICH, STEPHANIE D | 08/19/91 | 27600.0000 | 24960. |
| 5034 | GLASFELTER, MICHAEL R | 01/07/91 | 11.2500 | 10.93 |
| 5102 | GODFREY III, JAMES E | 03/11/85 | 14.5700 | 14.15 |
| 5339 | GOHN, JR, JOHN L | 12/13/95 | 10.0000 | |
| 5197 | GOODWILL, GARY L | 04/20/92 | 11.0900 | 10.74 |
| 5115 | GRISSINGER, DANIEL H | 04/04/90 | 11.2600 | 10.93 |
| 5131 | GROVE, JEFFREY L | 05/28/91 | 9.7100 | 9.49 |
| 5711 | GROVE, LESTER L | 03/04/85 | 34990.0000 | 34990. |
| 5990 | HALSTER, THOMAS J | 08/15/88 | 39840.0000 | 39840 |

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 7/31/95 Rate |
|------|------|------|------|------|
| 5105 | HEISE, GERALD E | 01/07/95 | 30000.0000 | — |
| 5100 | HERBST III, FREDERICK H | 05/23/83 | 39864.0000 | 39864. |
| 5172 | HERBST IV, FREDERICK H | 06/15/92 | 11.0200 | 11.27 |
| 5508 | HILT, EARL L | 12/19/94 | 10.0000 | 9.80 |
| 5123 | HIRSCHHORN, MICHAEL D | 05/20/91 | 12.3000 | 11.70 |
| 5215 | HOKE, RONNY S | 10/14/93 | 11.2700 | 10.84 |
| 5503 | HOKE, STEPHEN M | 05/10/82 | 14.4700 | 14.26 |
| 5254 | HUNTER, DAVID A | 03/25/96 | 11.0000 | 10.76 |
| 5255 | JOKES, DAVID A | 03/24/94 | 13.2900 | 11.51 |
| 5263 | ILGENFRITZ, GRANT E | 04/13/94 | 9.4700 | 9.19 |
| 5101 | ILGENFRITZ, MARTIN L | 02/24/93 | 11.0100 | 10.64 |
| 5551 | INGRAM, ROBERT L | 02/20/96 | 9.0000 | — |
| 7093 | JAGBE, JR., GEORGE G | 06/13/94 | 33600.0000 | 33600. |
| 5175 | JONES, PHILIP A | 07/27/93 | 10.5600 | 10.125 |
| 5107 | KEARNEY, SCOTT L | 04/09/90 | 10.8100 | 10.50 |
| 7007 | KEEFER, WILFRED L | 09/28/76 | 49774.0000 | 46080. |
| 5127 | KELLY, GEORGE E | 05/30/91 | 10.1900 | 9.80 |
| 5349 | KENT SR, DAVID M | 04/15/96 | 8.4500 | — |
| 5134 | KEFNER, ALLAN D | 03/01/93 | 11.0000 | 10.76 |
| 7116 | KING, BEVERLY S | 05/16/95 | 33600.0000 | 33600. |
| 5095 | KIRKEMAN, DANA S | 03/04/95 | 13.5400 | 13.15 |
| 5304 | KIRKENDALL, JR., WILLIAM S | 11/21/94 | 8.7000 | 8.45 |
| 5247 | KLEIMAN, SCOTT E | 02/24/94 | 9.6800 | 9.40 |
| 5355 | KREBS, BRUCE A | 02/26/96 | 8.8500 | — |
| 5296 | KREBS, MICHAEL H | 10/05/94 | 9.1600 | 8.85 |
| 7099 | KRIMER, TERRY L | 05/24/93 | 29568.0000 | 29568. |
| 5031 | KUNKEL, SCOTT D | 11/15/93 | 9.4200 | 9.15 |
| 5192 | KURTZ, JOSEPH G | 03/10/93 | 10.6000 | 10.29 |
| 5173 | KURTZ, ROBERT E | 07/20/92 | 10.1400 | 9.83 |
| 7017 | LAMB, KATHLEEN R | 05/10/82 | 32400.0000 | 30528. |
| 7100 | LANDSPERGER, CHERYL A | 09/19/94 | 9.2500 | 9.25 |
| 5349 | LAUCKS, STEVEN M | 02/12/96 | 28000.0000 | — |
| 5217 | LEATHERY, MARK D | 03/11/95 | 13.8700 | 13.47 |
| 5291 | LEITHEISER, NOE D | 03/09/94 | 9.2900 | 9.11 |
| 5295 | LENKER, KEITH R | 10/17/94 | 10.0000 | 8.45 |
| 5204 | LEPPO, TODD E | 05/10/93 | 31800.0000 | 31800. |
| 5348 | LOMBARDO, JOHN M | 02/12/96 | 9.0000 | — |
| 5277 | LOOKINGBILL, JAMES A | 06/09/94 | 9.3300 | 9.15 |
| 5239 | LUNDGREN, RICHARD D | 04/03/94 | 43440.0000 | 41760. |
| 1220 | LUTE, GERALD E | 06/25/79 | 53800.0000 | 56400. |
| 5114 | MARKS, PHILLIP A | 05/20/90 | 14.6500 | 14.20 |
| 5143 | MAZUREK, SR., JOSEPH R | 03/23/92 | 47280.0000 | 45408 |
| 5342 | MCCUE, MARK E | 01/22/96 | 8.4500 | — |
| 5112 | MCMASTER, THOMAS M | 03/07/91 | 36000.0000 | 36000 |
| 5203 | MCMILLAN, DAVID C | 05/03/93 | 50400.0000 | 39000 |
| 5371 | MEADOR, JOHN M | 04/29/96 | 8.6500 | — |
| 5097 | MESSINA, WILLIAM F | 01/25/91 | 15.0000 | 14.63 |
| 7018 | MICHAEL, KENNETH E | 05/10/82 | 46800.0000 | 43296. |
| 5316 | MIKITA, MICHAEL J | 03/15/95 | 47760.0000 | 45000 |
| 5325 | MILLER, ANDREW E | 04/24/95 | 44040.0000 | 44040. |
| 7053 | MILLER, CHARLES J | 07/15/91 | 53040.0000 | 53040. |
| 5019 | MILLER, DAVID E | 08/15/88 | 12.3900 | 12.52 |
| 5046 | MILLER, RONN A | 04/10/89 | 14.0900 | 13.55 |

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 7/2/95 |
|---|---|---|---|---|
| 5335 | MILLER, JOSHUA H | 10/21/95 | 9.7500 | |
| 5465 | MILLER, RONALD G | 10/14/95 | 9.0400 | 9.40 |
| 5179 | MILLER III, ROBERT E | 10/05/92 | 11.1800 | 10.65 |
| 5308 | MINEHIMER, JOHN J | 11/22/94 | 11.5800 | 10.15 |
| 5008 | MOONEY, RICHARD H | 06/08/93 | 46065.0000 | 43872. |
| 5152 | MOREHEAD, JR., TERRY R | 08/29/91 | 13.0300 | 12.35 |
| 5162 | MOSSBROOK, KENNETH H | 02/20/92 | 45900.0000 | 42312. |
| 5015 | MUSSELMAN, JAMES H | 11/10/83 | 15.1600 | 14.56 |
| 5209 | MYERS, MARK K | 05/17/82 | 37200.0000 | 37200. |
| 5384 | WAGE, JEFFREY A | 02/19/96 | 20400.0000 | |
| 5170 | WEBB, STEPHEN M | 04/01/92 | 12.2300 | 11.07 |
| 5245 | WENOUHER, SCOTT A | 02/01/94 | 28080.0000 | 246.96. |
| 7019 | NOEL, BARRY E | 05/17/82 | 39860.2000 | 37880. |
| 7124 | O'DONNELL, ROBERT S | 03/21/83 | 14.9400 | 13.32 |
| 5299 | O'NEILL, III, GEORGE J | 10/10/94 | 9.7200 | 9.30 |
| 636 | OAKDRA, LYNN C | 09/07/76 | 42360.0000 | 40008.00 |
| 5347 | ODERDIRK, MARK H | 02/05/96 | 11.0000 | |
| 5340 | PAULEY, JAMES S | 01/02/96 | 11.0000 | |
| 5238 | POPE, EDWARD H | 01/03/94 | 13.1600 | 10.82 |
| 5364 | RENTZEL, RALPH H | 03/11/96 | 11.0000 | |
| 5352 | REYNOLDS, MICHAEL H | 02/20/96 | 11.0000 | |
| 7092 | RIBES, RONNIE L | 06/01/94 | 58080.0000 | 58080. |
| 5302 | RILEY, DONALD L | 11/14/94 | 9.1600 | 8.45 |
| 5991 | ROHRER, MICHAEL H | 04/18/89 | 35520.0000 | 33720. |
| 5287 | RUDISILL, JR., ELY G | 09/26/94 | 10.4000 | 10.00 |
| 5707 | RUTH, JEFFREY L | 06/23/86 | 10.4600 | 10.16 |
| 5233 | RUTH, MICHAEL B | 11/15/93 | 10.3800 | 9.15 |
| 5185 | RUTH, RICHARD H | 03/08/93 | 11.5200 | 11.08 |
| 5213 | RUTH, ROBIN L | 10/04/93 | 12.0000 | 11.62 |
| 7037 | SALE, JENNIFER L | 02/22/92 | 52080.0000 | 52080. |
| 5294 | SANMILLER, WILLIAM C | 10/03/94 | 9.0000 | 8.70 |
| 5022 | SCHWARTZ, KENNETH E | 07/05/83 | 14.1600 | 13.88 |
| 5145 | SCHWARTZ, ROBERT C | 08/27/91 | 12.0400 | 11.69 |
| 5297 | SCHWARK, BARRY E | 10/05/94 | 9.1600 | 8.45 |
| 5356 | SEARS JR, STANLEY D | 03/04/96 | 10.0000 | |
| 5198 | SEALS, JAMES T | 05/24/93 | 9.4300 | 9.20 |
| 1872 | SEGUIN, GARY W | 04/01/85 | 33480.0000 | 31656. |
| 5120 | SHADLE, ROY A | 07/16/90 | 13.6200 | 13.10 |
| 5708 | SHAFFER, KAREN | 05/10/82 | 14.0000 | 13.47 |
| 5125 | SHARP, RANDY L | 02/25/85 | 15.6100 | 15.01 |
| 5281 | SHILDT, LAMONT P | 08/24/94 | 11.7600 | 10.04 |
| 5341 | SHUE, GLEN A | 01/11/96 | 8.4500 | |
| 5256 | SHULTZ, BYRON D | 03/28/94 | 9.7000 | 9.33 |
| 7106 | SILL, BRIAN D | 12/06/94 | 33000.0000 | 30000. |
| 5346 | SIMPSON, JOHN E | 02/05/96 | 11.0000 | |
| 5327 | SMITH, BARBARA A | 06/05/95 | 8.4000 | 8.50 |
| 5336 | SMITH, DANIEL L | 10/16/95 | 8.4500 | |
| 7023 | SMITH, HARRY E | 03/11/85 | 78000.0000 | 63400. |
| 5212 | SMITH, KEVIN E | 10/25/93 | 9.7900 | 9.41 |
| 5293 | SMITH, RANDY E | 09/28/94 | 9.0000 | 8.50 |
| 5221 | SMITH, JR., MARSHALL V | 11/01/93 | 11.6700 | 10.34 |
| 5361 | SNYDER, MATTHEW E | 03/04/96 | 8.4500 | |
| 5701 | SPRAH, SHREDK D | 05/26/92 | 13.4800 | 12.66 |

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 7/31/95 Rate |
|---|---|---|---|---|
| 5245 | EPPEHIMER, CRAIG E | 02/14/94 | 10.1000 | 9.44 |
| 5269 | ETAUB, CLIFFORD K | 10/16/95 | 10.7500 | |
| 5090 | ETEICH, RUSSELL W | 01/21/85 | 13.0000 | 13.55 |
| 5409 | STERNER, JOHN W | 03/26/90 | 13.8000 | 13.00 |
| 5230 | STERNER, JR., JOHN W | 11/11/93 | 10.0000 | 9.31 |
| 5151 | STONER, CHRISTOPHER L | 09/09/91 | 11.2100 | 10.37 |
| 5159 | STOUGH JR., LARRY E | 03/05/94 | 10.0000 | 10.00 |
| 5315 | STRAYER, RAYMOND E | 03/13/95 | 10.4000 | 10.45 |
| 5275 | STREETT, SCOTT H | 06/13/94 | 11.0000 | |
| 5140 | STROHERT, JOHN G | 07/29/91 | 13.0000 | 14.80 |
| 5249 | SUMMERS, ROY M | 06/16/86 | 13.5200 | 13.03 |
| 5292 | SWIFT, JR., ARCHER E | 09/26/94 | 11.9600 | 11.50 |
| 5250 | TONE, ANGELA L | 02/28/94 | 9.0000 | 8.56 |
| 5260 | TREAT, PENNY J | 03/09/87 | 13.6500 | 12.65 |
| 5290 | VAUGHN, III, EDWARD R | 07/18/94 | 9.1000 | 8.45 |
| 5146 | WAGNER, WAYNE W | 08/26/91 | 12.6700 | 11.97 |
| 5344 | WALTURE, RICHARD L | 01/29/96 | 8.8500 | |
| 5093 | WARFEL IV, LEARY | 01/21/85 | 12.6700 | 12.30 |
| 5139 | WEBER, LAWRENCE J | 07/15/91 | 14001.0000 | 13,208. |
| 5105 | WESTERHOLD, ROBERT G | 04/10/89 | 12.8000 | 12.43 |
| 7078 | WHETSELL, DONALD E | 08/16/93 | 32400.0000 | 32400. |
| 5370 | WHETZEL JR., DAVID E | 04/15/96 | 8.4500 | |
| 7138 | WILDASIN, KEITH N | 02/18/85 | 12.1000 | 11.80 |
| 5257 | WILLIS, SCOTT H | 03/28/94 | 10.3200 | 10.02 |
| 5268 | WIRE JR, HAROLD L | 08/16/88 | 13.7500 | 14.24 |
| 5160 | WOLF, WILLIAM G | 05/06/91 | 14.1100 | 12.97 |
| 5240 | WOOD, JOSEPH M | 01/03/94 | 34416.0000 | 32400. |
| 5052 | WRIGHT, JAMES E | 02/26/90 | 13.0300 | 12.49 |
| 5312 | YINGLING, NEAL G | 02/13/95 | 9.1100 | 8.50 |
| 5372 | Darlene Pearson | 5/13/96 | 8.90 | |
| 5373 | Brandy Norwood | 5/13/96 | 8.45 | |

SCHEDULE 3.21

Labor Relations

Complaint of Kimberly Anne Lenken with the Pennsylvania Human Relations Commission.
Docket No. E73338D. (Has been settled).

SCHEDULE 3.22

Employee Benefit Plans

1.   JLG Industries, Inc. Employees' Retirement Savings Plan

2.   JLG Industries, Inc. Group Life Insurance Plan (including employee supplemental and
     dependent)

3.   Medical and Dental Plan for Employees of JLG Industries, Inc.

4.   Short-Term Disability Plan for Employees of JLG Industries, Inc.

5.   JLG Industries, Inc. Travel Accident Plan

6.   JLG Industries, Inc. Long-Term Disability Plan

7.   JLG Industries, Inc. Stock Incentive Plan, as amended and restated

8.   JLG Industries, Inc. Executive Medical Reimbursement Plan

9.   JLG Industries, Inc. Employee Stock Purchase Program

10.  JLG Industries, Inc. Relocation Policy

11.  The Profitability and Productivity Improvement Award Program

12.  Management Incentive Plan

13.  In accordance with the three (3) Highlights of Employee Benefits attached

14.  Accrued vacation obligation to certain employees for service prior to January 29, 1990
     and in accordance with the attached listing

JLG INDUSTRIES, INC.
## HIGHLIGHTS OF EMPLOYEE BENEFITS
### SALARY PERSONNEL

SCHEDULE    (Monday-Friday)
Morning - 8:00 am - 12:15 pm          Lunch - 12:15 pm - 1:00 pm          Afternoon - 1:00 pm - 4:45 pm

PAY PERIODS  (Semi-Monthly) - 15th and Last Day of the Month

BENEFITS      (Eligibility starts after 30 days)

#### Group Life Insurance

Employee coverage-premium paid by Company:
Group Life Insurance                              1 x Annual Base Salary
Accidental Death and Dismemberment                1 x Annual Base Salary

#### Supplemental Life Insurance

Option to purchase additional life insurance for employee, spouse and eligible dependents.
Employee pays group premium rate through payroll deduction.

#### Comprehensive Medical Coverage - Company provided coverage based on the following schedule:

Maximum Insured Benefit   $1,000,000 per individual insured
Individual deductible     $150
Family deductible         $300
Co-payment                85% Company/ 15% employee
Individual Stop Loss      $500
Family Stop Loss          $1,000
Note:   Coverage to include hospitalization, surgery, maternity, physician office visits, and other valid medical charges as noted in plan provisions.

#### Prescription Drug Plan- Company pays 85% of prescription drug cost; mail order prescriptions available at no cost.

#### Dental Insurance Coverage- Company payment is based on the following schedule of services:

|                                                                  |        |
|------------------------------------------------------------------|--------|
|                                                                  | 100%   |
| Preventative                                                     | 85%    |
| Oral Surgery, Periodontics                                       | 50%    |
| Crowns, Inlays, Onlays & Prosthetics                             | 50%    |
| Orthodontic (w/dep coverage only) $50 ded/$850 max               | $50    |
| Note:   Individual deductible (does not include preventative)    |        |
| Maximum annual benefit per insured                               | $1,000 |

#### Vision

Eye Exam and Glaucoma Screening (19 years of age and older, once per 24 months;    100%
                                       under age 19, once per 12 months).
Eyewear discounts - Eye Care Plan of America

#### Employee Insurance Contribution  (JLG Flex Plan option is available through payroll deduction):

|                                                                    |         |
|--------------------------------------------------------------------|---------|
| Employee coverage (required)                                       | $ 5.16  |
| w/One Dependent medical, dental & prescription (voluntary)         | $20.65  |
| w/Two or more Dependents medical, dental & prescription (voluntary)| $24.12  |

<u>Disability Insurance Coverage</u>  - Company pays for the following:

<u>Salary Continuation Schedule</u>:  30 days 100% / 31-60 days 75% / 61-90 days 60%

<u>Long Term Disability</u> - Replaces 60% of monthly earnings after 90 days and is coordinated with Social Security Disability. Premiums for supplemental benefits and benefit for spouse, if disabled. 50/50 co-pay basis. Employee cost is $.0703 per week per $1,000 of annual pay. Participation is voluntary.

<u>Travel Accident Insurance</u> - Premium paid by Company.                          $250,000
(Immediate Eligibility)

<u>Holidays</u>  (Paid)

| | | |
|---|---|---|
| New Years Day | Memorial Day | Thanksgiving Day |
| Washington's Birthday | July 4 | Friday after Thanksgiving |
| Good Friday | Labor Day | Christmas Day |

plus: .. Two Floating Holidays - Dates announced annually.

<u>Vacation</u>  (Paid)

| | |
|---|---|
| Up to 1 year | .8 hrs. pay per week of service (40 hrs. max) |
| After 1 year | 1.6 hrs. pay per week of service (80 hrs. max) |
| After 10 or more years | 2.4 hrs. pay per week of service (120 hrs. max) |
| After 15 or more years | 3.2 hrs. pay per week of service (160 hrs. max) |

<u>Tuition Aid</u> - 50% advance for approved courses, balance up to 100% based on grade attainment.

<u>Military Pay</u> - Difference between normal rate and military rate for 2 weeks Reserve Duty.

<u>Direct Deposit</u> - Deposit of payroll directly to employee bank accounts.  Funds also directed to Individual Savings Plan, Christmas Club and Individual Retirement Account.

<u>Payroll Deduction Services</u> - Purchase of work related equipment.

<u>Stock Purchase Program</u> -  Opportunity for employees to purchase JLG stock through payroll deduction, which is through The Fulton County National Bank.  Commissions are charged to participants.

<u>JLG Merit Scholarship</u> -  Opportunity for sons and daughters of JLG employees to apply for Company sponsored college scholarships through the National Merit Scholarship Corporation.  Applications to be completed during junior year of high school.

<u>PPI Award</u> -The Profitability and Productivity Improvement Award program provides a cash award opportunity and recognizes employees' participation in our continuous improvement efforts.  At the start of each fiscal year, a profitability target is set for the following year.  You must be hired at least six months before the end of the fiscal year, and be employed by JLG on the date that the awards are paid.

<u>Retirement Savings Plan</u>  - (Requires 1,000 hours of service for participation)  The Company offers a 401(k) Savings Plan which provides an annual Company discretionary profit sharing contribution of up to 5% of regular compensation and up to 5% of regular compensation over the social security wage base. The Plan allows voluntary before tax contributions of up to 14% of pay and the Company will match 50% of the first 5% of voluntary contribution.  Company contribution and match are subject to a 4 year vesting schedule.  Employees are provided investment options.  Loans are available.

(Salary) Revised 01-15-96

JLG INDUSTRIES, INC.
## HIGHLIGHTS OF EMPLOYEE BENEFITS
### PRODUCTION HOURLY PERSONNEL

SCHEDULE      *SHIFT OPERATIONS*
              1st Shift      7:00 am - 3:00 pm
              2nd Shift      3:00 pm - 11:00 pm
              3rd Shift      11:00 pm - 7:00 am

PAY PERIODS   (Weekly) First Shift - Friday; Second and Third Shifts - Thursday

BENEFITS      (Eligibility starts after 30 days)

Group Life Insurance
        Employee coverage - premium paid by Company:
        Group Life Insurance                          1 x Annual Base Salary
        Accidental Death and Dismemberment            1 x Annual Base Salary

Supplemental Life Insurance
        Option to purchase additional life insurance for employee, spouse and eligible dependents.
        Employee pays group premium rate through payroll deduction.

Comprehensive Medical Coverage - Company provided coverage based on the following schedule:

Maximum Insured Benefit          $1,000,000 per individual insured
Individual deductible            $150
Family deductible                $300
Co-payment                       85% company/15% employee
Individual Stop Loss             $500
Family Stop Loss                 $1,000
        Note:    Coverage to include hospitalization, surgery, maternity, physician office visits and
                 other valid medical charges as noted in plan provisions.

Prescription Drug Plan - Company pays 85% of prescription drug cost; mail order prescriptions
                         available at no cost.

Dental Insurance Coverage - Company payment is based on the following schedule of services:

Preventative                                                          100%
Oral Surgery, Periodontics                                            85%
Crowns, Inlays, Onlays & Prosthetics                                  50%
Orthodontic (w/dep coverage only) $50 ded/$850 max.                   50%
        Note:    Individual deductible (does not include preventative)   $50
                 Maximum annual benefit per insured                     $1,000

Vision

Eye Exam and Glaucoma Screening (19 years of age and older, once per 24 months;    100%
                                under age 19, once per 12 months)
Eyewear discounts - Eye Care Plan of America

Employee Insurance Contribution - (JLG Flex Plan option is available through payroll deduction):

Employee coverage (required)                                          $ 2.38
w/ One dependent medical, dental & prescription (voluntary)           $ 9.53
w/ Two or more dependents medical, dental & prescription (voluntary)  $11.13

Disability Insurance Coverage - Company pays for the following:

Short Term Disability - 60% of your pay up to 90 days.

Long Term Disability - Replaces 60% of monthly earnings after 90 days and is coordinated with Social
                       Security Disability. Premiums for supplemental benefit and benefit for spouse if disabled.
                       50/50 co-pay basis. Employee cost is $.0703 per week per $1,000 of annual pay.

<u>Travel Accident Insurance</u> - Premium paid by Company.
(Immediate eligibility)

<u>Holidays</u> (Paid)
    New Years Day
    Washington's Birthday
    Good Friday
    Plus: Two Floating Holidays - Dates announced yearly.

    Memorial Day
    July 4
    Labor Day

    Thanksgiving Day
    Friday after Thanksgiving
    Christmas Day

<u>Vacation</u> (Paid)
    Up to 1 year    .8 hours pay per week of service (40 hrs. max)
    After 1 year    1.6 hours pay per week of service (80 hrs. max)
    After 10 or more years    2.4 hours pay per week of service (120 hrs. max)
    After 15 or more years    3.2 hours pay per week of service (160 hrs. max)

<u>Personal Time Off With Pay</u> - One day of personal leave is earned for each four (4) months worked. Up to five (5) days may be accumulated.

<u>Tuition Aid</u> - 50% advance for approved courses, balance up to 100% based on grade attainment.

<u>Funeral Pay</u> - Immediate family - 3 days, other family members - 1 day (Monday-Friday).

<u>Military Pay</u> - Difference between normal rate and military rate for 2 weeks Reserve Duty.

<u>Shift Differential</u> - Night shift premium - $.35 per hour.

<u>Overtime</u> - Time and one half for time worked over 8 hours per day, 40 hours per week.

<u>Safety Glasses</u> - (Prescription) Selected frames are available at cost - employee pays for examination.

<u>Lunch and Rest Periods</u> - 30 minute paid lunch period.

<u>Orientation Period</u> - 180 Calendar days.

<u>Work Clothing</u> - A uniform and coverall service is offered at cost to production employees who elect to enroll.

<u>Direct Deposit</u> - Deposit of payroll directly to employee bank accounts. Funds also directed to Individual Savings Plan, Christmas Club and Individual Retirement Account.

<u>Payroll Deduction Service</u> - Purchase of work related equipment, uniform and coverall services.

<u>Stock Purchase Program</u> - Opportunity for employees to purchase JLG stock through payroll deduction, which is through the The Fulton County National Bank. Commissions are charged to participants.

<u>JLG Merit Scholarship</u> - Opportunity for sons and daughters of JLG employees to apply for Company sponsored college scholarships through the National Merit Scholarship Corporation. Applications to be completed during junior year of high school.

<u>PPI Award</u> - The Profitability and Productivity Improvement Award program provides a cash award opportunity and recognizes employees' participation in our continuous improvement efforts. At the start of each fiscal year, a profitability target for the following year. You must be hired at least six months before the end of the fiscal year, and still be employed by JLG on the date that the awards are paid.

<u>Retirement Savings Plan</u> - (Requires 1,000 hours of service for participation) The Company offers a 401(k) Savings Plan which provides an annual Company discretionary profit sharing contribution of up to 5% of regular compensation. The Plan allows voluntary before tax contributions of up to 14% of pay and the Company will match 50% of the first 5% of voluntary contribution. Company contribution and match are subject to a 4 year vesting schedule. Employees are provided investment options. Loans are available.

## HIGHLIGHTS OF EMPLOYEE BENEFITS
### OFFICE HOURLY PERSONNEL

<u>SCHEDULE</u> - (Monday - Friday)
Morning - 8:00 am - 12:15 pm          Lunch - 12:15 pm - 1:00 pm          Afternoon - 1:00 pm - 4:45 pm

<u>PAY PERIODS</u> - Weekly (Friday)

<u>BENEFITS</u>     (Eligibility starts after 30 days)

<u>Group Life Insurance</u>
    Employee coverage - premium paid by Company
        Group Life Insurance                                    1 x Annual Base Salary
        Accidental Death and Dismemberment          1 x Annual Base Salary

<u>Supplemental Life Insurance</u>
    Option to purchase additional life insurance for employee, spouse and eligible dependents. Employee pays
    group premium rate through payroll deduction.

<u>Comprehensive Medical Coverage</u> - Company provided coverage based on the following schedule:

| | |
|---|---|
| Maximum Insured Benefit | $1,000,000 per individual insured |
| Individual deductible | $150 |
| Family deducible | $300 |
| Co-payment | 85% Company/15% employee |
| Individual Stop Loss | $500 |
| Family Stop Loss | $1,000 |

    Note:   Coverage to include hospitalization, surgery, maternity, physician office visits and
    other valid medical charges as noted in plan provisions.

<u>Prescription Drug Plan</u> - Company pays 85% of prescription drug cost; mail order prescriptions
    available at no cost.

<u>Dental Insurance Coverage</u> - Company payment is based on the following schedule of services:

| | |
|---|---|
| Preventative | 100% |
| Oral Surgery, Periodontics | 85% |
| Crowns, Inlays, Onlays & Prosthetics | 50% |
| Orthodontic (w/dep coverage only) $50 ded/$850 max. | 50% |
| | $50 |
| | $1,000 |

    Note:   Individual deductible (does not include preventative)
    Maximum annual benefit per insured

<u>Vision</u>

| | |
|---|---|
| Eye Exam and Glaucoma Screening (19 years of age and older, once per 24 months; | 100% |
| under age 19, once per 12 months) | |

    Eyewear discounts - Eye Care Plan of America

<u>Employee Insurance Contribution</u> - (JLG Flex Plan option is available through payroll deduction)

| | |
|---|---|
| Employee coverage (required) | $2.38 |
| w/ One dependent medical, dental & prescription (voluntary) | $9.53 |
| w/ Two or more dependents medical, dental & prescription (voluntary) | $11.13 |

<u>Disability Insurance Coverage</u> - Company pays for the following:

    Short Term Disability - 60% of your pay up to 90 days.

Long Term Disability - Replaces 60% of monthly earnings after 90 days and is coordinated with Social Security Disability. Premiums for supplemental benefit and benefit for spouse if disabled. 50/50 co-pay basis. Employee cost is $.0703 per week per $1,000 of annual pay. participation is voluntary.

Travel Accident Insurance - Premium paid by Company                    $250,000
(Immediate eligibility)

Holidays (Paid)
New Year's Day                    Memorial Day                    Thanksgiving Day
Washington's Birthday             July 4                          Friday after Thanksgiving
Good Friday                       Labor Day                       Christmas Day
Plus Two Floating Holidays - Dates announced yearly.

Vacation (Paid)
Up to 1 year                      8 hours pay per week of service (40 hrs. max)
After 1 year                      16 hours pay per week of service (80 hrs. max)
After 10 or more years            24 hours pay per week of service (120 hrs. max)
After 15 or more years            32 hours pay per week of service (160 hrs. max)

Personal Time Off With Pay - One day of personal leave is earned for each four (4) months worked. Up to five (5) days may be accumulated.

Tuition Aid - 50% advance for approved courses, balance up to 100% based on grade attainment.

Funeral Pay - Immediate family - 3 days, other family members - 1 day (Monday-Friday).

Military Pay - Difference between normal rate and military rate for 2 weeks Reserve Duty.

Overtime - Time and one half for time worked over 8 hours per day, 40 hours per week.

Direct Deposit - Deposit of payroll directly to employee bank accounts. Funds also directed to Individual Savings Plan, Christmas Club and Individual Retirement Account.

Payroll Deduction Service - Purchase of work related equipment, uniform and coverall services.

Stock Purchase Program - Opportunity for employees to purchase JLG stock through payroll deduction, which is through The Fulton County National Bank. Commissions are charged to participants.

JLG Merit Scholarship - Opportunity for sons and daughters of JLG employees to apply for Company sponsored college scholarships through the National Merit Scholarship Corporation. Applications to be completed during junior year of high school.

PPI Award - The Profitability and Productivity Improvement Award program provides a cash award opportunity and recognizes employees' participation in our continuous improvement efforts. At the start of each fiscal year, a profitability target is set for the following year. You must be hired at least six months before the end of the fiscal year, and be employed by JLG on the date that the awards are paid.

Retirement Savings Plan - (Requires 1,000 hours of service for participation) The Company offers a 401(k) Savings Plan which provides an annual Company discretionary profit sharing contribution of up to 5% of regular compensation. The Plan allows voluntary before tax contributions of up to 14% of pay and the Company will match 50% of the first 5% of voluntary contributions. Company contribution and match are subject to a 4 year vesting schedule. Employees are provided investment options. Loans are available.

Hourly

Pay Rate          To: Jeanne

| | | | Hourly Pay Rate | |
|---|---|---|---|---|
| 5105 | Robert Westerhold | 1 Week | 12.43 | 497.20 |
| 5046 | Donn Miller | 1 Week | 13.55 | 542.00 |
| | | | | 1056.00 |
| 5020 | Keith Ankney | 2 Weeks | 38,232.00 annual | 1470.40 |
| 5080 | Scott Becker | 2 Weeks | 12.95 | 1036.00 |
| 5089 | Roger Belcher | 2 Weeks | 14.56 | 1164.80 |
| 5037 | Preston Bosley | 2 Weeks | 14.02 | 1121.60 |
| 5007 | Sterling Doll, Sr. | 2 Weeks | 14.62 | 1169.60 |
| 5285 | Bruce Geiselman | 2 Weeks | 13.38 | 1070.40 |
| 5016 | Gary Gilbert | 2 Weeks | 14.15 | 1132 |
| 5102 | James Godfrey, III | 2 Weeks | 34,992.00 annual | 1345.60 |
| 5711 | Lester Grove | 2 Weeks | 39,864.00 annual | 1532.80 |
| 5220 | Fred Herbst, III | 2 Weeks | 13.15 | 1052 |
| 5095 | Dana Kinneman | 2 Weeks | 13.47 | 1077.60 |
| 5217 | Mark Leathery | 2 Weeks | 12.65 | 1012 |
| 5092 | Rock Lefevre | 2 Weeks | 32,784.00 annual | 1260.80 |
| 5330 | Rick Metzger | 2 Weeks | 12.52 | 1001.60 |
| 5019 | David Miller | 2 Weeks | 14.56 | 1164.80 |
| 5016 | James Musselman | 2 Weeks | 9.58 | 766.40 |
| 5762 | Raymond Myers | 2 Weeks | 13.72 | 1097.60 |
| 5224 | Robert O'Donnell | 2 Weeks | 10.16 | 812.80 |
| 5707 | Jeffrey Ruth | 2 Weeks | 13.88 | 1101.40 |
| 5322 | Ken Schwartz | 2 Weeks | 15.01 | 1200.80 |
| 5125 | Randy Sharp | 2 Weeks | 13.66 | 1092.80 |
| 5701 | Audrey Sorano | 2 Weeks | 13.55 | 1084 |
| 5090 | Russell Steich | 2 Weeks | 13.03 | 1042.40 |
| 5249 | Roy Summers | 2 Weeks | 12.65 | 1012 |
| 5260 | Penny Treat | 2 Weeks | 12.30 | 984 |
| 5093 | Leary Warfel | 2 Weeks | 11.80 | 944 |
| 5111 | Keith Wildasin | 2 Weeks | 14.24 | 1139.20   31,983.26 |
| 5269 | Harold Wire | 2 Weeks | | |
| 5720 | Thomas Conrad | 3 Weeks | 49,920.00 annual | 2880 |
| 5110 | Barry Fissel | 3 Weeks | 41,280.00 annual | 2380.80 |
| 5303 | Stephen Hoke | 3 Weeks | 14.26 | 1711.20 |
| 7017 | Kathleen Lamb | 3 Weeks | 32,400.00 annual | 1868.40 |
| 7018 | Kenneth Michael | 3 Weeks | 43,296.00 annual | 2497.20 |
| 5708 | Karen Shaffer | 3 Weeks | 13.47 | 1616.40 |
| 5015 | James Musselman | 3 Weeks | 14.56 | 1747.20   16,981.6 |
| 708 | Barry Noel | 3 Weeks | 37,800.00 annual | 2180.40 |

Not sure of Vada Mummert..She was only part time in 1990. She
may receive 20 hours which was normal for part time employees
at USTC.

Total

2080

50,004.40

SCHEDULE 3.24

Potential Competing Interests

1.    Items 5, 6, 7, 8, 9, 10 and 11 on Schedule 1.01(k) Contracts.

2.    Schedule 3.22 Employee Benefit Plans.

3.    Compensation due Employees as of the Closing Date.

4.    Severance Payment obligations to Alex M. Belote.

SCHEDULE 3.25

Environmental Matters

1.  Applicable environmental permits are listed in Schedule 1.01(x), items 1 through 6.

2.  Since January 29, 1990, Seller has caused the remediation of a condition with a chip storage container and a condition with a wash area.  Soil Sampling and Analysis Report by Gannett Fleming, Inc. and dated December 1995.

3.  Since January 29, 1990, the only complaint, order, directive, claim, citation or notice are the permits listed in Schedule 1.01(x), items 1 through 6 and item 4 below.

4.  HSCA Notice from the Commonwealth of Pennsylvania Department of Environmental Resources regarding the Industrial Solvents and Chemical Company Site, Newbury Township, York County, Pennsylvania.

5.  There are currently no underground storage tanks located on the Real Property.

6.  The Hazardous Materials on the Real Property are identified on the attached Hazardous Substance Survey Form.

7.  The only underground pipelines on the Real Property are water and sewer.

8.  Phase I Environmental Site Assessment by Gannett Fleming, Inc., Environmental Compliance Audit by Gannett Fleming, Inc., and OSHA Compliance Audit by Fairfax Environmental.

9.  Preliminary Environmental Assessment by APT Engineering, Inc. and dated November 22, 1989.

10.  As reflected in the public records in the Recorder of Deeds Office of York County, Pennsylvania.

11.  Asbestos Survey dated March 1996 and by Gannett Fleming, Inc.

12.  Proposal for Environmental Services, York, Pennsylvania Facility by Groundwater Sciences Corporation and dated April 10, 1996.

13.  Draft Preliminary Environmental Site Assessment and Remedial Activities Report JLG Industries, Inc., York, Pennsylvania Site by Groundwater Sciences Corporation and dated April 29, 1996.

14.  Draft Environmental Site Assessment and Remedial Activities Report JLG Industries, Inc., York, Pennsylvania Site by Groundwater Sciences Corporation dated May 14, 1996.

15.    JLG Industries, Inc. Phase II Environmental Site Assessment, York County, Pennsylvania Plant by Gannett Fleming, Inc. and dated May 1996.

16.    Letter Agreement between JLG Industries, Inc. and Powerscreen USC Inc. and dated May 21, 1996.

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

### HAZARDOUS SUBSTANCE SURVEY FORM
#### Worker and Community Right to Know Program

Name of Company: <u>JLG Industries, Inc.</u>
Federal Employer ID #: <u>-</u>
ivision or Plant Name: <u>Material Handling Division</u>
Workplace Covered: <u>Entire Facility</u>
Street Address: <u>RD 6, Box 34-B</u>
<u>York, PA  17404-9806</u>
Mailing Address: <u>SAME AS ABOVE</u>
Telephone Number: <u>(717) 792-9731</u>
County Name: <u>York</u>                    County Code: <u>67</u>
Representative: _____
Title: _____
Signers Address: <u>SAME AS ABOVE</u>
Reporting Period: <u>From 01/01/95 Thru 12/31/95</u>

Signature: _____   Date: <u>03/04/96</u>

| CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|
| | | FIR | REL | REA | ACU | CER |
| | 00711 PENETRANT-LUBRICANT | X | | | X | X |
| 111-76-2 | ETHANOL, 2-BUTOXY- | X | X | | X | X |
| 74-98-6 | PROPANE | | | | | |
| | 07961 CATERPILLAR ANTIFREEZE 535 | | | X | X | X |
| 107-21-1 | ETHYLENE GLYCOL | | | | | |
| | 2 TON CLEAR EPOXY - HARDENER | | | | X | X |
| 111-40-0 | 1,2-ETHANEDIAMINE, N-(2-AMINOETHYL) | | | | | |
| | 3M BRAND TYPE 148 TONER | | | | X | X |
| 1333-86-4 | CARBON BLACK | | | | X | |
| 7631-86-9 | SILICA | | | | | |
| | 3M BRAND TYPE 152 DEVELOPER PREMIX | | | | X | |
| 7631-86-9 | SILICA | | | | | |
| | 3M TYPE 164 TONER | | | | X | X |
| 1333-86-4 | CARBON BLACK | | | | X | |
| 7631-86-9 | SILICA | | | | | |
| | 3M TYPE 264 DEVELOPER | | | | X | X |
| 1333-86-4 | CARBON BLACK | | | | | |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: _-_                     Date: 03/04/96

| E | S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|---|-------|----------------------------------------|-----|-----|-----|-----|-----|
| | | | **50CC 515** | X | X | X | X | X |
| E | | 79-10-7 | ACRYLIC ACID | X | | | X | X |
| E | | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| | | | **7070 ODC CLEANER** | | | | X | X |
| | | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | | **ABC DRY CHEMICAL** | | | | X | X |
| | | 12001-26-2 | MICA-GROUP MINERALS | | | | X | |
| | | 7631-86-9 | SILICA | | | | | |
| | | | **ABRASION RESISTANT CAST IRON** | | | | X | X |
| E | S | 7440-47-3 | CHROMIUM | X | | X | X | X |
| E | S | 7440-50-8 | COPPER | X | | X | X | X |
| | | 7439-96-5 | MANGANESE | X | | | X | |
| | | 7439-98-7 | MOLYBDENUM | X | | | X | X |
| E | S | 7440-02-0 | NICKEL | X | | | X | X |
| E | | 7723-14-0 | PHOSPHORUS | X | | | X | |
| | | 7440-21-3 | SILICON | | | | | |
| | | 7704-34-9 | SULFUR | | | | | |
| | | | **ACETYLENE** | X | X | X | X | |
| | | 74-86-2 | ACETYLENE | | | | | |
| | | | **ACRYLIC ALKYD GLOSS ENAMEL** | X | | | X | X |
| E | | 108-88-3 | TOLUENE | X | | | X | X |
| E | | 1330-20-7 | XYLENE (MIXED ISOMERS) | | | | | |
| | | | **ACRYLIC-ALKYD HIGH GLOSS** | X | | | X | X |
| E | | 108-88-3 | TOLUENE | X | | | X | X |
| E | | 1330-20-7 | XYLENE (MIXED ISOMERS) | | | | | |
| | | | **ACRYLIC-ALKYD HIGH GLOSS GREY** | X | | | X | X |
| E | | 108-88-3 | TOLUENE | X | | | X | X |
| E | | 1330-20-7 | XYLENE (MIXED ISOMERS) | | | | | |
| | | | **ACTIVATOR 81669** | X | | X | X | |
| E | | 7429-90-5 | ALUMINUM | | | | | |
| | | | **ADHESIVE 81669** | X | X | X | X | X |
| | | 79-10-7 | ACRYLIC ACID | | | | | |

Special Hazardous Substance

```
                                              RTK USE ONLY
                                  Facility: _____
                                  Doc. Code: _____ Date: _____

         Name of Company: JLG Industries, Inc.
orkplace Covered By Form: Entire Facility
    Federal Employer ID #: ___-_____        Date: 03/04/96
```

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|---|---|---|---|---|---|---|
| | | ADHESIVE 81669 (cont.) | | | | | |
| | 7429-90-5 | ALUMINUM | X | X | | X | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| | | ADHESIVE/SEALANT 242 | | | | | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| S | 81-07-2 | SACCHARIN | | | | X | X |
| | 7631-86-9 | SILICA | | | | X | |
| | | ADHESIVE/SEALANT 262 | | | | | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| S | 81-07-2 | SACCHARIN | | | | X | X |
| | 7631-86-9 | SILICA | | | | X | |
| | | AIR CARBON ARC GOUGING ELECTRODES | | | | | |
| | 7782-42-5 | GRAPHITE | | | | | X |
| | | ALCLEAN 200A | | | | | |
| | 34590-94-8 | PROPANOL, (2-METHOXYMETHYLETHOXY)- | X | | | | |
| | | ALKYD AIR-DRY 3.0 VOC PRIMER, BUFF | | | | | |
| | 110-43-0 | 2-HEPTANONE | X | | | X | |
| | 7727-43-7 | BARIUM SULFATE | | | | X | X |
| | 108-10-1 | METHYL ISOBUTYL KETONE | X | | | X | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | |
| | | ALKYD SPECIAL PURPOSE COATINGS | | | | | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | ALL CARBOLOY (R) CARBIDE GRADES EXCEPT 6 | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7440-48-4 | COBALT | X | | | X | X |
| | | ARCAIR (R) PROTEX (R) EXTRA | | | | | |
| | 141-43-5 | ETHANOL, 2-AMINO- | X | | | X | X |
| | | ARGOMIX 218, 225 | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
rkplace Covered By Form: Entire Facility _____
Federal Employer ID #: ___-_____ Date: 03/04/96

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CER |
|---|---|---|---|---|---|---|---|
| | | **PHYSICAL AND<br>HEALTH HAZARD(S)** | | | | | |
| | | ARGON | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | | ARGON, COMPRESSED | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | | ARGOSHIELD GAS #8C, #25C | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | ATRAX CARBIDE GRADES AND BRAZED TOOLS AN | | | | | |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| S | 7440-43-9 | CADMIUM | X | | | X | X |
| | 7440-48-4 | COBALT | X | | | X | X |
| | 7440-50-8 | COPPER | X | | X | X | X |
| | 7440-02-0 | NICKEL | X | | | X | X |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | 7440-22-4 | SILVER | X | | | X | |
| | 7440-66-6 | ZINC | X | | X | X | X |
| | | AVITROL | | | | | |
| | 7647-01-0 | HYDROCHLORIC ACID | | X | | X | X |
| | 504-24-5 | PYRIDINE, 4-AMINO- | | | | X | X |
| | | BALL PAINT MARKERS - ALL COLORS | | | | | |
| | 107-98-2 | 2-PROPANOL, 1-METHOXY- | X | | | X | |
| | | BOND "SUPER TOILEX" | | | | | |
| | 7647-01-0 | HYDROCHLORIC ACID | | X | | X | X |
| | | BRAZO FLUX | | | | | |
| | 1303-96-4 | SODIUM BORATE DECAHYDRATE | | | X | X | X |
| | | BRUNING PD ACTIVATOR | | | | | |
| | 107-41-5 | 2,4-PENTANEDIOL, 2-METHYL- | | | | X | |
| | 112-80-1 | 9-OCTADECENOIC ACID (Z)- | | | | | |
| | 100-51-6 | BENZENEMETHANOL | | | | X | X |
| | 141-43-5 | ETHANOL, 2-AMINO- | X | | | X | X |
| | 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: <u>JLG Industries, Inc.</u>
Workplace Covered By Form: <u>Entire Facility</u>
Federal Employer ID #: __<u>-</u>_____    Date: <u>03/04/96</u>

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S)<br>FIR | REL | REA | ACU | CH |
|---|---|---|---|---|---|---|---|
| | | **CARBOLOY (R) CARBIDE GRADE 616** | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | | | | | | | |
| | | **CARBON DIOXIDE** | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | | | | | | |
| | | **CARBON DIOXIDE, GAS** | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | | | | | | |
| | | **CENTARI (R) ACRYLIC ENAMEL** | | | | | |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | | | | | | |
| | | **CENTARI (R) BASEMAKERS** | | | | | |
| | 108-83-8 | 4-HEPTANONE, 2,6-DIMETHYL- | X | | | X | |
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | | | | | | | |
| | | **CLEANING SOLVENT 755 (AEROSOL)** | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | X | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | 109-87-5 | METHANE, DIMETHOXY- | X | | | X | X |
| | 75-65-0 | TERT-BUTYL ALCOHOL | X | | | X | |
| | | | | | | | |
| | | **COATED ABRASIVE PRODUCT - ADALOX & METAL** | | | | | |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | | | | | | | |
| | | **COATED ABRASIVE PRODUCT - NORZON** | | | | | |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | | | | | | | |
| | | **COATED ABRASIVE PRODUCT - NORZON F826** | | | | | |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | | | | | | | |
| | | **COLD SOLVENT DEGREASER** | | | | | |
| S | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 8002-05-9 | PETROLEUM | | | | X | X |
| | 79-01-6 | TRICHLOROETHYLENE | | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: <u>JLG Industries, Inc.</u>
orkplace Covered By Form: <u>Entire Facility</u>
Federal Employer ID #: __-_____    Date: <u>03/04/96</u>

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) FIR REL REA ACU CER | | | | |
|---|---|---|---|---|---|---|---|

**CROSSLINKER**

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CER |
|---|---|---|---|---|---|---|---|
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

**CSM-1 DEGREASER**

| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |

**DAR-2**

| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

**DAZ-L FLUORESCENT (ALL COLORS)**

| | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |

**DECO BRITE AEROSOL SPRAY PAINT**

| | 67-64-1 | ACETONE | X | | | X | X |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

**DECO BRITE GLOSS YELLOW AEROSOL SPRAY**

| | 67-64-1 | ACETONE | X | | | X | X |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

**DTR602**

| | 67-64-1 | ACETONE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
Federal Employer ID #: ___-_____    Date: 03/04/96

| E | S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|-------|-----------------------------------------|------|------|------|------|------|
|   |   |       |                                         | FIR | REL | REA | ACU | CHR |
|   |   |       | **DUCTILE IRON** | | | | | |
| E |   | 7429-90-5 | ALUMINUM | X | | X | X | |
| E | S | 7440-47-3 | CHROMIUM | | | X | X | X |
| E |   | 7440-50-8 | COPPER | X | | X | X | X |
|   |   | 7439-95-4 | MAGNESIUM | | | | | |
| E |   | 7439-96-5 | MANGANESE | X | | X | X | X |
|   |   | 7439-98-7 | MOLYBDENUM | X | | | X | |
| E | S | 7440-02-0 | NICKEL | X | | | X | X |
| E |   | 7723-14-0 | PHOSPHORUS | X | | | X | X |
|   |   | 7440-21-3 | SILICON | X | | | X | |
|   |   | 7704-34-9 | SULFUR | | | | | |
|   |   |       | **DURACELL** | | | | | |
|   |   | 1310-58-3 | POTASSIUM HYDROXIDE (K(OH)) | | | X | X | X |
|   |   | 7440-66-6 | ZINC | X | | X | X | X |
|   |   |       | **DXR80** | | | | | |
| E |   | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
|   |   |       | **DYKEN SPRAY STEEL BLUE SP-1100** | | | | | |
| E |   | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
|   |   | 106-97-8 | BUTANE | X | X | | X | |
|   |   | 64-17-5 | ETHANOL | X | | | X | |
| E |   | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
|   |   | 74-98-6 | PROPANE | X | X | | X | X |
|   |   | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
|   |   |       | **ENAMEL REDUCERS** | | | | | |
|   |   | 108-83-8 | 4-HEPTANONE, 2,6-DIMETHYL- | X | | | X | |
|   |   | 141-78-6 | ACETIC ACID ETHYL ESTER | X | | | X | X |
| E |   | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| E |   | 67-64-1 | ACETONE | X | | | X | X |
| E |   | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| E |   | 7439-92-1 | LEAD | X | | X | X | X |
| E |   | 71-36-3 | N-BUTYL ALCOHOL | X | | | X | X |
| E |   | 108-88-3 | TOLUENE | X | | | X | X |
| E |   | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | |
|   |   |       | **EPOXY** | | | | | |
|   |   | 110-43-0 | 2-HEPTANONE | X | | | X | |
|   |   | 25551-13-7 | BENZENE, TRIMETHYL- | X | | | X | |

```
                                              RTK USE ONLY
                                  Facility: _____
                                  Doc. Code: _____ Date: _____

        Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
     Federal Employer ID #:    -                      Date: 03/04/96
```

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CER |
| | | **EPOXY (cont.)** | | | | | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| S | 50-00-0 | FORMALDEHYDE | X | X | X | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **EPOXY HARDENER** | | | | | |
| | 108-10-1 | METHYL ISOBUTYL KETONE | X | | | X | |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | | **F-100 INK** | | | | | |
| | 64-17-5 | ETHANOL | X | | | X | X |
| | | **FABSHIELD 4** | | | | | |
| | 1309-48-4 | MAGNESIUM OXIDE (MGO) | | | | | X |
| | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7440-02-0 | NICKEL | X | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **FAST DRY INHIBITING PRIMER** | | | | | |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | | **FAST DRY PRIMER** | | | | | |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | **FLAME RETARDANT FLOOR COVERING - WHITE** | | | | | |
| | 7783-20-2 | AMMONIUM SULFATE (SOLUTION) | | | | X | |
| | | **FLEETWOOD 37** | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 1314-13-2 | ZINC OXIDE (ZNO) | | | | X | X |
| | | **FORM-A-GASKET (R) #1** | | | | | |
| | 1309-37-1 | IRON OXIDE (FE2O3) | | | | X | |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 1332-58-7 | KAOLIN | | | | X | |
| | | **FORM-A-GASKET (R) #2** | | | | | |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 1332-58-7 | KAOLIN | | | | X | |

```
                                              RTK USE ONLY
                              Facility:  _____
                              Doc. Code: _____  Date: _____
```

Name of Company: JLG Industries, Inc.
rkplace Covered By Form: Entire Facility
Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CER |
| | | **FORMULA 707** | | | | | |
| | 1310-58-3 | POTASSIUM HYDROXIDE (K(OH)) | | | X | X | X |
| | | **G-G F.D. METAL SHOP PRIMER** | | | | | |
| | 78-83-1 | 1-PROPANOL, 2-METHYL- | X | | X | X | X |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | | **GASKET ELIMINATRO (R) 515 SEALANT** | X | X | X | X | X |
| | 79-10-7 | ACRYLIC ACID | X | | | X | X |
| | 80-15-9 | CUMENE HYDROPEROXIDE | | | | X | X |
| S | 81-07-2 | SACCHARIN | | | | X | |
| | 7631-86-9 | SILICA | | | | | |
| | | **GLASS CLEANER (AEROSOL)** | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **GLID-GUARD ALKYD INDUSTRIAL ENAMEL - IMP** | | | | | |
| | 1317-80-2 | RUTILE (TIO2) | | | | | |
| | | **GLID-GUARD ALKYD INDUSTRIAL ENAMEL - PAS** | | | | | |
| | 1317-80-2 | RUTILE (TIO2) | | | | | |
| | | **GLID-GUARD ALKYD INDUSTRIAL ENAMEL - WHI** | | | | | |
| | 1317-80-2 | RUTILE (TIO2) | | | | | |
| | | **GLID-GUARD GLID-SHIELD - DEEP TINT BASE** | | | | | |
| | 1317-80-2 | RUTILE (TIO2) | | | | | |
| | | **GLID-GUARD INDUSTRIAL MAINTENANCE COLORA** | | | | X | X |
| | 1333-86-4 | CARBON BLACK | | | | X | |
| | 1309-37-1 | IRON OXIDE (FE2O3) | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **GLID-GUARD MACH GRAY** | | | | | |
| | 1317-80-2 | RUTILE (TIO2) | | | | | |
| | | **GLID-GUARD MED YELLOW** | | | | | |
| | 1317-80-2 | RUTILE (TIO2) | | | | | |

RTK USE ONLY

Facility: _____
Doc. Code: _____    Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|-------|----------------------------------------|:---:|:---:|:---:|:---:|:---:|
| | | | FIR | REL | REA | ACU | CER |
| | | **GLID-GUARD SPEEDENAMEL Q.D. ENAMEL** | | | | | |
| | 1317-65-3 | LIMESTONE | | | | X | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GLID-GUARD SPEEDENAMEL QUICK-DRY CLEAR T** | | | | | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GOOD GULF LEADED GASOLINE** | | | | | |
| S | 71-43-2 | BENZENE | X | | X | X | X |
| | 110-82-7 | CYCLOHEXANE | X | | | X | X |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | |
| | 1634-04-4 | METHYL TERT-BUTYL ETHER | X | | | X | |
| | 91-20-3 | NAPHTHALENE | X | X | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GRAPHITE GUN** | | | | | |
| | 7782-42-5 | GRAPHITE | | | | | X |
| | | **GRAY AIR DRY PRIMER** | | | | | |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GRAY IRON CASTING** | | | | | |
| | 7429-90-5 | ALUMINUM | X | | X | X | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7440-50-8 | COPPER | X | | X | X | X |
| | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | 7723-14-0 | PHOSPHORUS | X | | | X | X |
| | 7440-21-3 | SILICON | X | | | X | |
| | 7704-34-9 | SULFUR | | | | | |
| | | **GRAY IRON CASTING** | | | | | |
| | 7429-90-5 | ALUMINUM | X | | X | X | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7440-50-8 | COPPER | X | | X | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
rkplace Covered By Form: Entire Facility
Federal Employer ID #: _____-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CER |
| | | GRAY IRON CASTING (cont.) | | | | | |
| | 7439-96-5 | MANGANESE | X | X | | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | 7723-14-0 | PHOSPHORUS | X | | | X | X |
| | 7440-21-3 | SILICON | X | | | X | |
| | 7704-34-9 | SULFUR | | | | | |
| | | HI-GLOSS ENAMEL | | | | | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | HIGH SOLIDS ACRYLIC ENAMEL | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 100-42-5 | STYRENE | X | | | X | X |
| | | HIGH TECH ELECTRONIC CLEANER | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | X | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | HOSE ASSEMBLY LUBRICANT | | | | | |
| | 8002-05-9 | PETROLEUM | | | | X | X |
| | | I-M COLORANT CHROME YELLOW | | | | | |
| : S | 7440-47-3 | CHROMIUM | | | | X | X |
| : | 7439-92-1 | LEAD | X | | | X | X |
| | | I-M COLORANT LAMPBLACK | | | | | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | | I-M COLORANT MOLY ORANGE | | | | | |
| : S | 7440-47-3 | CHROMIUM | | | | X | X |
| : | 7439-92-1 | LEAD | X | | | X | X |
| | | I-M COLORANT PHTHALO BLUE | | | | | |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | | I-M COLORANT WHITE | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: <u>JLG Industries, Inc.</u>
orkplace Covered By Form: <u>Entire Facility</u>
Federal Employer ID #: <u>    -          </u>          Date: <u>03/04/96</u>

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CER |
|---|-------|----------------------------------------|-----|-----|-----|-----|-----|
| | | **I-M COLORANT, CHROME YELLOW, MEDIUM** | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7439-92-1 | LEAD | X | | | X | X |
| | | | | | | | |
| | | **IMRON (R) POLYURETHANE ENAMEL** | | | | | |
| | 141-78-6 | ACETIC ACID ETHYL ESTER | X | | | X | X |
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 7429-90-5 | ALUMINUM | X | | X | X | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| S | 18454-12-1 | LEAD CHROMATE, BASIC | | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | | | | | | |
| | | **INHIBITED ETHYLENE GLYCOL** | | | | | |
| | 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |
| | | | | | | | |
| | | **JON-DRAW 700** | | | | | |
| S | 50-00-0 | FORMALDEHYDE | X | X | X | X | X |
| | | | | | | | |
| | | **KOAL PLASMA QUENCH NO. 617** | | | | | |
| | 7631-99-4 | SODIUM(I) NITRATE (1:1) | X | | | X | X |
| | | | | | | | |
| | | **KOAL PLASMA QUENCH NO. 617.2** | | | | | |
| | 7631-99-4 | SODIUM(I) NITRATE (1:1) | X | | | X | X |
| | | | | | | | |
| | | **LACQUER THINNER** | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | | | | | | |
| | | **LATEX FLOOR, PORCH & TRIM ENAMEL** | | | | | |
| | 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |
| | | | | | | | |
| | | **LED-PLATE NO. 250 ANTI-SEIZE SEALING COM** | | | | | |
| | 7439-92-1 | LEAD | X | | | X | X |

```
                                              RTK USE ONLY
                                    Facility: _____
                                    Doc. Code: _____ Date: _____
```

Name of Company: <u>JLG Industries, Inc.</u>
orkplace Covered By Form: <u>Entire Facility</u>
  Federal Employer ID #: <u>  -              </u>          Date: <u>03/04/96</u>

|   |   | PRODUCT NAME | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| S | CAS # | HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
| | | **LENOX BAND-ADE MACHINE CLEANER** | | | | | |
| | 102-71-6 | ETHANOL, 2,2',2"-NITRILOTRIS- | | | | | |
| | | **LIQUEFIED PETROLEUM GAS OR PROPANE** | | | | | |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | | **LIQUIFIED PETROLEUM GAS W/METYL ACETYLEN** | | | | | |
| | 74-99-7 | 1-PROPYNE | X | | | X | |
| | | **LOCQUIC (R) PRIMER T** | | | X | X | X |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | X | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **LUX-REE LAT. FLAT WHITE & TINTS** | | | X | X | X |
| | 107-21-1 | ETHYLENE GLYCOL | | | | | |
| | | **M-60 GLASS CLEANER, CLEAR THRU, C-CLEAR,** | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| : | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **M-BOND 200 ADHESIVE** | | | | | |
| | 137-05-3 | 2-PROPENOIC ACID, 2-CYANO-, METHYL | | | | X | |
| | | **M-BOND 200 CATALYST** | | | X | X | X |
| : | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | | | |
| | 92-50-2 | ETHANOL, 2-(ETHYLPHENYLAMINO)- | | | | | |
| | | **M-PREP CONDITIONER A** | | | | X | X |
| : | 7664-38-2 | PHOSPHORIC ACID | | | | | |
| | | **M-PREP NEUTRALIZER 5** | | | | X | X |
| : | 1336-21-6 | AMMONIUM HYDROXIDE ((NH4)(OH)) | X | | | X | X |
| : | 67-63-0 | ISOPROPYL ALCOHOL | | | | | |
| | | **MARKAL BALL PAINT MARKERS** | | | | | |
| | 57-55-6 | 1,2-PROPANEDIOL | X | | | X | X |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | | | | | |
| | | **MARSH SPRAY MARKOVER TAN & WHITE** | X | | | X | X |
| S | 75-09-2 | DICHLOROMETHANE | | | | | |
| | 68476-85-7 | LIQUEFIED PETROLEUM GAS | | | | | |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
orkplace Covered By Form: Entire Facility _____
Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
| | | | FIR | REL | REA | ACU | CER |
|---|---|---|---|---|---|---|---|
| | | MARSH SPRAY MARKOVER TAN & WHITE (cont.) | X | | | X | X |
| | 108-88-3 | TOLUENE | | | | | |
| | | METAL SHOP PRIMER | | | | | |
| | 78-83-1 | 1-PROPANOL, 2-METHYL- | X | | X | X | X |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 1309-37-1 | IRON OXIDE (FE2O3) | | | | X | |
| | 14808-60-7 | QUARTZ (SIO2) | | | | X | |
| | 14807-96-6 | TALC | | | | X | X |
| | | MINT DISINFECTANT, PH, COEF. 7.5 | | | | | |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | NATURAL GAS | X | X | | X | |
| | 106-97-8 | BUTANE | | | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | | |
| | 74-84-0 | ETHANE | X | X | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |
| | 7783-06-4 | HYDROGEN SULFIDE (H2S) | X | X | | X | |
| | 74-82-8 | METHANE | X | X | | X | X |
| | 109-66-0 | PENTANE | X | X | | X | X |
| | 74-98-6 | PROPANE | X | X | | X | |
| | | NATURAL GRAPHITE MICRO MESH | | | | | X |
| | 7782-42-5 | GRAPHITE | | | | X | |
| | 14808-60-7 | QUARTZ (SIO2) | | | | X | |
| | | NICKEL BASED CAST STEELS | | | | X | X |
| : S | 7440-47-3 | CHROMIUM | X | | | X | X |
| : | 7440-48-4 | COBALT | X | | X | X | X |
| : | 7440-50-8 | COPPER | X | | X | X | X |
| : | 7439-96-5 | MANGANESE | X | | | X | |
| | 7439-98-7 | MOLYBDENUM | X | | | X | X |
| : S | 7440-02-0 | NICKEL | X | | | X | |
| | 7440-21-3 | SILICON | X | | | X | |
| | | NISSEN FELTIP PAINT MARKER | | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
rkplace Covered By Form: Entire Facility
Federal Employer ID #: _ _____    Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|-------|--------------------------------------|-----|-----|-----|-----|-----|
| | | | FIR | REL | REA | ACU | CHR |
| | 7727-37-9 | NITROGEN LIQUID BULK NITROGEN | | | | | |
| | 7727-37-9 | NITROGEN, COMPRESSED GAS NITROGEN | | | | | |
| | 7782-44-7 | OXYGEN, COMPRESSED GAS OXYGEN | | | | | |
| | | PIGMENT DISPERSION | | | | | |
| | 25551-13-7 | BENZENE, TRIMETHYL- | X | | | X | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 8052-41-3 | STODDARD SOLVENT | X | | | X | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | PIPE SEALANT WITH TEFLON | | | | | |
| | 111-87-5 | 1-OCTANOL | X | | | X | X |
| | 80-15-9 | CUMENE HYDROPEROXIDE | | | | X | X |
| | 9002-84-0 | ETHENE, TETRAFLUORO-, HOMOPOLYMER | | | | X | X |
| | 12001-26-2 | MICA-GROUP MINERALS | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | POLY SPRAY JET | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | POLYOL | | | | | |
| | 110-43-0 | 2-HEPTANONE | X | | | X | |
| | 110-19-0 | ACETIC ACID, 2-METHYLPROPYL ESTER | X | | | X | |
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 108-10-1 | METHYL ISOBUTYL KETONE | X | | | X | |
| | | PRIMER N 7649 (4.5 OZ) | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | | PROTECT-O-METAL NO. 2 | | | | | |
| | 1317-65-3 | LIMESTONE | | | | X | |
| | | PROTEX SPRAY | | | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | | |

RTK USE ONLY
Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
Federal Employer ID #: ___-_____   Date: 03/04/96

| E S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) FIR | REL | REA | ACU | CHR |
|---|---|---|---|---|---|---|---|
| | | **PROTEX SPRAY (cont.)** | | | | | |
| E S | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | | **PST (R) H TEMP ANTI-GALLING PIPE SEALANT** | | | | | |
| E | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| E S | 81-07-2 | SACCHARIN | | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **PST (R) PIPE SEALANT** | | | | | |
| E | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| E S | 81-07-2 | SACCHARIN | | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **PURPLE K DRY CHEMICAL** | | | | | |
| | 12001-26-2 | MICA-GROUP MINERALS | | | | X | X |
| | | **QUAL (AND OTHER BRANDS)** | | | | | |
| E | 7664-93-9 | SULFURIC ACID | X | | X | X | X |
| | | **QUICK 'N EASY SPRAY ENAMEL** | | | | | |
| E | 110-19-0 | ACETIC ACID, 2-METHYLPROPYL ESTER | X | | | X | |
| E | 67-64-1 | ACETONE | X | | | X | X |
| E | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| E | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| E | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| E | 108-88-3 | TOLUENE | X | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **REDUCERS** | | | | | |
| E | 95-63-6 | 1,2,4-TRIMETHYLBENZENE | X | | | X | X |
| E | 98-82-8 | CUMENE | X | | | X | X |
| S | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **REGULAR STARTING FLUID** | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| E | 60-29-7 | ETHANE, 1,1'-OXYBIS- | X | X | X | X | X |
| | 142-82-5 | HEPTANE | X | X | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
rkplace Covered By Form: Entire Facility
Federal Employer ID #: _____-_____          Date: 03/04/96

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | REL. AGENT 81669 | | | X | X | X |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | |
| | 124-38-9 | CARBON DIOXIDE | | | X | X | |
| | | RESINOID BONDED GRINDING WHEELS | | | | X | X |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | |
| | 409-21-2 | SILICON CARBIDE (SIC) | | | | | |
| | | RM 81 | X | | | X | X |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | | | X | X | X |
| | 1310-58-3 | POTASSIUM HYDROXIDE (K(OH)) | | | | | |
| | | RUST VETO 2109 | | | | | |
| | 8008-20-6 | KEROSENE | | | | | |
| | | RUST-O-LENE OIL 110 | | | | X | X |
| | 92-52-4 | BIPHENYL | | | | | |
| | 8008-20-6 | KEROSENE | | | | | |
| | 91-20-3 | NAPHTHALENE | X | X | | X | X |
| | | RUSTMASTER SPRAY - CLEAR GLOSS | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | RUSTMASTER SPRAY - FLAT WHITE | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | SAFETY-KLEEN 105 PARTS WASHING SOLVENT | | | X | X | X |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | | X | X |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| S | 127-18-4 | TETRACHLOROETHYLENE | | | X | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | SAVOGRAN STRYPEEZE SEMI PASTE | | | | X | X |
| | 67-64-1 | ACETONE | X | | | X | X |
| S | 75-09-2 | DICHLOROMETHANE | X | | X | X | X |
| | 67-56-1 | METHANOL | X | | | | |

RTK USE ONLY

Facility: _____
Doc. Code: _____   Date: _____

Name of Company: <u>JLG Industries, Inc.</u>
Workplace Covered By Form: <u>Entire Facility</u>
Federal Employer ID #: _<u>  -  </u>_____   Date: <u>03/04/96</u>

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | **SAVOGRAN STRYPEEZE SEMI PASTE (cont.)** | | | | | |
| | 8002-74-2 | PARAFFIN WAXES AND HYDROCARBON WAXE | | | | X | |
| C | 108-88-3 | TOLUENE | X | | | X | X |
| | | **SEAMLESS STEEL TUBING & STEEL BARS** | | | | | |
| C S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| C S | 7440-02-0 | NICKEL | X | | | X | X |
| | | **SENTRY GU SAFETY SOLVENT** | | | | | |
| C | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | | **SPEAR-O-SAN GERMICIDAL CLEANER** | | | | | |
| | 7722-88-5 | DIPHOSPHORIC ACID, TETRASODIUM SALT | X | | | X | X |
| | | **SPRAOL CLOTH MOP DRESSING** | | | | | |
| | 106-97-8 | BUTANE | X | X | | X | |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | | **SPRED - FLAT BLACK** | | | | | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | | **STOP SEIZE** | | | | | |
| C | 7440-50-8 | COPPER | X | | X | X | X |
| | 7782-42-5 | GRAPHITE | | | | | X |
| | | **SUPER COACH H/G BLACK** | | | | | |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | | **SUPERBONDER(R) 430 INSTANT ADHESIVE** | | | | | |
| | 137-05-3 | 2-PROPENOIC ACID, 2-CYANO-, METHYL | | | | X | |
| | | **SUPERFLEX(TM) SILICONE ADHESIVE/SEALANT** | | | | | |
| C | 64-19-7 | ACETIC ACID | X | | | X | X |
| | | **TOP COAT** | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 100-42-5 | STYRENE | X | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
Federal Employer ID #: __-_____    Date: 03/04/96

| E S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CER |
|-----|-------|------------------------------------------|-----|-----|-----|-----|-----|
| | | **TOP COAT (cont.)** | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **TRAFFIC PAINT YELLOW** | | | | | |
| | 110-54-3 | HEXANE | X | X | | X | X |
| E S | 7758-97-6 | LEAD CHROMATE | | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **TUNGSTEN CARBIDE PRODUCT WITH COBALT BIN** | | | | | |
| E | 7440-48-4 | COBALT | X | | | X | X |
| | | **TURCO DY-CHEK DEVELOPER NA PSU** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| E | 76-13-1 | FREON 113 | | X | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **TURCO DY-CHEK PENETRANT (PSU)** | | | | | |
| | 84-74-2 | DIBUTYL PHTHALATE | X | | | X | X |
| E | 76-13-1 | FREON 113 | | X | | X | X |
| E | 8002-05-9 | PETROLEUM | | | | X | X |
| | | **TURCO DY-CHEK REMOVER LS (PSU)** | | | | | |
| | 64-17-5 | ETHANOL | X | | | X | X |
| | 76-13-1 | FREON 113 | | X | | X | X |
| E | 8002-05-9 | PETROLEUM | | | | X | X |
| | | **ULTRA BLACK(R) RTV SILICONE** | | | | | |
| | 7429-90-5 | ALUMINUM | X | | X | X | |
| E | 1333-86-4 | CARBON BLACK | | | | X | X |
| | | **VCI METAL PROTECTIVE PAPER** | | | | | |
| | 141-43-5 | ETHANOL, 2-AMINO- | X | | | X | X |
| E | 7632-00-0 | SODIUM NITRITE | X | X | X | X | X |
| | | **VISIONAID RAINBOW ANTI-FOG, ANTI-STAT LI** | | | | | |
| E | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **VITRIFIED BONDED - ABRASIVE PRODUCTS** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | 409-21-2 | SILICON CARBIDE (SIC) | | | | X | |
| | 7704-34-9 | SULFUR | | | | | |

S = Special Hazardous Substance

RTK USE ONLY

Facility: _____
Doc. Code: _____  Date: _____

Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
Federal Employer ID #: ___-___          Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) FIR REL REA ACU CER | | | | |
|---|-------|--------------------------------------|------|------|------|------|------|
| | | **WD-40 SPRAY CANS** | | | | | |
| | 68476-85-7 | LIQUEFIED PETROLEUM GAS | | | | | |
| | 8052-41-3 | STODDARD SOLVENT | X | | X | | |
| | | | | | | | |
| | | **WHITE STENCIL INK #7083** | | | | | |
| S | 75-09-2 | DICHLOROMETHANE | X | | X | X | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | X | X | |
| | 108-88-3 | TOLUENE | X | | X | X | |
| | | | | | | | |
| | | **WINDSHIELD WASHER** | | | | | |
| | 67-56-1 | METHANOL | X | X | X | X | |
| | | | | | | | |
| | | **X-L CONCENTRATE** | | | | | |
| | 7722-88-5 | DIPHOSPHORIC ACID, TETRASODIUM SALT | X | | X | X | |
| | | | | | | | |
| | | **XAGRA- 7021AEROSOL** | | | | | |
| | 108-88-3 | TOLUENE | X | | X | X | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | X | X | |
| | | | | | | | |
| | | **XYLENE** | | | | | |
| | 100-41-4 | ETHYLBENZENE | X | | X | X | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | X | X | |

| Customer No. | Customer Name | Invoice Date | Invoice No. | Amount |
|---|---|---|---|---|
| 10622 | US Rentals Inc. | 4/3/96 | 224477 | (11,605.92) |
| 10911 | Clarklift of Ft. Worth, Inc, | 4/10/96 | 225886 | (35,786.00) |
| 9512 | Busey Truck Equipment | 4/16/96 | 227294 | (6,528.00) |
| 10622 | US Rentals Inc. | 4/16/96 | 227286 | (11,605.92) |
| 10895 | US Rentals | 4/16/96 | 227288 | (11,605.92) |
| 9544 | Fallsway Equipment Co., Inc. | 4/26/96 | 230320 | (6,169.25) |

SCHEDULE 5.06

Supply of Cylinders

Attached and labeled as Schedule 5.06 - Attachment A are the hydraulic cylinders to be sold and delivered by Seller pursuant to Section 5.06.

Schedule 5.06 – Attachment A

## MHD – TRUCK CRANE LINE
### HYDRAULIC CYLINDER REQUIREMENTS/ANALYSIS TO END OF SEPT '98

| PART # | DESCRIPTION | PRESENT SUPPLIER | 5/14/96 QTY ON HAND MHD | 5/14/96 QUANTITY AT MCB | ADDITIONAL QTY NEEDED FROM MCB BY SEPT '98 |
|---|---|---|---|---|---|
| | PRODUCTION CYLINDERS | | | | |
| 1681745 | VERT DROP | MCB | 5 | | 8 |
| 1681753 | LIFT DEICER | MCB | 2 | | 8 |
| 1681758 | OUTRIGGER | MCB | 6 | | 8 |
| 1681763 | 28 TELE DEICER | MCB | 2 | | 3 |
| 1681631 | 44" TELE 600BT | MCB | 1 | | 2 |
| 1681969 | O & D | MCB | 3 | | 25 |
| 1682026 | OUTRIGGER | MCB | 3 | | 7 |
| 1682026 | JACK | MCB | 10 | | 12 |
| 1682126 | O & D | MCB | | | 7 |
| 1682467 | FRONT BUMPER | MCB | 3 | | 13 |
| 1682484 | A FRAME | MCB | 20 | | 56 |
| 1682484 | 31" TELE | MCB | 0 | | 1 |
| 1682605 | 47" TELE (1683332) | MCB | 6 | | 3 |
| 1682623 | JACK | MCB | 6 | | 20 |
| 1682832 | O&D EXTEND | MCB | 12 | | 12 |
| 1682834 | JACK | MCB | 4 | | 15 |
| 1683000 | O&D EXTEND | MCB | 2 | | 10 |
| 1683001 | 38" TELE | MCB | 2 | | 8 |
| 1683041 | 85" TELE | MCB | 5 | | 20 |
| 1683226 | 70" TELE | MCB | 2 | | 36 |
| 1683228 | 65" TELE | MCB | 1 | | 10 |
| 1683231 | 114" TELE | MCB | 0 | | 4 |
| 1683233 | 84" TELE | MCB | 0 | 2 | 6 |
| 1683235 | 61" TELE | MCB | 4 | | 30 |
| 1683305 | 56" TELE | MCB | 2 | | 23 |
| 1683922 | 77" TELE | MCB | 2 | | 4 |
| 1683338 | 59"6" TELE | MCB | 1 | 1 | 20 |
| 1683342 | 47" TELE | MCB | 2 | | 3 |
| 1683344 | SWING CAB TELE | MCB | 0 | | 10 |
| 1683374 | | MCB | 1 | | |
| | | | 101 | 3 | 374 |

## SERVICE CYLINDERS

| PART # | DESCRIPTION | PRESENT SUPPLIER | 5/14/96 QTY ON HAND MHD | 5/14/96 QUANTITY AT MCB | ADDITIONAL QTY NEEDED FROM MCB BY SEPT '96 |
|---|---|---|---|---|---|
| 1680264 | O/R, JACK | MCB | | 0 | 1 |
| 1680398 | CYL, STEER | MCB | | 0 | 2 |
| 1680266 | O/R, JACK | MCB | | 0 | 1 |
| 16812885 | ROD ASSM (SERV) | MCB | | 0 | 1 |
| 16816295 | ROD ASSM (SERV) | MCB | | 0 | 1 |
| 1682062 | TELE | MCB | | 0 | 1 |
| 1682062 | TELE | MCB | | 0 | 3 |
| 1682063 | TELE | MCB | | 0 | 3 |
| 1682067 | 7S TELE, 1700BT | MCB | | 0 | 2 |
| 1682068 | TELE | MCB | | 0 | 3 |
| 16824735 | BARREL WELD | MCB | | 0 | 1 |
| 16827705 | ROD WELD | MCB | | 0 | 1 |
| 1683026 | LIFT 2500J | MCB | | 0 | 1 |

18

SCHEDULE 5.08

Transition Services

Purpose

To document current information systems and general accounting support requirements and responsibilities of JLG Industries, Inc. and the Purchaser of the Material Handling Division during the transition period.

The Purchaser shall assume actual costs ($1,438 per month) for the installed T1 communication line between JLG Corporate Headquarters in McConnellsburg, Pennsylvania and the Material Handling Division located near York, Pennsylvania, beginning the day following closing and transfer of ownership.

The Purchaser shall assume actual costs for maintenance contracts covering installed PC's, printers ($364 per month) and Data Net data collection terminals ($48 per month) at the Material Handling Division, beginning the day following closing and transfer of ownership.

JLG will give the service providers notice of termination by JLG of the above services in accordance with the related contracts. Purchaser will be responsible for arranging its own support thereafter. JLG will bill Purchaser for expenses relating to these contracts thereof through the termination period.

Accounting services will be prepared on JLG's current time schedule. JLG will use its chart of accounts numbering scheme. JLG will give Purchaser access to JLG's systems for only Material Handling Division records.

TIME FRAME

The transition period shall begin on the date of closing and shall end 120 days later.

INFORMATION SYSTEMS SUPPORT DEFINITION

Support includes:

- Computer Operator support and hard copy reports as currently being provided to the Division.
- Conversion of JLG file information to Purchaser's file requirements will be provided in a "flat file" format provided by the Purchaser, with the exception of payroll information which will be provided via hard copy.
- JLG and the Purchaser shall each provide a "point-of-contact" person for questions during the entire transition period.

Support does not include:

- Any support for new application development.
- Technical support for the installation of new devices, or the relocation of existing devices, except those devices that will be returned to JLG Industries, Inc.

## GENERAL ACCOUNTING SUPPORT DEFINITION

Support includes:

- **Payroll** - JLG will provide Purchaser with employee time records or a check register that details employee data. JLG will provide Purchaser with information to make payroll tax deposits.

- **Accounts Payable** - JLG will provide Purchaser a report of open invoices and, upon request, a cash requirements report detailing payment requirements. JLG will process invoices and provide Purchaser a list of invoices posted. Unless otherwise notified, JLG will follow its normal procedures in processig invoices for payment.

- **Accounts Receivable** - JLG will provide Purchaser a weekly aging. JLG will generate customer invoices and post cash receipts information provided by Purchaser.

- **General Ledger** - JLG will provide Purchaser a monthly trial balance and supporting detail. For information that is not provided by JLG's systems, Purchaser will provide journal entries in JLG's format. JLG will print departmental expense reports in JLG's current format.

- **Fixed Assets** - JLG will not maintain a detailed fixed assets register. JLG will supply the Purchaser with a list of assets as of the closing date.

- **After Services End** - JLG will provide Purchaser general ledger detail for the time period JLG maintained records for the Material Handling Division.

Support does not include:

- Collecting cash
- Payment of payroll and vendor disbursements
- Preparation of financial statements
- All tax calculations, support or deposits

SCHEDULE 6.03

Product Models

Model 1000P Crane
Model 1500P Crane
Model 1200T Crane
Model 1450T Crane
Model 1500T Crane
Model 2000T Crane
Model 1500SD Crane
Model 1500UC Crane
Model 2200UC Crane
Model 685 Crane
Model 686 Crane
Model 755 Crane (also referred to as Model 85M Crane)
Model 886 Crane
Model 8812 Crane
Model 8875 Crane

SCHEDULE 6.04

Intellectual Property

**Patents**

| Case No. | Title | Country | Registration/ Application No. | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| 123 | Telescopic Boom Construction | U.S. Canada | 4,406,375 1,182,076 | 9/27/83 2/5/85 | 9/27/00 2/5/02 |
| 125 | Boom Limit Safety Control System (with Back-Up System) | Canada S. Africa | 1,201,793 81/3798 | 3/11/86 6/30/82 | 3/11/03 6/8/01 |

SCHEDULE 7.02

Closing Deliveries

See attached Closing Checklist

F:\USERS\545\POWERSCR\CHK.LST

POWERSCREEN USC INC.

Acquisition of Assets of
the Materials Handling Division
of JLG Industries, Inc.

CLOSING CHECKLIST

1.   Assets Purchase Agreement to be signed by:

Powerscreen USC Inc. ("Powerscreen")
Powerscreen International PLC ("International")
JLG Industries, Inc. ("JLG")
Fulton International, Inc. ("Fulton")

2.   Bill of Sale to be signed by:

*    JLG

Attachments:

*    Schedule A    - Equipment
*    Schedule B    - Inventory
*    Schedule C    - Permits

3.   Vehicle transfer documents for the Vehicles to be signed by:

*    JLG; and
*    Powerscreen.

4.   Assignments of Conveyed Intellectual Property to be signed by:

*    JLG/Fulton; and
*    Powerscreen.

5.   Assignment of Assumed Contracts to be signed by:

*    JLG; and
*    Powerscreen.

Attachment:

*    Exhibit A    -    List of Assumed Contracts.

6.   Requests for Consents to Assignment from:

*    Rasna;
*    Print-O-Stat;
*    Marlin Industrial Division, Inc.;
*    Quality Copy Products; and
*    IBM

7.   Certificates of Amendment of the Certificates of Incorporation
of USTC, USTC Indiana, Inc. and US Truck Cranes, Inc.
amending name.

8.  Pennsylvania Assumed Name filings to be signed by:

    *   Powerscreen.

9.  Environmental Permits and Licenses.

10. Opinions of Brown, Todd & Heyburn PLLC re Powerscreen and of Andrew Harris re International.

11. Officers' Certificate of Powerscreen to be signed by:

    *   Barry Cosgrove as President; and
    *   Shay McKeown as CEO.

12. Certified Resolution of Powerscreen to be signed by:

    *   Shay McKeown as CEO;
    *   Barry Cosgrove as President;
    *   Patrick Devlin as Secretary/Treasurer; and
    *   Jay Tannon as Assistant Secretary.

13. Delaware Certificate of Good Standing for Powerscreen.

14. Pennsylvania Certificate of Authority for Powerscreen.

15. Opinion of Covington & Burling re JLG and Fulton.

16. Officers' Certificate of JLG to be signed by:

    *   Tom Singer as VP, Gen Counsel & Secretary; and
    *   David Black as Chairman, President & CEO.

17. Certified Resolution of JLG to be signed by:

    *   Tom Singer.

18. Pennsylvania Certificate of Good Standing for JLG.

19. Pennsylvania Certificate of No Tax Due for JLG.

20. UCC-3 Termination Statements from:

    *   Department of Commerce: 036140;
    *   Department of Commerce: 93-ST-01238-01.

22. Escrow Agreement to be signed by:

    *   JLG;
    *   Powerscreen; and
    *   PNC Bank

23.  Indenture to be signed by:

 * JLG; and
 * Powerscreen.

24.  Tax Exemption Certificates.

25.  Agreements regarding soil disposal and NPDES.

26.  Wire to JLG account at First National Bank of Maryland $10,954,341.80 (Preliminary Purchase Price less adjustment for escrow of $250,000.00, cash requirement of $750,000.00 and real estate transfer and ad valorem taxes).

27.  $750,000 wire to Powerscreen account at PNC Bank, York.

28.  $250,000 wire to PNC Bank, Kentucky as escrow agent.

29.  IISA filing for Powerscreen and International.


 *   Resolve division of motor vehicle taxes post-closing.

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS POWERSCREEN USC., INC., POWERSCREEN INTERNATIONAL PLC, and TEREX CORPORATION |
|---|---|
| JLG INDUSTRIES, INC. | |

**(b)** County of Residence of First Listed Plaintiff  Fulton
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Jefferson
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) 302-504-7840
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Ave., Suite 750, Wilmington, DE 19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☒☒ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332

Brief description of cause:
contractual indemnification

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE  Chief Judge Sue L. Robinson

DOCKET NUMBER  06-50 SLR (now dismissed)

DATE
11/2/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 8 - 6 7 7 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___4___ COPIES OF AO FORM 85.

_11-2-06_____          _____
(Date forms issued)              (Signature of Party or their Representative)

                           ___Ben Lougheed_____
                           (Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

## MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
### ATTORNEYS AT LAW

RICHARD MONTGOMERY DONALDSON
Admitted in Delaware, Pennsylvania & New Jersey

DIRECT DIAL
302-504-7840

rdonaldson@mmwr.com

300 DELAWARE AVENUE, SUITE 750
WILMINGTON, DE 19801
302-504-7800
Fax 302-504-7820

123 SOUTH BROAD STREET
AVENUE OF THE ARTS
PHILADELPHIA, PA 19109
215-772-1500
Fax 215-772-7620

LIBERTYVIEW
457 HADDONFIELD ROAD, SUITE 600
CHERRY HILL, NJ 08002
856-488-7700
Fax 856-488-7720

1235 WESTLAKES DRIVE, SUITE 200
BERWYN, PA 19312
610-889-2210
Fax 610-889-2220

220 WEST GAY STREET
WEST CHESTER, PA 19380-2934
610-350-3150
Fax 610-430-8718

November 2, 2006

*BY HAND DELIVERY*
Dr. Peter T. Dalleo
Clerk of the Court
U.S. District Court for the District of Delaware
844 N. King Street, Room 4209
Lockbox 18
Wilmington, DE 19801

Re:  **JLG Industries, Inc. v. Powerscreen USC, Inc. et al.** (*newly filed action*)
     *Prior Related Action*:  **JLG Industries, Inc. v. Powerscreen USC, Inc. et al, 06-50 - SLR**

Dear Dr. Dalleo:

Enclosed for filing are the originals of the following:

- Case Information Statement
- Summons, Complaint and Exhibits
- Rule 7.1 Statement, and
- Check in the amount of $350.00.

Also enclosed is a disk containing the above in .pdf format.

We note that this action involves the same parties and contract indemnity obligations that were at issue in an earlier action (C.A. No. 06-50 SLR). The earlier action was settled and dismissed on June 28, 2006. We bring this to the Court's attention as it may be desirable to for this case to be assigned to Chief Judge Robinson as well.

Respectfully yours,

R. Montgomery Donaldson

RMD/saa
Enclosures
cc:    The Honorable Sue L. Robinson (w/o encls.)
       Rosanna DiMeo, Case Manager (w/o encls.)